UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DISTRICT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:14CR00175 AGF (DDN) |
| | ) | |
| MARK PALMER, | ) | |
| SAMUEL LEINICKE, | ) | |
| CHARLES WOLFE, a/k/a "Chuck Wolfe," | ) | |
| ROBERT WOLFE, and | ) | |
| JOSEPH GABRICK | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND MOTION FOR BILL OF PARTICULARS**

Comes now the United States of America, by and through its attorneys, Richard G. Callahan, United States Attorney for the Eastern District of Missouri, and James C. Delworth, Jennifer Winfield, and Erin Granger, Assistant United States Attorneys for said District, respectfully submits this omnibus response to Defendants' motions.

## I.   INTRODUCTION

Beginning in 2011, law enforcement was confronted with a dramatic rise in the "designer" drug industry whereby individuals manufactured and distributed synthetic drugs commonly known on the street as "K2," "Spice," and "bath salts."   Manufacturers of these products spray a synthetic compound chemically similar to tetrahydrocannabinol (the psychoactive ingredient in marijuana) on to a mixture of organic carrier medium such as Damiana.   These products posed an imminent hazard to the public.   Users of these products reported effects similar to Schedule I controlled substances, but many times greater, including hallucinations, paranoia, panic attacks,

1

increased heart rate and increased blood pressure.   As a result of ingesting these substances, many people overdosed and were hospitalized.

In an attempt to circumvent enacted federal laws, the defendants began manufacturing and distributing these synthetic cannabinoid and cathinone products.   The chemical structure of these products was substantially similar to the chemical structure of Schedule I Controlled Substances and had substantially similar pharmacological effects on the central nervous system.   Defendants Mark Palmer and Anthony Palmer would import synthetic drug chemicals from countries such as China.   These chemicals included controlled substances and controlled substance analogues.   In an effort to avoid detection by law enforcement, these chemicals were affixed with misleading labels.   In order to create synthetic drugs, defendants Mark Palmer, Anthony Palmer and Samuel Leinecke would liquefy these chemicals through a process of adding denatured alcohol or acetone and then spray the chemical on herbs.   They would then add flavorings to the drugs.

The defendants named these products *inter alia* "Avalon," "Bizarro," "Grave Digger," and "Devil's Dank."   The defendants also mislabeled these products.   The packaging did not identify any ingredients or provide directions for use.   Further, the defendants began labeling these products as "not for human consumption," in direct response to the Controlled Substance Analogue Enforcement Act's reference to a controlled substance analogue being intended "for human consumption."   The defendants were aware that individuals were ingesting these products to get high.   In an attempt to avoid federal drug scheduling regulations, they would change the chemicals to stay ahead of DEA scheduling.   These new chemicals produced synthetic drugs with the same physiological effect which mimicked the high of a controlled substance.

2

Defendants Mark Palmer, Anthony Palmer, Samuel Leinicke, and Joseph Gabrick used a manufacturing lab in Barnhart, Missouri to manufacture and bag these synthetic drugs. They also used several storage lockers to store the synthetic drugs.

Defendant Mark Palmer and Charles Wolfe entered into an agreement wherein Charles Wolfe would distribute these packaged synthetic drugs to other wholesalers and retail establishments.   Robert Wolfe and Joseph Gabrick assisted Charles Wolfe in these sales. Charles Wolfe, Robert Wolfe, and Joseph Gabrick were also aware that individuals were using these products to get high.   Mark Palmer, Charles Wolfe, Robert Wolfe, and Joseph Gabrick also engaged in monetary transactions through the use of a financial institutions which disguised the nature of the proceeds.   These proceeds were derived from the sale of controlled substances and controlled substance analogues.

**Procedural History**

On May 21, 2014, a federal grand jury returned an indictment charging all five[1] defendants with conspiracy to distribute and to possess with the intent to distribute Schedule I controlled substances and Schedule I controlled substance analogues intended for human consumption as provided in Title 21, United States Code § 813, all in violation of 21 U.S.C. §§841(a)(1) and 846, and conspiracy to introduce misbranded drugs into interstate commerce in violation of 21 U.S.C. §§ 331(a), 333(a)(2) and 371.   Defendants Mark Palmer, Charles Wolfe, Robert Wolfe, and Joseph Gabrick were also charged with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1957 and 1956(h).   Mark Palmer was further charged with conspiracy to import Schedule I controlled substances and Schedule I controlled substance analogues intended for human consumption, in violation of 21 U.S.C. §§ 952, 960(a)(1), 960(b)(3), and 963 and

---

[1] Anthony Palmer was also charged in this indictment.   On October 5, 2015, Anthony Palmer filed a waiver of motions.   He is referenced in this motion only to provide context to the conspiracy.

3

conspiracy to facilitate the transportation of merchandise knowing the merchandise has been imported with false documents, in violation of 18 § U.S.C. 545.

This indictment included an extensive description of the Manner and Means of the conspiracy, as well as overt acts committed by the defendants, co-conspirators, and others in furtherance of the conspiracy.   See Docs. 1 and 2.

On October 8, 2015, Defendants filed a joint motion to dismiss the indictment as unconstitutionally void for vagueness (Doc #181), a motion to dismiss count one of the indictment on the grounds that it fails to state an offense and that 21 U.S.C. §§ 813 and 802 (32)(A) are unconstitutionally vague (Doc #182), a motion for bill of particulars (Doc #184), and a motion to dismiss count one with memorandum in support (Doc #185).

This memorandum constitutes the United States' omnibus response to the motions raised by defendants Mark Palmer, Samuel Leinicke, Charles Wolfe, Robert Wolfe, and Joseph Gabrick.

II.    **THE INDICTMENT IS NOT UNCONSITUTIONALLY VOID FOR VAGUENESS**

Defendants argue that the indictment is unconstitutionally void for vagueness because it does not provide a person with ordinary intelligence a reasonable opportunity to know what conduct is prohibited.

"[A]n indictment adequately states an offense if it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution."   United States v. Mann, 701 F.3d 274, 288 (8th Cir. 2012) (internal quotations omitted).   The Eighth Circuit has held that "an indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge

the offense for which the defendant was convicted." Id. at 288.   In United States v. Sewell, 513 F.3d 820, 821 (8th Cir. 2008), the court concluded that "an indictment is normally sufficient if its language tracks the statutory language."

There is well-developed case law establishing the standards for reviewing a claim that a statute is constitutionally "void for vagueness."   "The doctrine whereby statutes are found void for vagueness developed in part to ensure that poorly drafted or overly vague statutes are not used to ensnare the innocent."   United States v. Derezinski, 945 F.2d 1006, 1010 (8th Cir. 1991).   A statute must provide "the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and should not "trap the innocent by not providing fair warning."   Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).

To determine whether a statute is void for vagueness, the Court can apply a two-part test. First, the statute must provide adequate notice of the proscribed conduct.   Second, the statute must not lend itself to arbitrary enforcement.   United States v. Bamberg, 478 F.3d 934, 937-38 (8th Cir. 2007) (citing Kolender v. Lawson, 461 U.S. 352, 357 (1983).   In evaluating a statute under the "void for vagueness" doctrine, the Court's starting point should be the "presumptive validity of the statute."   United States v. Ghane, 673 F.3d 771, 777 (8th Cir. 2012).   The void for vagueness "…inquiry looks at what a person of 'common intelligence' would 'reasonably' understand the statute to proscribe, not what the particular defendant understood the statute to mean."   United States v.Washam, 312 F.3d 926, 930 (8th Cir. 2002) (quoting United States v. Nat'l Dairy Prods. Corp., 372 U.S. 29, 32-33 (1963)).

Previously, courts in the Eighth Circuit have been faced with constitutional vagueness challenges to the Analogue Act.   The Eighth Circuit has consistently found the Analogue Act to be constitutional and not void for vagueness.   See, e.g., United States v. Berger, 553 F.3d 1107,

1110 (8th Cir. 2009) ("the statute is not unconstitutionally vague"); Washam, 312 F.3d at 926;

United States v. Orchard, 332 F.3d 1133, 1138 (8th Cir. 2003) ("the statute is not void for

vagueness").    Support for the Eighth Circuit exists almost uniformly among other circuits.    See

also United States v. Ansaldi, 372 F.3d 118, 122 (2nd. Cir. 2004); United States v. Roberts, 363

F.3d 118, 127 (2nd Cir. 2004); United States v. Klecker, 348 F.3d 69, 71-72 (4th Cir. 2003)

("courts of appeals have unanimously rejected vagueness challenges to the Analogue Act.");

United States v. Desurra, 865 F.2d 651, 653 (5th Cir. 1989); United States v. Granberry, 916 F.2d

1008, 1010 (5th Cir.1990) (ruling that the CSA's Analogue Provision is "clearly and specifically

defined, in terms readily comprehensible to the ordinary reader... There is nothing vague about the

statute"); United States v. Hofstatter, 8 F.3d 316, 321 (6th Cir. 1993); United States v. Turcotte,

405 F.3d 515,531 (7th Cir. 2005) ("The circuit courts considering this issue have unanimously

held that the CSA's Analogue Provision is not unconstitutionally vague"); and United States v.

Fisher, 289 F.3d 1329, 1339 (11th Cir. 2002), cert. denied, 537 U.S. 1112 (2003).

Defendants contend that the Analogue Act, 21 USC § 813 is void for vagueness because

the statute contains the words "substantially similar."    Defendants argue that "a person of average

intelligence will not know whether a substance has a chemical structure substantially similar to a

scheduled drug." (Doc. 181 at 6).

It is well established that where "terms used in a statute are undefined, we give them their

ordinary meaning."    Jones v. United States, 529 U.S. 848, 855 (2000).    In looking at the phrase

"substantially similar," the Court must be aware that the phrase does not hinge on how a scientist

would interpret the term, but how ordinary people will use the language.    In other words, the

Court should look to the questioned terms and determine whether an individual of common

intelligence would be able to understand what conduct has been prohibited.    Experts' differing

opinions on "substantially similar" does not render the statute vague.   Instead, the testimony should be evaluated by the trier of fact.

In United State v. McKinney, 79 F.3d 105, 108 (8th Cir. 1996), vacated on unrelated grounds 520 U.S. 1226 (1997), the court rejected the argument that there must be a scientific consensus to defeat a vagueness challenge.   The court concluded that a reasonable layperson has the ability to examine a chemical charge and intelligently decide whether the chemical structure of two substances were substantially similar.   Id.   Similar to McKinney, other courts have found that the term "substantially similar" is not vague.   See Hofstatter, 8 F.3d at 321 ("substantially similar" is "sufficiently precise to enable the ordinary person in the position of [the defendants] to know that [chemicals]…should not be possessed for the purpose of manufacturing, for human consumption, substances similar to [controlled substances]");   United States v. Brown, 279 F.Supp.2d 1238, 1241 (S.D. Ala. 2003) (examining dictionary definitions of the terms "substantial" and "similar" and concluding that "it is apparent to the court that the phrase 'substantially similar,' as contained in the Analogue Act, does not hinge on how a scientist would interpret the term, but how ordinary people use the language."); United States v. Niemoeller, 2003 WL 1563863 *1, *4 (S.D. Ind. 2003) ("The key concepts in the Controlled Substance Analogue Act – substantial similarity of chemical structure and substantial similarity of stimulant, depressant, or hallucinogenic effects – provide significant guidance for both law enforcement and citizens who seek to comply with the law.   Those concepts may not provide absolute certainty in every case in which a person seeks to experiment in reaching the outermost boundaries of lawful conduct, but that is not the standard for due process.   On its face, the statute gives fair notice to persons of average intelligence of the conduct proscribed.")

Defendants argue that the recent holding in United States v. Johnson, 135 S. Ct. 2551, (2015) provides fresh support for the argument that the term "substantially similar" is vague. Defendant's reliance on Johnson however, is misplaced.   In Johnson, the Supreme Court held that the residual clause of the Armed Career Criminal Act of 1984 (ACCA), 18 U.S.C. § 924(e)(2)(B)(ii), is unconstitutionally vague.   It is important to note that Johnson did not strike the entire Armed Career Criminal Act.   Instead, Johnson struck the residual clause which defines "violent felony" to include an offense that "involves conduct that presents a serious potential risk of physical injury to another."   18 U.S.C. § 924(e)(2)(B)(ii).   The Court held that this residual clause violated the Due Process Clause because it is impermissibly vague on its face.   The Court noted that the clause was "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement."   135 S. Ct. at 2556.   It is unconstitutionally vague because it combines "indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony."   Id. at 2558.

In clarifying its concerns, the Court explained that the residual clause requires courts to assess whether a crime presents a serious potential risk of injury in light of a list of enumerated offenses which are "far from clear in respect to the degree of risk each poses."   Id.   The Court was concerned that the assessment was tied to considering risk in an "ordinary case," but without accounting for "real-world facts or statutory elements."   Id. at 2557.   The Court found that the inability of its own cases to develop a "principled and objective standard" demonstrates the ACCA's residual clause's "hopeless indeterminacy."   Id.   The clause both denies fair notice to defendants and invites arbitrary enforcement by judges.   Id. at 2557.   It was this combination of factors that convinced the Johnson Court to find the ACCA's residual clause vague.

Johnson's holding is limited.    Critical to the Johnson decision is the Court's unwillingness to question the application of the ACCA to the remainder of the Act's definition of a violent felony which includes a felony offense "that has an element the use, attempted use, or threatened use of physical force against the person of another,"    18 U.S.C. § 924(e)(2)(B)(i) and a felony offense that "is burglary, arson, or extortion [or] involves the use of explosives," 18 U.S.C. § 924(e)(2)(B)(ii).   Id. at 2563.   The holding also does not disturb the ACCA's definition of "serious drug offense."   18 U.S.C. § 924(e)(2)(A).

In addition to these definitions, Johnson does not support vagueness challenges to other guidelines.   In Johnson, the Court distinguished provisions whose application depends on the defendant's actual conduct, stating that it "d[id] not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct." Johnson, 135 S. Ct. at 2561.   The Court enumerated several factors unique to the residual clause that combined to render the provision a "black hole of confusion and uncertainty," Id. at 2562, including that the residual clause required courts to evaluate the degree of risk in a hypothetical "ordinary case," without accounting for "real-world facts."   Id. at 2557.

The concerns in Johnson are not present in the instant case.   The Analogue Act provides fair notice to ordinary people and does not invite arbitrary enforcement.   It is clear from the language in 21 U.S.C. § 802 (32)(A) that in order for a substance to be classified as a controlled substance, it must meet the strict definition.   First, the substance must have a chemical structure that is substantially similar to the chemical structure of a controlled substance in schedule I or II. Second, the substance must have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule  I or II;

**or** a person represents or intends the substance to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.   Such language cannot be said to cause a "black hole of confusion and uncertainty" that was found in <u>Johnson</u>.   <u>Id</u>. at 2562

The holding in <u>Johnson</u> does not advocate a finding that the Analogue Act, which requires courts and juries to assess a defendant's actual conduct, is unconstitutionally vague.   While <u>Johnson</u> held that a statute may be facially vague even though "there is some conduct that clearly falls within the provision's grasp," <u>Id</u>. at 2561, it did not hold that any possibility of a vague application requires finding a statute to be void for vagueness.   Facial vagueness challenges should be reserved for statutes that "simply ha[ve] no core," "in the sense that no standard... is specified at all."   <u>Smith v. Goguen</u>, 415 U.S. 566, 577-578 (1974).

In applying <u>Johnson</u>, it is significant to note that approximately two weeks before it was decided, the Supreme Court decided <u>United States v. McFadden</u>, 135 S. Ct. 2298 (2015).    In its analysis, the Court addressed the issue of the instant statute's vagueness.   In <u>McFadden</u>, the Court was tasked with determining the required intent element in a controlled substance analogue prosecution.   The Court noted that knowledge may be met by showing that the defendant knew he possessed a substance listed on the schedules or the defendant knew the identity of the substance he possessed, even if he does not know it is scheduled.   As an example, the Court discussed how an individual could be guilty if he knows that he is distributing heroin even if he does not that know that heroin is listed on the schedules. ("Ignorance of the law is typically no defense…").   <u>Id</u>. at 2304.

The Court found that the scienter requirement in the Analogue Statute does not render the statute vague." McFadden, 135 S. Ct. at 2307. The Court also clarified that a defendant does not need to know that the Analogue Act exists to know that he is dealing with a controlled substance. Id. at 2305. The Court referred to the statute as "unambiguous" and noted that a scienter requirement in the statute "alleviate[s] vagueness concerns," "narrow[s] the scope of the [its] prohibition[,] and limit[s] prosecutorial discretion." Gonzales v. Carhart, 550 U.S. 124, 149-50 (2007). This language from McFadden is helpful to this Court in addressing any vagueness challenges.

Defendant is asking this Court to swim against well-established caselaw which has held that the Analogue Act and its' inclusion of the phrase "substantially similar" is not void for vagueness. Defendants' arguments however, are not novel and do not overcome prior court holdings. The statute provides adequate notice of the proscribed conduct and does not lend itself to arbitrary enforcement. Thus, this Court should deny the Defendants' motion to dismiss the indictment as unconstitutionally void for vagueness.

## III.   THE INDICTMENT STATES AN OFFENSE AND 21 U.S.C. § 812(c)(d)(2)(A) IS NOT IN CONFLICT WITH 802(32)(A)

Defendants seek to dismiss count one of the indictment on the grounds that 21 USC § 813 and 21 U.S.C. § 802(32)(A) are unconstitutionally vague. In the alternative, Defendants request that the Court dismiss certain substances from the indictment including AKB48, APINACA, XLR-11, 5-flouro-UR-144, UR-144, and 5F-PB-22. Defendants argue that these substances are analogues of JWH-018 which is a "cannabimimetic agent" as defined by 21 U.S.C. § 812(c)(d)(2)(A). Defendants maintain that the definition of "cannabimimetic agents" as found in 21 U.S.C. § 812(c)(d)(2)(A) is in conflict with the provisions of the Analogue Act. As a result of the inclusion of cannabimimetic agents as Schedule I controlled substances, prosecution under the

Analogue Act is no longer feasible.   Under Defendants' theory, the prosecution of these

substances as controlled substance analogues must yield to the definition of "cannabimimetic

agents" and cannot be analyzed under the provisions of the Analogue Act.   Defendants however,

misunderstand the basic construction of the statute and the purpose of the Analogue Act.   As

explained below, 21 U.S.C. § 802(32)(A) and 21 U.S.C. § 812(c)(d)(2)(A) are not in conflict with

another.

      The background of the Analogue Act is illustrative to this Court to help understand these

statutes which were designed to combat a serious drug problem.   Enacted in 1986, the Analogue

Act was intended to address "underground chemists who tinker with the molecular structure of

controlled substances to create new drugs that are not scheduled."   United States v. Forbes, 806 F.

Supp. 232, 236 (D. Colo. 1992).   As explained by the Eighth Circuit in McKinney, "[b]ecause

manufacturers of illegal drugs have become adept at tinkering with the molecular structure of

[scheduled] controlled substances while retaining the effects that those substances produce, the

analogue statute is aimed at prohibiting innovative drugs before they are specifically listed in the

schedules as controlled substances."   McKinney, 79 F.3d at 107.   Prior to the Controlled

Substance Analogue Enforcement Act, unlawful conduct with regard to drug trafficking was tied

to "precise chemical definitions," and "law enforcement authorities ha[d] long found themselves at

least one step behind drug dealers who possess certain rudimentary scientific abilities." S. Rep.

No. 99-196, at 1 (1985).   That underground chemists could "evade our Nation's drug laws" by

making "minor alterations in the molecular structure of a controlled substance" was viewed as a

"loophole" in the Controlled Substances Act.   Id. at 1-2.

      Accordingly, the purpose of the Act was to "prohibit persons who specifically set out to

manufacture or to distribute drugs which are substantially similar to the most dangerous controlled

substances from engaging in this activity."   Forbes, 806 F. Supp. at 235 (quoting S. Rep. No.

99-196, at 5 (1985)).   Courts have recognized that this was the Act's purpose.   See, e.g., United

States v. Turcotte, 405 F.3d at 526; United States v. Washam, 312 F.3d at 933 ("One of Congress'

purposes for passing the Analogue Statute was to prohibit innovative drugs that are not yet listed as

controlled substances.").

　　　The Controlled Substance Analogue Enforcement Act equates such controlled substance

analogues "to the extent intended for human consumption" with Schedule I Controlled Substances

for purposes of all federal laws.   These laws include those in the Controlled Substances Act

prohibiting importation, possession with the intent to distribute, and distribution of controlled

substances, as well as conspiracies to engage in such conduct.   It is important to note that with the

constant evolving of designer drugs, the Analogue Act does not specifically list the chemicals and

substances that are controlled substance analogues.   See United States v. Klecker, 228 F. Supp. 2d

720, 726 (E.D. Va. 2002).   "Given the creativity of amateur chemists, such a list might well be

impossible to compile."   United States v. Hofstatter, 8 F.3d at 322.   Rather, the Act sets forth

requirements for a substance to be deemed a controlled substance analogue.

　　　As stated above, the Act defines a controlled substance analogue as a substance:

　　(i)　　the chemical structure of which is substantially similar to the chemical structure of

　　　　　a controlled substance in schedule I or II;

　　(ii)　　which has a stimulant, depressant, or hallucinogenic effect on the central nervous

　　　　　system that is substantially similar to or greater than the stimulant, depressant, or

　　　　　hallucinogenic effect on the central nervous system of a controlled substance in

　　　　　schedule I or II; or

　　(iii)　　with respect to a particular person, which such person represents or intends to have

a stimulant, depressant, or hallucinogenic effect on the central nervous system that

is substantially similar to or greater than the stimulant, depressant, or

hallucinogenic effect  on the central nervous system of a controlled substance in

schedule I or II.

21 U.S.C. § 802(32)(A).

In order to convict a defendant of an offense involving an alleged controlled substance

analogue, the government must satisfy these analogue proof requirements.   The Government

must prove both that the substance satisfies the definition of "controlled substance analogue" and

that the defendant intended the substance for human consumption.   These requirements have been

in place since the Analogue Act was passed in 1986.

Following the passage of the Analogue Act, individuals continued to make minor

alterations to the molecular structure of a controlled substance to evade federal laws.   Over the

last thirty years, synthetic cannabinoids have been developed for research purposes to investigate

the cannabinoid system.   See 75 FR 71636.   In the mid- 1990's, synthetic cannabinoids such as

JWH-018[2] were evaluated to further advance the understanding of drug-receptor interactions

regarding the cannabinoid system.   76 FR 11075-11076.   These substances were never intended

to be used for any other purpose than research.   157 Cong. Rec. S1830 (2011).   Although

synthetic cannabinoids such as JWH-018 were not intended for human consumption, underground

chemists began using this substance and others as a vehicle for people to get high.   These

substances had the potential to be extremely harmful due to their method of manufacture and their

high pharmacological potency.   76 FR 11076.

In response to these newly enacted substances, on March 1, 2011, DEA published a final

---

[2]  JWH-018 is a cannabinoid which was developed by Clemson University Professor John W. Huffman.

order temporarily placing five (5) synthetic cannabinoids (including JWH-018) in Schedule I on an emergency basis pursuant to 21 U.S.C. § 811(h).[3]   As a result of this action, JWH-018 was a controlled substance as of March 1, 2011.   As such, it received the full coverage of a Schedule I controlled substance.   Prior to this date, JWH-018 was not a controlled substance nor did it fit the definition of a controlled substance analogue because its chemical structure was not substantially similar to the chemical structure of a controlled substance in schedule I or II.   Following this scheduling, new substances which contained a chemical structure substantially similar to JWH-018 and which had the same or greater pharmacological effects, could be evaluated under the Controlled Substance Analogue Statute.

On March 30, 2011 the Synthetic Drug Control Act was introduced by United States Representative Charlie Dent.   The legislation's purpose was to prohibit harmful synthetic drugs that imitate the hallucinogenic or stimulant properties of drugs such as marijuana, cocaine, or methamphetamine.   On November 22, 2011, House Report 112-295 reported favorably on the amendment to place synthetic drugs in Schedule I.   U.S. House, Committee on Energy and Commerce.   *Synthetic Drug Control Act of 2011* (H. Rpt. 1254).   Recognizing the dangers that these synthetic drugs presented, the report noted that these drugs "are a serious public health problem, and unfortunately, the use of these substances is increasing dramatically."   Id. at 3.   The report referenced families who have "witnessed firsthand that these designer drugs are anything but harmless… the use of these drugs has resulted in agitation, anxiety, vomiting, nausea, elevated blood pressure, seizures, tremors, hallucinations, paranoia, non-responsiveness, and death."   Id. The Report also stressed that the amendment would include cannabimimetic agents, "chemicals

---

[3] 21 U.S.C. § 811(h) authorizes the Attorney General to add substances to a schedule, to remove substances from a schedule, and to move a substance from one schedule to another.   In turn, the Attorney General has delegated this temporary scheduling power to the DEA as permitted under 21 U.S.C. § 871.

that are commonly known as synthetic drugs."   Doing so would allow the government "to pursue cases involving drug use that it otherwise would not be able to prosecute."   Id. at 5.

On May 24, 2012, these concerns were echoed by the Senate who were deliberating the amendment.   As United States Senator Patrick Leahy stated, the proposed bill recognized the need to control substances which "have no legitimate use and can too easily be obtained under current law… Bath salts have resulted in a number of reports of individuals acting violently in the United States… and have led to injuries."   158 Cong. Rec. 76 (2012).

Following, on July 9, 2012, the Synthetic Drug Abuse Prevention Act ("SDAPA") was signed into law and permanently scheduled certain synthetic compounds, including JWH-018. SDAPA rendered moot any requirement for a Final Order from DEA to permanently place the March 1, 2011 substances, as well as additional substances, into Schedule I.   For purposes of scheduling, controlled substance analogues are treated as schedule I controlled substances.   21 U.S.C. § 813 because these controlled substances have a high potential for abuse and have no currently accepted medical use in treatment in the United States.   In addition, there is a lack of accepted safety for use of these controlled substances under medical supervision.   See 21 U.S.C. § 812(b)(1).

In addition, SDAPA also scheduled an entire class of "cannabimimetic agents," obviating the need for further Agency action regarding scheduling of these substances.   21 U.S.C. § 812(c)(d)(1), states that "unless specifically exempted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of cannabimimetic agents… is possible within the specific designation" which here, is a Schedule I controlled substance.   "The term 'cannabimimetic agents' means any substance that is a cannabinoid receptor type 1 (CBI receptor) agonist as demonstrated by binding studies and functional assays within any

16

of the following structural classes:

(i)  2-(3-hydroxycyclohexyl)phenol with substitution at the 5-position of the phenolic ring by alkyl or alkenyl, whether or not substituted on the cyclohexyl ring to any extent.

(ii)  3-(1-naphthoyl)indole or 3-(1-naphthylmethane)indole by substitution at the nitrogen atom of the indole ring, whether or not further substituted on the indole ring to any extent, whether or not substituted on the naphthoyl or naphthyl ring to any extent.

(iii)  3-(1-naphthoyl)pyrrole by substitution at the nitrogen atom of the pyrrole ring, whether or not further substituted in the pyrrole ring to any extent, whether or not substituted on the naphthoyl ring to any extent.

(iv)  1-(1-naphthylmethylene)indene by substitution of the 3-position of the indene ring, whether or not further substituted in the indene ring to any extent, whether or not substituted on the naphthyl ring to any extent.

(v)  3-phenylacetylindole or 3-benzoylindole by substitution at the nitrogen atom of the indole ring, whether or not further substituted in the indole ring to any extent, whether or not substituted on the phenyl ring to any extent."

21 U.S.C. § 812(c)(d)(2)(A).

Such term includes *inter alia* JWH-018, JWH-073, JWH-250, JWH-122, and AM-2201. These are all Schedule I drugs.   Although this legislation codified JWH-018 and other substances as Schedule I controlled substances, it did not replace the necessity of the Analogue Act. Contrary to Defendants' assertions, 21 U.S.C. § 813 and 21 U.S.C. § 802(32)(A) do not conflict with 21 U.S.C. § 812(c)(d)(2)(A).   21 U.S.C. § 812(c)(d)(2)(A) provides a necessary distinction for purposes of scheduling controlled substances.   There is no conflict in the statutory scheme as a result of the definition of "cannabimimetic agents" differing from the definition of controlled substance analogue under 21 U.S.C. § 802(32)(A).   Indeed, those substances which fit the definition of "cannabimimetic agents" are controlled substances, not controlled substance analogues.

Defendants claim that four of the substances in the indictment must be stricken because

17

they allege "controlled substance analogues" of specific cannabimimetic agents.   They list those substances as the following:   AKB48 and APINACA, XLR-11 and 5-fluoro-UR-144, UR-144, and 5F-PB-22.   Defendants argue that these substances cannot be analogous to JWH-018 which is classified as a cannabimimetic agent under 21 U.S.C. § 812(c)(d)(2)(A) because these substances do not fall into the same structural class.   Defendants argue that their conduct relating to synthetic drugs must only be analyzed under 21 U.S.C. § 812(c)(d)(2)(A) and that any other analysis runs afoul of statutory construction.   Specifically, defendants maintain that courts should look to whether substances share the same structural class as a cannabimimetic agent rather than analyze such substances under the "substantially similar" definition as found in 21 U.S.C. § 802(32)(A).

As this Court is aware, one of the fundamental principles of statutory construction is that "a reviewing court should not confine itself to examining a particular statutory provision in isolation."   FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33 (2000).   As a result, any revision to the scheduling cannot be read without reference to the actual analogue statute.   Contrary to Defendants' assertions, there is no authority which requires that Defendants' conduct must only be analyzed under 21 U.S.C. § 812(c)(d)(2)(A) as opposed to 21 U.S.C. § 802(32)(A).   Indeed, 21 U.S.C. § 802(32)(A) is the framework for proving whether a substance is a controlled substance analogue.   21 U.S.C. § 812(c)(d)(2)(A) is merely the treatment of certain substances, included cannabimimetic agents, under Schedule I.   The two sections do not contradict each other and can co-exist.

Defendants argue that because AKB48 and APINACA, XLR-11 and 5-fluoro-UR-144, UR-144, and 5F-PB-22 do not share the same structural class as JWH-018, they cannot be treated as controlled substance analogues intended for human consumption.   Although they may not share the same structural class as JWH-018, this does not mean that these substances do not have a

chemical structure which is substantially similar to the chemical structure of JWH-018, which is the requirement to prove a substance is a controlled substance analogues.   "Structural class" and "chemical structure" are two totally different tests.   To adopt Defendants' reasoning that these substances must share the same structural class defeats the purpose of the Analogue Act.   This conclusion would allow chemists to make minor alterations to the molecular structure of a controlled substance and seek haven under 21 U.S.C. § 812(c)(d)(2)(A) because that particular structural class may not be listed.   This action would leave law enforcement authorities one step behind drug dealers who possess certain rudimentary scientific abilities.   In essence, it would allow the very loophole which the Analogue Act is designed to prohibit.

The requirements of 21 U.S.C. § 802(32)(A) do not contradict 21 U.S.C. § 812(c)(d)(2)(A) and comparing those two sections does not result in conflicting statutes which are unenforceable. Whether a disputed substance meets the definition of a controlled substance analogue will be decided by the trier of fact.   Therefore, the Defendants motion to dismiss count one of the indictment on the grounds that 21 USC § 813 and 21 U.S.C. § 802(32)(A) are unconstitutionally vague and their request that the Court dismiss certain substances from the indictment should be denied.

## IV.   DEFENDANTS ARE NOT ENTITLED TO A BILL OF PARTICULARS

Defendants request this Court to direct the Government to file a Bill of Particulars because Defendants believe the Indictment is lacking precise details with respect to perceived critical issues.

"The purpose of a bill of particulars is to inform the defendant of the nature of a charge with sufficient precision to enable him to prepare for trial and to avoid or minimize the danger of surprise at trial."   United States v. Livingstone, 576 F.3d 881, 883 (8th Cir. 2009).   It is not the

19

purpose of a bill of particulars to provide the defendant with evidentiary detail or discovery regarding the government's case.   United States v. Hester, 917 F.2d 1083, 1084 (8th Cir. 1990); United States v. Hill, 589 F.2d 1344, 1352 (8th Cir.), cert. denied, 442 U.S. 919 (1979).

An Indictment must also provide sufficient information to allow the defendant to plead a conviction or acquittal as a double jeopardy bar.   See, e.g. Mann, 701 F.3d at 288. It "is normally sufficient if its language tracks the statutory language."   Sewell, 513 F.3d at 821.   Further, an indictment need not use the specific words of the statute, so long as 'by fair implication' it alleges an offense recognized by law."   United States v. Villarreal, 707 F.3d 942, 957 (8th Cir. 2013) (internal quotation omitted).   In order to determine whether a defendant has received sufficient information to allow him to prepare for trial, a court should consider what information the defendant received from the discovery and the indictment.   United States v. Diaz, 303 F. Supp. 2d 84, 88-89 (D. Conn. 2004) (citation omitted).

In their motion, Defendants request that the Government file a bill of particulars with respect to: 1) which controlled substances and controlled substance analogues apply to which defendants, 2) the timeframe within which Defendants were engaged in any illegal activity, 3) which controlled substance a substance is an analogue of, and 4) the dates that substances were scheduled.

The Government objects to Defendant's request.   The Indictment in this case complies with Rule 7(c) of the Federal Rules of Criminal Procedure in that it contains a plain, concise, definitive statement of the essential facts and elements constituting the offense charged and from which the defendant is sufficiently able to prepare his defense.   Hamling v. United States, 418 U.S. 87, 117 (1974); United States v. Fleming, 8 F.3d 1264, 1265 (8th Cir. 1993); United States v. Matlock, 675 F. 2d 981, 986 (8th Cir. 1982).   The Indictment in this case consists of 19 pages and

contains details of the manner and means of the conspiracy.   In addition to the Indictment, the Government has provided discovery which contains in excess of 1,000,000 pages, which includes, but is not limited to: police reports, lab reports, search warrants, information generated from multiple electronic devices, as well as various seized documents.

Some of the information sought by Defendants such as the dates when certain substances were emergency scheduled are public records and the Government is not obligated to provide such information. There is no case law or other supporting authority which requires that the United States must provide notice of the specific controlled substances to which analogues will be compared to at trial, either in the charging document itself or in a bill of particulars.   Moreover, this request is premature.   To date, the Court has not set a deadline for expert disclosures in this case.   Thus, the United States has not yet been under any obligation to disclose the opinions of its expert witnesses regarding which controlled substances are comparable to the charged analogues. The Government anticipates that in accordance with the Courts' trial orders, it will provide defendants with notice, through the preliminary declarations of DEA experts, of the comparable controlled substances for all analogues charged in the Indictment.

Defendant's additional requests, such as the dates when the defendants engaged in illegal conduct, can be found in the voluminous discovery provided by the Government.   Such discovery has included police reports, search warrants, lab reports, audio statements, videos, and records. On all of these facts, Defendants cannot honestly claim any legitimate concern regarding their ability to prepare for trial.   Thus, their request for a Bill of Particulars should be rejected.

**V.      Count I of the Indictment should not be dismissed in light of United States v.
          McFadden because it contains the elements of the offense**

Finally, Defendants argue that Count I of the Indictment should be dismissed in light of the recent holding in <u>United States v. McFadden</u>.   As explained earlier, an indictment is sufficient if it

includes the elements of the offense, fairly informs the defendant of the charges, and alleges

sufficient information to allow the defendant to plead a conviction or acquittal as a bar to

subsequent prosecution.   United States v. Huggans, 650 F.3d 1210, 1217 (8th Cir. 2011).   "An

indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any

reasonable construction, to charge the offense for which the defendant was convicted."   United

States v. Hayes, 574 F.3d 460, 472 (8th Cir. 2009).   An indictment does not need to use specific

words of a statute "as long as by fair implication it alleges an offense recognized by law."   United

States v. Villareal, 707 F.3d at 957.   An indictment is fatally insufficient when an essential

element "of substance" rather than "of form" is omitted.   Id.   In making the determination

whether an essential element has been omitted, "a court may not insist that a particular word or

phrase appear in the indictment when the element is alleged in a form which substantially states the

element."   United States v. Boykin, 794 F.3d 939, 945 (8th Cir. 2015) (quoting Villareal 707 F.3d

at 957).

        "Challenging an indictment is not a means of testing the strength or weakness of the

government's case, or the sufficiency of the government's evidence."   United States v. Todd, 446

F.3d 1062, 1067 (10th Cir. 2006) (citation omitted).   Contrary to defendants' assertions, an

indictment "need not be charged with the same degree of specificity as would ordinarily be

required in a prosecution."   See United States v. Bedford, 536 F.3d 1148, 1156 (10th Cir. 2008).

In Bedford, the court faced a challenge to an indictment which did not include the word

"interdependent."   Although "interdependent" was not mentioned in the statute, it was a required

element in the Tenth Circuit.   In finding the indictment to be sufficient, the court noted that the

indictment described the interdependent behavior of the coconspirators in the sections entitled

"Manner and Means of the Conspiracy" and "Overt Acts" and ruled the indictment sufficiently

charged Defendant with the elements of conspiracy. Id. at 1157.

In Boykin, the court found an indictment charging the offense of kidnapping to be sufficient even when the indictment failed to include the language "for ransom or reward or otherwise" as found in the statute.   Boykin, 794 F.3d at 946.   Likewise, in United States v. Pemberton, 121 F.3d 1157, 1169 (8th Cir. 1997), the Court found an indictment to be sufficient when the indictment did not include an element of the offense outlined in the statute under which the defendant was charged.   In Pemberton, a co-defendant challenged the sufficiency of an indictment which challenged him under 18 U.S.C. § 666 of stealing from a program receiving federal funds.   The defendant argued that the indictment did not allege that he was an agent which was a required element of the offense.   The court noted that the indictment alleged the co-defendant was the company's attorney during the dates alleged in the indictment and that information was sufficient.   Id. at 1169.

In the case before this Court, Count One charges the defendants with conspiracy to violate 21 U.S.C. §§ 841(a)(1) and 813.   The elements of this offense are as follows:

1. during the time alleged in the indictment, two or more persons reached an agreement or came to an understanding to distribute substances containing detectable amounts of synthetic cannabinoids, all of which at the time were either Schedule I controlled substances or Schedule I controlled substance analogues;

2. that the defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some time while it was still in effect;

3. at the time the defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding; and

4.  that the Scheduled I controlled substance analogues being distributed during the course of the conspiracy were intended for human consumption.

Count One of the indictment states that "Beginning sometime in 2012, and continuing to on or about the date of this Indictment, with the exact dates unknown, in the Eastern District of Missouri and elsewhere, Mark Palmer, Anthony Palmer, Samuel Leinicke, Charles Wolfe, Robert Wolfe, and Joseph Gabrick, the defendants herein, did knowingly and unlawfully combine, conspire, agree, and confederate together with each other and other persons, both known and unknown to the Grand Jury, to distribute and to possess with the intent to distribute Schedule I controlled substances and Schedule I controlled substance analogues intended for human consumption…" See Docs. 1 and 2.   Following this language, the Government included a "Manner and Means of the Conspiracy" alleging the defendants' specific acts as well as identifying many of the controlled substances and controlled substance analogues intended for human consumption.   As required, the indictment includes the elements of the offense, fairly informs the defendant of the charges, and alleges sufficient information to allow the defendant to plead a conviction or acquittal as a bar to subsequent prosecution.

Defendants argue that the indictment is insufficient due to the Supreme Court's recent holding in United States v. McFadden, 135 S. Ct. 2298 (2015).   McFadden, however did not change the requirements for a sufficient indictment.   In McFadden, the Court elucidated the *mens rea* requirement for controlled substance analogue cases.   Specifically, the Court more clearly explained the knowledge necessary for a conviction under 21 U.S.C. § 841(a)(1) when the controlled substance at issue is an analogue.   The Court held that the Government is required to prove knowledge and described two ways the Government can prove the defendant had the requisite knowledge when the substance involved was an analogue.

24

First, it can be established by evidence that a defendant knew that the substance with which he was dealing is some controlled substance—that is, one actually listed on the federal drug schedules or treated as such by operation of the Analogue Act—regardless of whether he knew the particular identity of the substance.   Second, . . . [a] defendant who possesses a substance with knowledge of those features (that make the substance a controlled substance analogue) knows all of the facts that make his conduct illegal, just as a defendant who knows he possesses heroin knows all of the facts that make his conduct illegal.   A defendant need not know of the existence of the Analogue Act to know that he was dealing with "a controlled substance."

Id. at 2305.

The Court noted that the Government could prove the requisite mental state through either direct or circumstantial evidence. Circumstantial evidence could include a defendant's concealment activities, evasive behavior towards law enforcement, knowledge that a particular substance produces a "high" similar to that produced by controlled substances, and knowledge that a substance is subject to seizure at customs."   Id. at 2304, n.1.   Whether the Government can prove knowledge will be left to the trier of fact.   Id., n.3.

The Government is aware of its burden under McFadden and maintains that its indictment contains the essential elements of the offense.   Prior to McFadden, the Eighth Circuit required that the Government prove that the defendants must have known that the substance at issue was a controlled substance analogue.   For example, in United States v. Sullivan, 714 F.3d 1104 (8th Cir. 2013), the court noted that in order to convict the defendant, the jury was required to find that first, that the defendant possessed a controlled substance analogue; second, that defendant knew he was in possession of a controlled substance analogue; and third, that he intended to distribute some or all of the controlled substance analogue intended for human consumption.   Id. at 1107.   The Eighth Circuit found that the Government's evidence was sufficient to prove that the defendant knew that mephedrone was a controlled substance analogue.

Defendants argue that there is no way to determine whether the Grand Jury found that the

25

defendants had the requisite knowledge in this case.   As stated above, Eighth Circuit precedence has always required that the Government prove knowledge and McFadden did not change that obligation.   The defendants' argument that the Grand Jurors did not find knowledge is meritless. "An indictment returned by a legally established and unbiased grand jury 'is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence.'"   United States v. Roach, 28 F.3d 729, 739 (8th Cir. 1994) (quoting United States v. Calandra, 414 U.S. 338, 345 (1974)).

Defendants cite Russell v. United States, 369 U.S. 749 (1962) in support of their argument. Defendants' reliance on Russell however, is misplaced.   In Russell, six defendants were charged and convicted under 2 U.S.C.A. § 192 for Refusal of a Witness to Testify or Produce Papers.   The indictments failed to identify the subject under congressional subcommittee inquiry at the time the witness was interrogated.   Instead, the indictments stated that unanswered questions "were pertinent to the question then under inquiry" by the subcommittee.   Id. at 752.   The Court recognized the importance of determining the issue of pertinency.   The Court explained the first step in determining whether the questions were pertinent to the subject under inquiry is to ascertain what the subject was.   If the subject under inquiry has been identified in the indictment, the essential first step has been met.   Id. at 759.   In Russell, the Court found the indictment insufficient because it failed to inform the defendants the nature of the accusations against them. As a result, the prosecution was "free to roam at large." Id. at 768.

The danger manifested in Russell is not present in the case before this Court.   Here, the Indictment contains a clear statement of the offense and informs the defendants of the nature of the accusations.   Also included with Count One of the indictment, is a Manner and Means section which clearly outlines the defendants' conduct in this case and the steps they took to distribute and

26

possess with intent to distribute controlled substances and controlled substance analogues intended for human consumption.   Therefore, the instant indictment is sufficient and the Defendant's motion to dismiss the indictment should be denied.

**VI.**    **CONCLUSION**

Based on the foregoing, the Government requests that the Court deny the defendants' motion to dismiss the indictment as unconstitutionally void for vagueness, motion to dismiss count one of the indictment on the grounds that it fails to state an offense and that 21 U.S.C. §§ 813 and 802 (32)(A) are unconstitutionally vague, motion for bill of particulars, and motion to dismiss count one with memorandum in support.

Respectfully submitted,

RICHARD G. CALLAHAN
United States Attorney

*s/ Erin Granger*
ERIN GRANGER, #53593MO
Assistant United States Attorney
111 South 10th Street, Room 20.333
St. Louis, MO 63102
(314) 539-2200

27

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2015, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

*s/ Erin Granger*
ERIN GRANGER, #53593MO
Assistant United States Attorney