AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Missouri

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | |
| Storage Unit F80, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, Missouri. | ) | Case No.   4:13MJ07268 SPM |
| | ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, _____ Wayne House _____, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

Storage Unit F80, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, Missouri,

located in the ___ EASTERN ___ District of ___ MISSOURI ___, there is now concealed

see attached List - referred to as "ATTACHMENT D"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 331, 813, 841(a)(1), & 846; | --Manufacturing and Distribution, and Conspiracy to do so, of controlled substances and analogues of Schedule I controlled substances, Distribution of misbranded drugs; and |
| 18 USC 1956 & 1957 | --Money laundering |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

WAYNE HOUSE, Special Agent
Immigration and Customs Enforcement,
Homeland Security Investigations
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___ September 25, 2013 ___

*Judge's signature*

City and state: ___ St. Louis, MO ___

Honorable Shirley P. Mensah, U.S. Magistrate Judge
*Printed name and title*

AUSA:   James C. Delworth

**Exhibit 3-A**

NC 00015438

AO 93  (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the
Eastern District of Missouri

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | |
| Storage Unit F80, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, Missouri. | )  Case No. | 4:13MJ07268 SPM |
| | ) | |
| | ) | |
| | ) | |

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the ————— EASTERN ————— District of ————— MISSOURI —————

Storage Unit F80, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, Missouri,

The person or property to be searched, described above, is believed to conceal:

see attached List - referred to as "ATTACHMENT D"

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____ October 7, 2013 _____
                                                                                        *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.        ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
_Shirley P. Mensah_                                     .
                    *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30)*.
                                                                            ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: 9-25-13;  4:32 pm                     _____
                                                                                        *Judge's signature*

City and state:   St. Louis, MO _____                    Honorable Shirley P. Mensah, U.S. Magistrate Judge
                                                                                        *Printed name and title*

**Exhibit 3-A**

NC 00015439

<u>LIST OF ITEMS TO BE SEIZED AND SEARCHED</u>

1. Controlled substances and controlled substance analogues, to wit: synthetic cannabinoid products and synthetic cathinone products retail packaging, bulk packaging, and raw chemical forms including but not limited to products under the retail brand names: Mad Hatter, Black Arts, Mega Kush, Dirty Dirt Devil, Devil's Dank, Night Train, Freedom, and Bunker Buster.

2. Packaging material including, but not limited to, retail labeling for the packaging, marketing, and distribution of controlled substances and controlled substance analogues.

3. Materials and supplies related to the manufacture of controlled substances and controlled substance analogues, to wit synthetic cannabinoid products and substitute cathinone products.

4. Currency or other assets representing the proceeds of the distribution of synthetic cannabinoid products and synthetic cathinone products.

5. All business records, books, notes, documents, data records and information, including but not limited to information relating to the transportation, ordering, purchasing, sale and distribution of controlled substances and controlled substance analogues and vendor and/or supplier invoices, of **PSYCHEDELIC BLUR, DREAM WORLD GLASS (a/k/a GLASSWORKS), PAGGREGATE, PALMCORP., NGURU**, or any variation of these names associated with the manufacture and distribution of controlled substances, controlled substance analogues, and distribution of misbranded drugs in violation of Title 21, United States Code, Sections 331, 813, 841(a)(1), 846 and the laundering of drug trafficking proceeds in violation of Title 18, United States Code, Section 1956.

6. All documents regarding all loans, deeds to property and titles to vehicles in the name of **PSYCHEDELIC BLUR, DREAM WORLD GLASS (a/k/a GLASSWORKS),**

**Exhibit 3-A**

NC 00015440

**PAGGREGATE, PALMCORP., NGURU** or any variation of these names associated with the manufacture and distribution of controlled substances, controlled substance analogues, and distribution of misbranded drugs in violation of Title 21, United States Code, Sections 331, 813, 841(a)(1), 846 and the laundering of drug trafficking proceeds in violation of Title 18, United States Code, Section 1956.

7. All financial records including but not limited to bank statements, wire transfer forms, deposits, checks, money orders, money transfer forms, cashier checks, any records evidencing money being transferred to, from or within a financial institution in any form, mortgage insurance documents, organization documents, notices of transfer of servicing, loan applications, credit reports, certificates of deposits register receipts, statements, credit card statements, check book registers and ledgers, sales journals, account ledgers, balance, sheets, financial reports, profit/loss statements, investment records and cash flow statements payroll records (W-2 forms), employee information (W-4 forms), employment verification (I-9 ) forms, employee pay stubs, and income statements for **PSYCHEDELIC BLUR, DREAM WORLD GLASS (a/k/a GLASSWORKS), PAGGREGATE, PALMCORP., NGURU** or any variation of these names associated with the manufacture and distribution of controlled substances, controlled substance analogues, and distribution of misbranded drugs in violation of Title 21, United States Code, Sections 331, 813, 841(a)(1), 846 and the laundering of drug trafficking proceeds in violation of Title 18, United States Code, Section 1956.

8. Any and all documents, data, and records relating to the possession, dominion and control of the computer systems, storage devices, electronic storage devices, and digital storage devices, to be searched and seized;

**Exhibit 3-A**          NC 00015441

9. Computers, electronic storage devices, digital storage devices and all records and archives contained therein to include;

    a. All data files, including but not limited to, records and graphic representations, containing matter pertaining to the manufacture or trafficking in controlled substances or controlled substance analogues, that is, documents and visual depictions of accounting records, websites, marketing, and facilitating records.

    b. Graphic interchange formats and/or photographs, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI and MPEG) containing matter pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

    c. Electronic mail, chat logs, Internet Relay Chat (IRC) log files, and electronic messages, to include short message service (SMS) and multimedia messaging service (MMS), concerning the trafficking of controlled substances and controlled substance analogues through interstate or foreign commerce, including by United States mail or by computer, visual depictions, and records pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

    d. Log files and other records concerning dates and times of connection to the Internet and to websites pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

**Exhibit 3-A**

NC 00015442

e. Any Instant Message conversations, chats, e-mails, text messages, or letters pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

f. Call logs pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

**Exhibit 3-A**

NC 00015443

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

Your affiant, Wayne House, a Special Agent with Immigration and Customs Enforcement (hereinafter "ICE"), Homeland Security Investigations (hereafter HSI), within the Department of Homeland Security, being duly sworn, depose and state the following:

## INTRODUCTION AND AGENT BACKGROUND

1.  I am a Special Agent of ICE HSI, within the Department of Homeland Security, currently assigned to the Resident Agent in Charge St. Louis, Missouri office. I have been a federal officer for ten (10) years and have served in ICE HSI's Kansas City and St. Louis field offices and completed a two (2) year tour of duty in a headquarters level programmatic unit.   Prior to my employment with ICE, I was employed as a police officer for five (5) years with the City of Chesterfield, Missouri, Police Department.  During my employment with ICE HSI and with the City of Chesterfield, I have had the opportunity to lead, conduct, coordinate and/or participate in investigations concerning the importation, smuggling, and trafficking of controlled substances.  I have received training focused on the importation, smuggling, and trafficking of controlled substances.

2.  This affidavit is in support of an application for search warrants for the following locations being utilized for or facilitating the manufacturing and distribution of controlled substances and controlled substance analogues, distribution of misbranded drugs and money laundering, in violation of Title 21, United States Code, Sections 331, 813, 841, 846 and Title 18, United States Code, Section 1956, by **CHARLES A. WOLFE II d/b/a PSYCHEDELIC BLUR, LLC, DREAM WORLD GLASS, LLC, LLC** and others:

    A) Storage Unit F80, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, MO;

    B) Storage Unit F81, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, MO ;

1

**Exhibit 3-A**

NC 00015450

C) Storage Unit F37, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, MO;

D) Storage Unit F38, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, MO

3. All of the aforementioned storage units are invoiced in the name of PSYCHEDELIC BLUR, Blur, LLC, DREAM WORLD GLASS WORKS and CHUCK WOLFE, 3477 Nameoki Road, Suite 165, Granite City, Ill. The latest invoices reflect payments on all four units for the period of July 1, 2013 through September 30, 2013. Investigation reflects that the 3477 Nameoki Road address is for a UPS Store utilized by **WOLFE**.

4. Because this affidavit is being submitted for the limited purpose of securing the requested search warrants, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause for the requested search warrant. Where statements of others are set forth in this affidavit, they are set forth in substance and in part.

## OVERVIEW OF INVESTIGATION

5. I am currently participating in an Organized Crime Drug Enforcement Task Force ("OCDETF") investigation with Internal Revenue Service Criminal Investigation, Drug Enforcement Administration, Federal Bureau of Investigation, United States Postal Inspection Service, Illinois States Attorney's Office, Effingham Police Department, St. Charles County Sherriff's Office and the United States Attorney's Office concerning the manufacturing and distribution of controlled substance and controlled substance analogues. The investigation initially focused upon **MICHAEL J. LENTSCH Jr.** (hereinafter "**LENTSCH**"), **ANWER N. RAO** (hereinafter "**RAO**") and **GREGORY SLOAN** (hereinafter "**SLOAN**"). **LENTSCH** and **RAO** d/b/a **OPM Midwest, Inc.** and **TS Botanical, Inc**. manufactured and marketed synthetic drugs under the brand name

2

**Exhibit 3-A**

NC 00015451

"CLOUD 9"through store fronts, such as the **"Tha Grind"** store fronts, located within the Southern District of Illinois and Eastern District of Missouri, and the internet as a product which is legal for sale.  **LENTSCH** and **RAO** provided their customers with laboratory reports that gave the appearance that the product they were selling was in compliance with federal and state law.   In addition, **LENTSCH** and **RAO** attempted to fraudulently circumvent the Controlled Substance Analogue Enforcement Act of 1986, Title 21, United States Code, Section 813, by placing the phrase "not for human consumption" on the rear of each package.  In December, 2012, **LENTSCH** and **RAO** expanded their operation to include the sale of "research chemicals" through the web site **www.BPBLabs.com**. According to the website, **BPBLabs.com** was formed to provide, the most prompt, reliable, and discreet service in the research chemical industry by offering the highest quality products available at the absolute best price.  However, most if not all the drugs products offered for sale on the website are known to be used in the manufacturing of synthetic drugs (i.e. synthetic herbal incense).

6.  **SLOAN** marketed and distributed the synthetic drugs that **LENTSCH** and **RAO** manufactured under the brand name "CLOUD 9"; along with other synthetic drugs through a wholesale and retail distribution network known as **NEB DISTRIBUTING, LLC** and the **SILVER ROCKET GROUP, LLC .**

7.  In July, 2012, a number of state and federal search warrants were executed at the residences and business locations owned and or controlled by **RAO**, **LENTSCH** and **SLOAN** in July 2012.  A substantial amount of synthetic drugs were seized along with business records.  An analysis of business records for **NEB DISTRIBUTING** reflects that from on or about November, 2010 through July, 2012, **WOLFE,** doing business in his

3

**Exhibit 3-A**                                                       NC 00015452

own name and the name **PSYCHEDELIC BLUR, LLC,** purchased and redistributed over $2,700,000.00 of synthetic drugs, (designated as herbal incense blends) obtained from **NEB Distributing, LLC.** The vast majority of the synthetic drugs/herbal blends **WOLFE d/b/a PSYCHEDELIC BLUR, LLC** purchased, sold, and distributed from **SLOAN d/b/a NEB Distributing, LLC** originated from **RAO and LENTSCH d/b/a TS Botanicals, Inc.**

8.  From on or about May 2011 through July 2012, **RAO** and **LENTSCH, d/b/a OPM Midwest, Inc. and TS Botanical, Inc.,** retained the services of AI Biotech located in Richmond, VA to perform an analysis of their synthetic herbal blends for the presence of synthetic cannabinoids. According to the lab reports prepared and produced to **RAO** and **LENTSCH d/b/a OPM Midwest, Inc. and TS Botanical, Inc.** in 2011 and 2012 , **RAO** and **LENTSCH** knew that their synthetic herbal blends contained one or more of the following controlled substances and/or controlled substance analogues: AM 2201, JWH 250 URB 754, 4MAM 2201, α-PVP, UR 144, α-PVP, and 5MeO-Dalt.

9.  In December 2012, your agents obtained search warrants issued in the Eastern District of Missouri for the email accounts known to be used by **RAO, LENTSCH, SLOAN,** and others associated with the investigation. According to the emails produced by the electronic communications service companies and email providers, your agents determined that **SLOAN** and **WOLFE** were regularly provided a copy of these same AI Biotech lab reports addressed to **RAO** and **LENTSCH d/b/a OPM Midwest, Inc.** and **TS Botanical, Inc.** as they became available and, as a result, were aware that the products they were purchasing and reselling contained one or more of the substances listed above. In addition, based on those same email communications your agents determined **SLOAN**

4

**Exhibit 3-A**

NC 00015453

and **WOLFE** actively followed changes in federal, state, and local legislation in an effort to circumvent the changes in the law as it pertained to the use and scheduling of synthetic cannabinoids.    Through the examination of these emails your agents determined that **SLOAN** and **WOLFE** also monitored law enforcement's efforts to combat the illegal synthetic drug industry.

10.   Following the execution of search warrants in July, 2012, **LENTSCH, RAO** and **SLOAN** ceased to operate their manufacturing and distribution of synthetic drugs in the same manner and through the same companies.   As further detailed, investigation, reflects that **CHARLES A. WOLFE II d/b/a PSYCHEDELIC BLUR, LLC, DREAM WORLD GLASS, LLC, MARK PALMER, ANTHONY PALMER, PAGGREGATE, LLC, PALMCORP, LLC** and **NGURU, LLC** and others have now become involved in the manufacture and distribution of synthetic drugs and distribution of misbranded drugs utilizing the Barnhart location to manufacture synthetic drugs, and the St. Charles Rock Road locations to operate a large scale synthetic drug distribution network.   It is believed that synthetic drugs and other items utilized in the manufacture and distribution of synthetic drugs is now concealed within Units F80, F81, F37 and F38 of the U-LOK STOR, Inc. facility.

## FEDERAL STATUTES

11. **CONTROLLED SUBSTANCES**: A person is in violation of Title 21 U.S.C. § 841, if that person knowingly or intentionally:

    a.   Manufactures, distributes, or dispenses, or possesses with intent to manufacture, distribute, or dispense, a controlled substance; or

5

**Exhibit 3-A**                    NC 00015454

    b. Creates, distributes, or dispenses, or possesses with intent to distribute or dispense, a counterfeit substance.

12. **ANALOGUE CONTROLLED SUBSTANCES ACT**: Under Title 21 U.S.C. § 813, a controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law as a controlled substance in Schedule I.

13. **DEFINITION OF CONTROLLED SUBSTANCE ANALOGUE**: Title 21, U.S.C. § 802(32)(A) defines a "controlled substance analogue" as a substance:

    a. The chemical compound of which is substantially similar to the chemical structure of a controlled substance in Schedule I or II; and

    b. Which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effects on the central nervous system of a controlled substance in Schedule I or II.

14. **DISTRIBUTION/MANUFACTURE OF MISBRANDED DRUGS**: A person is in violation of Title 21, U.S.C. § 331 if that person introduces or delivers for introduction into interstate commerce any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded and the manufacture of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded.

15. **MONEY LAUNDERING**:  A person is in violation of Title 18, U.S.C. § 1956 if the person, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity, with the intent to promote the carrying on of specified unlawful activity; or knowing that

6

**Exhibit 3-A**

NC 00015455

the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

## CONTROLLED SUBSTANCE ANALOGUES

16. I know that in recent years, individuals have begun to manufacture and traffic in smokable synthetic cannabinoid products, many times known on the street as "Spice" or "K2." Smokable synthetic cannabinoid products are a mixture of an organic "carrier" medium, such as the herb-like substance Damiana, which is then typically sprayed or mixed with a synthetic compound chemically similar to THC (tetrahydrocannabinol), the psychoactive ingredient in marijuana.   Currently, there are hundreds of synthetic cannabinoid compounds.  The five most common of these compounds, JWH-018; JWH-073; JWH-200; CP-47, 497 C8 homologue; and 47, 497 cannabicyclohexanol, were "emergency scheduled" by the DEA in March 2011.  In response, clandestine manufacturers and traffickers began distributing smokable synthetic cannabinoid products containing slightly varied synthetic cannabinoid compounds in an attempt to circumvent newly enacted federal and state laws.   Smokable synthetic cannabinoid products are commonly purchased in head shops, tobacco shops, convenience stores, adult stores and over the Internet.  They are often marketed as incense, potpourri or "fake weed" and almost always carry the markings "not for human consumption."  These markings are routinely in place in an attempt to fraudulent circumvent the product being identified as a controlled substance analogue.  Users of these products have reported effects similar to marijuana, but many times greater to include but not limited to paranoia, panic attacks, increased heart rate and increased blood pressure.

**Exhibit 3-A**

NC 00015456

17. Through experience I know that individuals, in an attempt to circumvent laws in place which make the possession and distribution of certain synthetic drugs illegal, seek out and purchase or produce substances which have a similar but slightly different chemical structure. These substances will produce the same pharmacological effect on the human body when ingested. In response to this production, Congress enacted the Controlled Substance Analogue Enforcement Act of 1986.

18. Through research, training and experience, I know that the synthetic cannabinoid 1-pentyl-3-(1-naphthoyl)indole (JWH-018) is a schedule I controlled substance, and that until July 2012 the synthetic cannabinoids: 1-Pentyl-3-(2-methoxyphenylacetyl)indole (JWH-250), 1-Pentyl-3-(4-methyl-1-naphthoyl)indole (JWH-122) and 1-(5-Fluoropentyl)-3-(1-naphthoyl)indole (AM2201) met the definition of controlled substance analogues when intended for human consumption. On July 9, 2012, these substance, JWH-018, JWH-250, JWH-122, AM2201 became permanently scheduled as control substances pursuant to the Synthetic Drug Abuse Act of 2012 (herein "SDAPA"). SDAPA amended the Controlled Substance Act (herein "CSA") by legislatively placing "cannabimimetic agents" and 26 substances in Schedule I. As referenced earlier, I know these substances to be considered hallucinogens and further affect the human body in a similar way to THC, the active hallucinogen found in the organic drug marijuana.

19. According to the DEA Office of Diversion Control, Drug and Chemical Evaluation Section various synthetic cannabinoids (e.g., JWH-018, etc.) laced on plant material have been encountered by law enforcement in recent years. These are promoted under the guise of herbal incense products. These products laced with synthetic cannabinoids are smoked for their psychoactive effects. In response to State and Federal control of these synthetic

8

**Exhibit 3-A**

NC 00015457

cannabinoids, a transition to new synthetic cannabinoids laced on plant material has been observed.  AKB48, 5F-AKB48 and XLR -11 are three of the many synthetic cannabinoids recently encountered on the designer drug market.

20. On May 16, 2013, the Deputy Administrator of DEA issued a final order to temporarily schedule three synthetic cannabinoids under the Controlled Substances Act (CSA) pursuant to the temporary scheduling provisions of Title 21, U.S.C. § 811(h). The substances are (1-pentyl-1H-indol-3-yl)(2,2,3,3- tetramethylcyclopropyl)methanone (UR-144), [1-(5-fluoro-pentyl)-1H- indol-3-yl](2,2,3,3-tetramethylcyclopropyl)methanone (5-fluoro-UR-144, XLR11) and N-(1-adamantyl)-1-pentyl-1H-indazole-3-carboxamide (APINACA, AKB48). This action is based on a finding by the Deputy Administrator that the placement of these synthetic cannabinoids and their salts, isomers and salts of isomers into Schedule I of the CSA is necessary to avoid an imminent hazard to the public safety.

21. AKB48 and 5F-AKB48 belong to a structural class with a core indazole structure. They are structurally related to other synthetic cannabinoids with a core indole structure, such as the Schedule I substances JWH-018 and AM2201. These core structures (scaffolds) are substituted at the 1- and 3-positions (R1 and R2, respectively) to give rise to these substances.   AKB48 and 5F-AKB48 were not previously reported in the scientific literature prior to their appearance on the designer drug market.   AKB48 is pharmacologically similar to Schedule I substances THC and various synthetic cannabinoids (e.g., JWH-018, AM2201 etc.). In vitro studies show that AKB48, similar to $\Delta 9$-THC and various synthetic cannabinoids, binds to the brain cannabinoid CB1 receptors and displays agonist properties in functional assays, suggesting that it would have the same in vivo effects as $\Delta 9$-THC and various synthetic cannabinoids.  The binding affinity

9

**Exhibit 3-A**

NC 00015458

of AKB48 is higher than that of Δ9-THC. Based on structure-activity relationship studies, 5F-AKB48 is expected to bind to CB1 receptors as well. There are no published studies as to the safety of AKB48 or 5F-AKB48 for human use. AKB48 and 5F-AKB48 were not previously reported in the scientific literature prior to their appearance on the designer drug market. There are no commercial or medical uses for these substances. Information on user population in the U.S. is limited, and includes information from drug user internet forums. AKB48 and 5F-AKB48 abuse is not monitored by any national drug abuse surveys. Poison control centers continue to report adverse health effects in response to the abuse of herbal incense products. AKB48 is a schedule I controlled substances under the Federal Controlled Substances Act. If intended for human consumption, 5F-AKB48 may be treated as a "controlled substance analogue" under the CSA pursuant to 21 U.S.C §§802(32)(A) and 813.

22. During this investigation, your agents and members of the investigative team were confronted with a new synthetic cannabinoid, AB-FUBINACA. Although AB-FUBINACA does not appear in Schedule I, your agents, through their research have determined that both AB-PINACA and AB-FUBINACA are cannabimimetic indazole-derivatives. These substances were identified as designer drugs in illegal products in Japan. According to the articles that discusses the discovery of the substances (Forensic Toxicol (2013) 31:93–100), the samples used for analysis were three products purchased via the Internet in July 2012 in Japan; one as a chemical and two as herbal products. Each of the herbal products (A and B) contained about 3g of mixed dried plants. The AB-FUBINACA was extracted and isolated out of the 3 gram sample of the herbal product B. According to Wikipdeia, AB-FUBINACA is a drug that acts as a potent agonist for the cannabinoid receptors and was originally developed by Pfizer

10

**Exhibit 3-A**

NC 00015459

in 2009 as an analgesic medication but was never pursued for human use. Subsequently in 2012, AB-FUBINACA was discovered as an ingredient in synthetic cannabis blends in Japan, along with a related compound AB-PINACA. (Even if this new substance is not determined to be a controlled substance analogue, manufacturing and distribution of this substance intended for human consumption without proper labeling is in violation of 21 U.S.C § 331.)

## DETAILS OF INVESTIGATION

23. During the course of this investigation, several sources of information have been utilized, including but not limited to corporate security records, public records, business records, financial records, state and local law enforcement personnel and their reports of investigation, physical and electronic evidence seized and analyzed through the use of state and federal search warrants. All the information contained in this affidavit is based on the personal knowledge of your affiant and the investigative sources of your affiant and the other agents working on this investigation.

24. As previously stated, investigation reflects that **CHARLES A. WOLFE II d/b/a PSYCHEDELIC BLUR, LLC, DREAM WORLD GLASS, LLC, MARK PALMER, ANTHONY PALMER, PAGGREGATE, LLC, PALMCORP, LLC** and **NGURU, LLC** and others have now become involved in the manufacture and distribution of synthetic drugs utilizing the Barnhart location to manufacture synthetic drugs and the St. Charles Rock Road locations to package and distribute the synthetic drugs.

25. **CHARLES A WOLFE d/b/a PSYCHEDELIC BLUR, LLC. WOLFE** is registered as the Managing Member of **PSYCHEDELIC BLUR, LLC.** According to records on file at the Florida Secretary of State, **PSYCHEDELIC BLUR, LLC** is a company with a principal place of business as 611 S. Fort Harrison Avenue, Suite #104, Clearwater, FL

11

**Exhibit 3-A**                    NC 00015460

33756. **WOLFE** as Managing Member lists his address as 3477 Nameoki Road, Suite 165, Granite City, Illinois 62040.  Your agents researched the **PSYCHEDELIC BLUR, LLC's** principal place of business and determined that the address is a UPS Store, specifically UPS Store #4344 located at 611 S. Fort Harrison Avenue, Suite #104, Clearwater, FL 33756.  Your agents obtained a copy of the United States Postal Service Application for Delivery of Mail Through Agent, Form 1583 (hereafter "Form 1583"), in reference to the address dated November 16, 2011 and determined the following: **WOLFE** advised that the name in which the applicants mail will be received for delivery to the agent was **CHUCK WOLFE**.  **WOLFE** advised that his home address was "3477 Nameoki Road #165, Granite City, OH 62040."  Your agents researched the address **WOLFE** provided to the UPS Store #4344 as his home address and determined that the address was a UPS Store, specifically UPS Store #5491 located at 3477 Nameoki Road, Granite City, IL 62040.  This UPS Store, specifically UPS Store #5491 located at 3477 Nameoki Road, Granite City, IL 62040, was used by **SLOAN** and individuals known to your agents to be involved in the operation of **NEB Distributing, LLC** and **Silver Rocket Distributing, LLC** in distributing the synthetic drug/herbal incense that **LENTSCH** and **RAO** manufactured under the brand name "**CLOUD 9.**  Your agents obtained a copy of the Form 1583 in reference to the address 3477 Nameoki Road #165, Granite City, IL 62040 dated September 8, 2011 and determined the following: **WOLFE** reported that the name in which the applicant's mail will be received for delivery to the agent was **CHUCK WOLFE**.  **WOLFE** reported that his home address was 1901 Williamstown Drive, O'Fallon MO 63376.  As of July 2013, **WOLFE** is still leasing delivery box #165 at UPS Store #5491.

12

**Exhibit 3-A**                                          NC 00015461

26. **DEAN GRAVER** d/b/a **DREAM WORLD GLASS, LLC**  According to records on file at the Florida Secretary of State, the effective date for **DREAM WORLD GLASS, LLC** is October 9, 2012.  **DREAM WORLD GLASS, LLC** is a company with a principal place of business at 611 S. Fort Harrison Avenue, Suite #212, Clearwater, FL 33756.  **DEAN GRAVER** and Avelina C. Bolibol (titled owner of 1901 Williamstown Drive, **WOLFE's** residence) are listed as the Managers/Members.  **DEAN GRAVER** used the address of 2024 Ridgedale Drive, Highridge, MO 63049.  Avelina C. Bolibol used the address of 3477 Nameoki Road, Suite 165, Granite City, Illinois 62040.  The address Bolibol used is the same addresses **WOLFE** used for **PSYCHEDELIC BLUR, LLC's.**  The registered agent for **DREAMWORD GLASS, LLC** is the same registered agent **WOLFE** used for **PSYCHEDELIC BLUR, LLC.**

27. Your agents recently received reports from  the Food and Drug Administration, Office of Criminal Investigations which is conducting an investigation in conjunction with DEA's Tactical Diversion Group involving the manufacturing and distribution of synthetic cannabinoids and substitute cathinones in the District of Kansas.  According to those reports, in March 2013, an Overland Park, Kansas Police Department confidential informant (herein "CI#13-4008") placed a consensually monitored telephone call to Cindy McRoberts (herein "McRoberts").  McRoberts is believed to be employed as a sales representative for Retailing Specialist.  This consensually monitored phone call was made to order a sample package of synthetic cannabinoids.  After establishing contact with McRoberts, CI#13-4008 inquired about what products they had currently for sale.  McRoberts offered the following products: Head Trip, Full Throttle, Avalon, Night Train, and Lights Out.  In addition the following new products were identified:  Black Arts,

13

**Exhibit 3-A**                    NC 00015462

Grave Digger, Devils Dank, Mad Hatter, Freedom, and Gold Leaf. McRoberts provided some prices for the different products and identified that the bigger the order the cheaper the cost per gram. McRoberts identified Lights Out as their biggest seller, Black Arts as having really good feedback, and Gold Leaf as a good value that is potent. McRoberts acknowledged that these are all their products and they are making them. CI#13-4008 initiated a discussion regarding the legality of the chemicals they were using. McRoberts said they were using new chemicals that are not listed on a pharmaceutical register. McRoberts stated the chemicals are not in a family that is listed (referring to analogues). McRoberts cautioned CI#13-4008 that is where they have to be careful. CI#13-4008 requested a sample package and McRoberts encouraged CI#13-4008 to establish an email account at hushmail.com and send her an address for shipping. McRoberts explained hushmail.com goes through Canada and cannot be subpoenaed by law enforcement. McRoberts told CI#13-4008 that Hushmail is more secure that Google and Yahoo! and further advised that if you think law enforcement is watching the email account CI#13-4008 is currently using don't send the information from there because you don't want to create a paper trail. The telephone call ended with CI#13-4008 and McRoberts agreeing to speak later so she could take his/her address over the phone. Later that same day, CI#13-4008 placed another consensual call to McRoberts. During this phone call, McRoberts took CI#13-4008's address for the "sample package." McRoberts confirmed that she would send out a sample package of products and that it should arrive in a few days.

28. On April 2, 2013, DEA received the "sample package" of products CI#13-4008 ordered from McRoberts during the consensually monitored telephone call described above. The

14

**Exhibit 3-A**                                              NC 00015463

contents of the package were photographed and inventoried. According to the photographs the "sample package" arrived in a FedEx envelope. The "sample package" originated from **Phil, PAGGREGATE, 2025 Zumbehl Road, Suite 192, St. Charles, MO 63330**. The FedEx package contained five 1gram packages of a product labeled "Head Trip," five 1gram packages of a product labeled "Avalon," five 1gram packages of a product labeled "Grave Digger," five 1gram packages of a product labeled "Freedom," five 1gram packages of a product labeled "Lights Out," five 1gram packages of a product labeled "Devil's Dank," five 1gram packages of a product labeled "Night Train," five 1gram packages of a product labeled "Mega Kush," five 1gram packages of a product labeled "Black Arts," five 1gram packages a product labeled "Full Thottle", five 1gram packages a product labeled "Mad Hatter"

29. On April 12, 2013, the contents of the FedEx "sample packages" were transferred to the Johnson County Sheriff's Office Criminalistics Laboratory for analysis and were completed on May 13, 2013. The results of the lab analysis are as follows:

    a.  Lab Item # 2 Vegetation from "Head Trip" confirmed the presence of FUR-144, XLR11 and 5-FLUOROPENTYL-AKB48. FUR-144 is structurally similar to JWH-018, a NAPHTHOYLINDOLE.

    b.  Lab Item # 3 Vegetation from "Avalon" confirmed the presence of FUR-144, XLR11 and 5-FLUOROPENTYL-AKB48.

    c.  Lab Item # 4 Vegetation from "Grave Digger" confirmed the presence of FUR-144, XLR11 and 5-FLUOROPENTYL-AKB48.

    d.  Lab Item # 6 Vegetation from "Lights Out" confirmed the presence of FUR-144, XLR11.

    e.  Lab Item # 8 Vegetation from "Night Train" confirmed the presence of FUR-144,

**Exhibit 3-A**

NC 00015464

XLR11.

   f.   Lab Item # 9 Vegetation from "Mega Kush" confirmed the presence of FUR-144, XLR11 and 5-FLUOROPENTYL-AKB48.

   g.   Lab Item # 10 Vegetation from "Black Arts" confirmed the presence of FUR-144, XLR11 and 5-FLUOROPENTYL-AKB48. .

   h.   Lab Item # 11 Vegetation from "Full Thottle" confirmed the presence of FUR-144, XLR11.

   i.   Lab Item # 12 Vegetation from "Mad Hatter" confirmed the presence 5-FLUOROPENTYL-AKB48.

30.  Your agents obtained and analyzed records associated with **WOLFE's PSYCHEDELIC BLUR, LLC's** Bank of America account ******333741.  According to these records, **WOLFE** opened the account in the name **PSYCHEDELIC BLUR LLC** at the Gulf to Bay Boulevard Banking Center located in Clearwater, Florida on or about 3/13/2012. **WOLFE** is the only authorized signer on the account.   **WOLFE** signed as the Member/Manager.  Although the name and address listed on the checks related to this account is **PSYCHEDELIC BLUR LLC**, 611 S Fort Harrison Ave., Suite 104, Clearwater, FL 33758-5301, on several out of state counter withdrawal slips the address is listed as 3477 Nameoki Road/Blvd., #165, Granite City, IL 62040-3709, the UPS Store utilized by **WOLFE**.

31. The investigative team reviewed and analyzed **WOLFE's PSYCHEDELIC BLUR, LLC's** Bank of America account ******333741 for the period March 13, 2012 through May 15, 2013 which reflects:

16

**Exhibit 3-A**

NC 00015465

a. For the period of March 13, 2012 through May 15, 2013, WOLFE had total deposits and credits of $3,475,781.07. For the period prior March 13, 2012 to July 2, 2012,[1] the period of time **WOLFE** was purchasing product from **SLOAN d/b/a NEB Distributing**, **WOLFE** had deposits/credits totaling $1,402,943.60 and checks/debits totaling $1,319,279.17.

b. For the period July 17, 2012 through May 14, 2013, **WOLFE** had total deposits/credits totaling $2,072,837.47. For that same period, **WOLFE** had total checks/debits totaling $2,137,695.01. Of particular interest were debits in the following amounts:

    i. A check #1051, dated August 2, 2012, in the amount of $5,000.00 payable to GAMCO. According to the memo section of the check, the check was for units 119, 116 and 102. Your agents know GAMCO to be the name of the company that leases the space at the building located at 13761 and 13765 St. Charles Rock Road, Bridgeton, MO 63044.

    ii. Several checks that posted to the account on May 10, 2012 through July 2, 2012 totaling $70,809.00 and single debit on August 28, 2012 in the amount of $40,000.00 to purchase a Bank of America Cashier's Check, all of which were payable to **HIPPIE DAZE DISTRIBUTION**. Your agents know **HIPPIE DAZE DISTRIBUTION** to be a fictitious name registered by G & B Novelty, LLC at 1001 Rondale Court, Dardenne, Prairie, MO 63368. G&B Novelty, LLC is a Missouri Limited Liability Company organized by **SLOAN** and Brett K. Beeman. Through evidence

---

[1] As stated earlier, on July 2, 2012, your agents assisted in search warrants issued in St. Charles County, Missouri in reference to **SLOAN d/b/a NEB DISTRIBUTING, LLC** and the **SILVER ROCKET GROUP, LLC**.

**Exhibit 3-A**

NC 00015466

recovered during the July, 2012, search warrant of **SLOAN's** businesses, cooperating individuals and undercover purchases, your agents know that **SLOAN** and **BEEMAN** d/b/a **HIPPIE DAZE DISTRIBUTION** were manufacturing and selling synthetic narcotics at the wholesale level.

   iii. Several checks that posted to the account on February 27, 2013 through April 25, 2013 payable to **PAGGREGATE, LLC** in the amount of $209,315.50. As described and contained herein in support for these search warrants, your agents know **PAGGREGATE, LLC** to be a Missouri Limited Liability Corporation organized by **PALMER**.

   iv. Two checks that posted to the account in April 2013 payable to **PALMCORP, LLC**. in the amount of $41,600.00.   . As described and contained herein in support for these search warrants, your agents know **PALMCORP, LLC** to be a Nevada Limited Liability Corporation organized and controlled by **PALMER**.

32. In addition to the above, DEA agents working in conjunction and cooperation with your agents provided the following in reference to businesses they have identified, through cooperating individuals and undercover purchases, as retail distributors of synthetic narcotics:

   a. In approximately October of 2012, the Drug Enforcement Administration (DEA), St. Louis Division, began conducting an investigation related to a conspiracy to distribute controlled substance analogues in violation of Title 21, U.S.C. § § 813, 841 and 846, by Smoke Sensations and South 94 Bait and Tackle Store. In 2012 and 2013, law enforcement agents have made multiple undercover purchases of synthetic drugs from these two locations.

18

**Exhibit 3-A**

NC 00015467

b.  Your agents obtained the telephone tolls for numbers known to be used by the South 94 Bait and Tackle Store, and **WOLFE** for the period of time September 2012 through July 2013 and conducted an analysis. Based on that analysis, except for a period of time beginning on or about October 25, 2012 through February 26, 2013, **WOLFE** talks with someone from South 94 Bait and Tackle Store a couple times a week.

c.  According to the bank analysis conducted by a DEA Financial Investigator in reference to Smoke Sensations' Fifth Third Bank account #******8233 and South 94 Bait & Tackle Fifth Third Bank Account #******0866, from March 2012 through April 2013, approximately 154 checks were written payable to 'PSYCHEDELIC' for a total of $1,160,096.70. Due to the lack of bank records currently available at the time of this affidavit, your agents have not been able to trace the disposition of all the checks written from Smoke Sensations and South 94 Bait & Tackle accounts to **PSYCHEDELIC**'. However, your agents have traced 37 of the 154 checks written payable to 'PSYCHEDELIC' as being deposited into **PSYCHEDELIC BLUR LLC**'s Bank of America account # ******333741.

d.  Deposit items into the **PSYCHEDELIC BLUR LLC's** Bank of America account ******333741 show that from September 10, 2012 through April 10, 2013, a total of 23 checks from Smoke Sensations Fifth Third Bank account #******8233. The total value of the 23 checks was $236,619.

e.  Deposit items into the **PSYCHEDELIC BLUR LLC's** account ******333741 show that from September 10, 2012 through April 10, 2013, a total of 14 checks

19

**Exhibit 3-A**

NC 00015468

from South 94 Bait & Tackle Fifth Third Bank account #\*\*\*\*\*\*0866.  The total value of the 14 checks was \$47,673.50.

33. On August 21, 2013 at approximately 3:30 pm, your affiant and agents from the Internal Revenue Service Criminal Investigation (IRSCI) and the DEA Tactical Diversion Squad (TDS) interviewed a DEA confidential source, (hereafter "DEA Source") at the IRSCI office in Fairview Heights, Illinois.  The source previously "cold" called the DEA as an anonymous tipster to report a synthetic marijuana manufacturing operation and street level distributor in the Mt. Olive, IL area.  DEA Source stated he/she is aware that an individual known to him/her as **HENRY WILSON** (herein referred to as "**WILSON**") is selling synthetic marijuana out of his home at 4468 Two Mile Rd., Mt. Olive, IL.  DEA Source further stated that **WILSON** is getting the synthetic marijuana from a manufacturing facility **WILSON** is working at with his mother (later identified and herein referred to as "**DENISE WILSON**") and brother (later identified and herein referred to as "**JIMMY JO WILSON**") in the southern St. Louis metropolitan area.

34. DEA Source stated he/she is aware **WILSON** is selling synthetic marijuana from the Two Mile Rd. location because DEA Source has bought it from **WILSON** there.  **WILSON** lives in a trailer at the address with his girlfriend, "Kelly", and their infant child.  The address is near Poplar and Oglesby in Mt. Olive, and the trailer is diagonally across from a lake at the intersection there.

35. DEA Source stated he/she is concerned for the child because the child crawls around the trailer with the synthetic marijuana product all around it.  **WILSON** has a cocaine problem as well.  The couple is involved with "meth" use also, which is also present around the child.  DEA Source stated other health and welfare concerns surrounding the

**Exhibit 3-A**

NC 00015469

child's living conditions in the trailer as well.  DEA Source stated it is concern for the child and because of his/her own addiction issues that he/she decided to come forth with the information on **WILSON**.

36. **WILSON** is selling the synthetic marijuana for approximately $10 a gram and distributes it in plastic bags similar to a traditional marijuana dealer.  **WILSON** usually keeps the synthetic marijuana in his home, but has recently begun keeping it in a shed next to the home.  **WILSON** has about five (5) regular customers in the Staunton/Mt. Olive area.

37. DEA Source stated that **WILSON** has told him/her that **WILSON** works at a synthetic marijuana manufacturing facility somewhere in the southern part of St. Louis.  The operation used to be run out of a location near Alton, IL, but the owner moved it to the southern location.  DEA Source was aware from **WILSON's** statements that it takes **WILSON** an hour and a half (1 ½ hours) to travel from his home in Mt. Olive to the new manufacturing location.  (A Google Map search reflects that it is approximately a one hour and 20 minute drive from the Mt. Olive residence to the Barnhart location.)  **WILSON's** mother, **DENISE WILSON**, and brother, **JIMMIE WILSON**, also work at the manufacturing facility.  **DENISE WILSON** is the foreman of the facility.  The three leave their homes between 4:30 am and 6:00 am to travel to the facility's location.  **WILSON** is also involved in some way with a meth lab in the Alton, IL area.

38. **WILSON** has stated that the synthetic marijuana is produced by laying leaves (carrier material) on a table and spraying chemicals onto the leaves.  The chemical is the same throughout various product brand names, but the level of chemical varies by brand.  The finished product is bagged into retail packaging by the baggers employed at the facility.  There is a "scrap bucket" which employees are allowed to sample from and routinely

21

**Exhibit 3-A**

NC 00015470

smoke on site.  Each employee is allowed to take home one (1) ounce of finished synthetic marijuana home per day after the shift.  The employees are paid cash for their work.

39. **WILSON** has stated there are also boxes of "bath salts" (cathinone products) stored at the facility.  The owner keeps the bath salts there because the chemicals used in the products are banned.  The owner distributes products containing banned chemicals through street level distributors like **WILSON** similar to traditional drug trafficking as opposed to retail smoke shop type outlets.

40. The synthetic marijuana manufactured at the southern facility location is taken to a warehouse in Earth City in St. Louis County.  Your investigators are aware that 13761 and 13765 St. Charles Rock Rd., Bridgeton , MO are located within a mile of the Earth City Expressway and that this area of Bridgeton is adjacent to the Earth City area.

41. On September 17, 2013, a Missouri State Highway Patrol officer seized (50) 4 gram packets of "Lights Out," (96) 4 gram packets of "Grave Digger," (25) 5 gram packets of "Darkness" and (1) 4 gram packet of "Night Train" following a traffic stop of **JOHN GALVIN** at mile marker 91 on Interstate 44 in Missouri.  **GALVIN** was driving a dark blue 2003 Chrysler Town and Country minivan with MO License Plate FJ2K1V.  This vehicle has been observed by law enforcement agents in front of the office suites located at 13765 St. Charles Rock Road.  Additionally, this vehicle has been observed making deliveries to the Smoke Sensation Nights of Rave store, 10532 P:age Ave., Overland, MO.  After waiving his Miranda rights GALVIN stated that he had been working for **Chuck WOLFE** for approximately 1 an one half years.  **GALVIN** stated that he had just delivered two boxes of "store products", with each box containing 800 packages, to Bilbos Earth Store in Springfield, Missouri.  **GALVIN** said the products are "aroma products"

22

**Exhibit 3-A**

NC 00015471

commonly known as "K2". **GALVIN** stated that he makes the delivery every 7 to 10 days and **WOLFE** pays him $300.00 per trip.  **GALVIN** also admitted to delivering the products in the St. Louis area including "94 Bait" and another store on Page Avenue. **GALVIN** stated that he knew people smoked the "aroma products" he was transporting, admitting that he smokes the products himself.

42.  On September 25 2013, law enforcement agents executed a federal search warrant at 4738 Orchard Drive, Barnhart, MO.  This electric service was in the name of MARK PALMER and water service was in the name of PALMER d/b/a PAGGRERGATE, LLC. Upon executing the search warrant, the agents discovered a synthetic drug manufacturing facility.  Among the items observed was a large quantity of herbal substance on a blue tarp that had apparently been sprayed with chemicals and was drying.   There were approximately 25 five gallon drums of acetone which is an agent utilized in liquidizing the chemical sprayed on the herbal substance.   There were a number of tables containing finished product with scales and baggies with names including Avalon, Mad Hatter and Bizzaro. Each station was set up for the weighing, packaging and labeling of the synthetic products.   There were many boxes filled with already processed packages of synthetic drugs.

43.  On September 25, 2013, federal search warrants were executed at 13761 St. Charles Rock Road, Suite 118, Bridgeton, Missouri and 13765 St. Charles Rock Road, Suites 101, 102, 111, 115, 116 and 121, Bridgeton, Missouri.  Based on information developed during the investigation your agents had conducted conducted drive bys and surveillance at these locations and determined that the **WOLFE** and **GRAVER** were operating out of suites in the buildings located at the same address.  Among the items seized from this location was thousands of packets of synthetic drugs with names including Avalon and Bizarro as well as

23

**Exhibit 3-A**

NC 00015472

approximately 17 pounds of suspected precursor material. A trailer outside the buildings was also searched and found to contain manufacturing items including tarps, spent cans of acetone, opened packets of retail synthetic drugs and unlabeled bags of synthetic drugs.

44. Law enforcement agents contacted the management of a commercial storage facility, U-LOK STOR, LLC which was located across the street from the search warrant suite locations. Investigation revealed an invoice reflecting that rental that units F80, F81, F37 and F38 had been rented by **PSYCHEDLIC BLUR, LLC; DREAM WORLD GLASS WORKS** and **CHUCK WOLFE**, 3477 Nameoki Road, Suite 165, Granite City, Illinois. Based upon your affiant's training and experience with other synthetic drug investigations, it is known that the distributors of synthetic drugs will often store inventory and other items in commercial storage units.

## TRAINING EXPERIENCE OF INVESTIGATIVE TEAM

45. With my experience and training, and that of other special agents and police officers on the investigating team, we have accumulated information and training in the areas of narcotics-based economic crime. The distribution of controlled substance analogues such as synthetic cannabinoid products and substituted cathinone products is often done through small, home based or internet businesses selling products to convenience stores, adult product stores, head shops and gas stations. These products which are often purchased or manufactured at a small price are sold at prices generating very large profit margins. Some of the money generated is utilized to continue the business operations.

46. Additionally, based upon my training, experience, and participation in investigations involving importation of controlled substances and analogues through the Drug Enforcement Administration; my investigation into controlled substances, analogues, and

24

**Exhibit 3-A**

NC 00015473

dangerous drugs; from speaking with other Agents and Officers; and my investigation further detailed in this affidavit, I have learned the following:

a. Controlled substance importers and distributors often intentionally mislabel parcels to hide the fact that the package actually contains controlled substances to avoid the substances being seized;

b. Distributors of controlled substance analogues will often mislabel wholesale or retail packaging to hide the fact that the substance will be utilized for human consumption and maintain labeling and packaging material;

c. Persons involved in importing and distributing controlled substances, in particular those who import controlled substance chemicals or controlled substance analogue chemicals typically possess items or documents showing the lab testing of the chemicals or like substances (e.g. analogues), maintain inventories of organic material to which the controlled substances are applied, and maintain packaging materials for the controlled substances or the products manufactured from the controlled substances;

d. Persons involved in the production of smokable synthetic cannabinoid products or substituted cathinones products (which are both analogues of controlled Schedule I substances) typically illegally import analogue substances into the United States using the United States Postal Service or a similar postal carrier.  Once the analogues have entered the United States, these persons typically, in the case of smokable synthetic cannabinoid products, spray the analogue substance onto an organic material and allow it to dry or, in the case of substituted cathinones products, mix the analogue substances with other compounds to produce the

25

**Exhibit 3-A**

NC 00015474

desired mixture.  These persons then sell the altered organic compound for human consumption under the street names of "spice" and/or "bath salts" utilizing various product names;

e.  Persons involved in setting up a home business operation for the distribution of synthetic cannabinoid products or substituted cathinones will often utilize storage facilities, warehousing facilities, or business locations to manufacture and store products for wholesale or retail sale until it can be distributed;

f.  The trafficking of illicit controlled substances or controlled substance analogues and the products manufactured from such is a cash-intensive enterprise, similar to the trafficking of "traditional" illicit drugs such as marijuana or cocaine.  Persons involved in distributing large quantities of synthetic cannabinoid  products or cathinone products generate large amounts of money which may be concealed within a residence, vehicle, business, other storage facility, as well as financial institutions, within their dominion and control are easily converted to other assets such as precious metals.  The proceeds are easily converted to other investment vehicles or financial instruments to include precious metals in an attempt to launder or conceal the monetary gains;

a.  Persons involved in the distribution of synthetic cannabinoid products or substituted cathinones will disguise the distribution through the appearance of a legitimate business operation and maintain business records regarding the purchase of the substances, sale of the substances, distributors and other information, including but not limited to, business records and archived business conversations.  I also know from my

26

**Exhibit 3-A**                                   NC 00015475

experience and training that such records and documents are kept and stored in computers, electronic and digital storage devices, and mobile devices in addition to or in lieu of hard-copy versions of this data. Similar to filing cabinets, boxes, or other physical devices for such records and documents, computers, electronic storage media and peripherals are commonplace and are often located inside residences. Further, documents and records can be "hidden" within such electronic storage media. Based on my knowledge, training, and experience, and the knowledge, training and experience of the investigators with expertise in computer and electronic/digital evidence, I am aware of the following search considerations and factors:

 i. Volume of evidence: Computer storage devices, including but not limited to hard disks, diskettes, tapes, CDs, DVDs, and thumb drives, can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instruments of a crime. This sorting process can take weeks or months, depending on the volume of data stored;

 ii. Technical requirements: Searching computer systems for criminal evidence can be a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer

27

**Exhibit 3-A**

NC 00015476

hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden", erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap") a controlled environment is essential to its complete and accurate analysis;

iii. Data analysis may use several different techniques to search electronic data for evidence or instrumentalities of a crime. These include, but are not limited to the following: examining file directories and subdirectories for the lists of files they contain, "opening" or reading the first few "pages" of selected files to determine their contents, scanning for deleted or hidden data, searching for key words or phrases ("string searches"). In view of the forgoing, computer related items sought to be searched include the following:

1. Hardware - Computer hardware consists of any and all computer equipment capable of being linked together in a local area network (LAN) (to include any equipment which

28

**Exhibit 3-A**

NC 00015477

has remote access capabilities) including all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes, but not limited to, any data-processing devices (such as central processing units, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as hard drives, fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, flash drives, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communication devices (such as modems, cables, and connections); as well an any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks);

2. Software - Computer software is digital information which can be interpreted by a computer and any related components to direct the way the work. Software is stored in electronic, magnetic, optical, or digital form. It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet

29

**Exhibit 3-A**                    NC 00015478

programs), utilities, compilers, interprets, and communications programs;

3. Documentation - Computer related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items;

4. Mobile devices - advances in mobile technology, such as "smart" phones, have made it possible for persons or representatives of businesses and criminal organizations to conduct activities on personal mobile devices, such as phones, or personal electronic tablet devices, such as an iPad, which are capable of sending electronic communications including electronic mail and electronic "text" messages. These devices also make it possible for an individual to access the Internet to operate email, websites, or store digital and electronic information;

5. Electronically Store Data - Any and all such data concerning the sales of imitation controlled substances and drug paraphernalia, laundering of monetary instruments, and engaging in monetary transactions in property derived from specified unlawful activity. Any and all identification documents and such data consisting of information stored

30

**Exhibit 3-A**

NC 00015479

on back-up tapes, computer hard drives, and/or any other form or manner;

6. Passwords and Data Security - Computer passwords and other data security devices are designated to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming codes. A password (a string of alphanumeric characters) usually operates as a sort of digital key to "unlock" particular date security devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it;

7. All documentation relating to retail sales including, but not limited to, sales invoices, Missouri sales/withholding tax returns, customer receipts, vendor/supplier invoices, cash register sales receipts, bank statements, bank/ATM card statements, credit card statements, check book and check registers, general ledgers, sales journals, payroll records (W-2 forms), employee information (W-4 forms),

31

**Exhibit 3-A**

NC 00015480

employment verification (I-9 forms), employee pay stubs, and income statements. All of the foregoing items of evidence in whatever form and by whatever means such items may have been created or stored on the computer to be searched, all of, which constitute evidence of violations of Title 21, United States Code Sections 813, 841 and 846, and Title 18, United States Code, Section 1956, found within the vehicles and premises:

g. It is also in the experience of your affiant that drug trafficking organizations, to include traffickers of synthetic drugs, rely heavily on mobile phones and devices to conduct activities related to and in furtherance of the criminal activity. Mobile phones are used to pass communications such as instructions, negotiations, directions, and locations, both verbally and in writing via electronic message; and

h. Advances in mobile technology, such as "smart" phones, have made it possible for persons or representatives of businesses and criminal organizations to conduct activities on personal mobile devices, such as phones, or personal electronic tablet devices, which are capable of sending electronic communications including electronic mail and electronic "text" messages. These devices also make it possible for an individual to access the Internet to operate websites or store digital and electronic information and records in furtherance of the criminal activity.

## CONCLUSION

As a result, based on the foregoing facts presented above and contained herein, my training and experience, and training and experience of the investigative team, your affiant believes

32

**Exhibit 3-A**

NC 00015481

there is probable cause to believe that evidence of a violation of Title 21, United States Code, Sections 331, 813, 841(a)(1) and 846, will be found at the following locations: A) Storage Unit F80, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, MO; B) Storage Unit F81, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, MO; C) Storage Unit F37, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, MO; D) Storage Unit F38, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, MO

47. The disclosure of the contents of the Application, Affidavit, and Search Warrant could compromise and jeopardized an ongoing investigation and witnesses who have provided information to the agents conducting the same; therefore it is respectfully requested that these materials be filed under seal.

**Exhibit 3-A**

NC 00015482

AO 5 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Missouri

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| Storage Unit F81, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, Missouri. | ) Case No.    4:13MJ07269 SPM |
| | ) |
| | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, _____Wayne House_____ , a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following  property:

Storage Unit F81, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, Missouri,

located in the _____EASTERN_____ District of _____MISSOURI_____ , there is now concealed

see attached List - referred to as "ATTACHMENT D"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 331, 813, 841(a)(1), & 846; | --Manufacturing and Distribution, and Conspiracy to do so, of controlled substances and analogues of Schedule I controlled substances, Distribution of misbranded drugs; and |
| 18 USC 1956 & 1957 | --Money laundering |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

WAYNE HOUSE, Special Agent
Immigration and Customs Enforcement,
Homeland Security Investigations
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____September 25, 2013_____

_____
*Judge's signature*

City and state: _____St. Louis, MO_____

Honorable Shirley P. Mensah, U.S. Magistrate Judge
*Printed name and title*

AUSA:  James C. Delworth

**Exhibit 3-B**

NC 00015444

AO 93  (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Missouri

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | |
| Storage Unit F81, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, Missouri. | ) | Case No.   4:13MJ07269 SPM |
| | ) | |
| | ) | |
| | ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

         An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the ————— EASTERN ————— District of ————— MISSOURI —————

         Storage Unit F81, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, Missouri,

         The person or property to be searched, described above, is believed to conceal:

see attached List - referred to as "ATTACHMENT D"

         I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

         **YOU ARE COMMANDED** to execute this warrant on or before ———————— October 7, 2013 ————————
                                                                                                    *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.         ☐ at any time in the day or night as I find reasonable cause has been
                                                                      established.

         Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

         The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
————— Shirley P. Mensah —————————————— .
                               *(name)*

         ☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐for ———— days *(not to exceed 30).*
                                                      ☐until, the facts justifying, the later specific date of ———————— .

Date and time issued: 9-25-13;  4:31 p.m.         ——————————————————————
                                                                                                    *Judge's signature*

City and state:     St. Louis, MO ————————         Honorable Shirley P. Mensah, U.S. Magistrate Judge
                                                                                       *Printed name and title*

**Exhibit 3-B**                                                         NC 00015445

LIST OF ITEMS TO BE SEIZED AND SEARCHED

1. Controlled substances and controlled substance analogues, to wit: synthetic cannabinoid products and synthetic cathinone products retail packaging, bulk packaging, and raw chemical forms including but not limited to products under the retail brand names: Mad Hatter, Black Arts, Mega Kush, Dirty Dirt Devil, Devil's Dank, Night Train, Freedom, and Bunker Buster.

2. Packaging material including, but not limited to, retail labeling for the packaging, marketing, and distribution of controlled substances and controlled substance analogues.

3. Materials and supplies related to the manufacture of controlled substances and controlled substance analogues, to wit synthetic cannabinoid products and substitute cathinone products.

4. Currency or other assets representing the proceeds of the distribution of synthetic cannabinoid products and synthetic cathinone products.

5. All business records, books, notes, documents, data records and information, including but not limited to information relating to the transportation, ordering, purchasing, sale and distribution of controlled substances and controlled substance analogues and vendor and/or supplier invoices, of **PSYCHEDELIC BLUR, DREAM WORLD GLASS (a/k/a GLASSWORKS), PAGGREGATE, PALMCORP., NGURU,** or any variation of these names associated with the manufacture and distribution of controlled substances, controlled substance analogues, and distribution of misbranded drugs in violation of Title 21, United States Code, Sections 331, 813, 841(a)(1), 846 and the laundering of drug trafficking proceeds in violation of Title 18, United States Code, Section 1956.

6. All documents regarding all loans, deeds to property and titles to vehicles in the name of **PSYCHEDELIC BLUR, DREAM WORLD GLASS (a/k/a GLASSWORKS),**

**Exhibit 3-B**

NC 00015446

**PAGGREGATE, PALMCORP., NGURU** or any variation of these names associated with the manufacture and distribution of controlled substances, controlled substance analogues, and distribution of misbranded drugs in violation of Title 21, United States Code, Sections 331, 813, 841(a)(1), 846 and the laundering of drug trafficking proceeds in violation of Title 18, United States Code, Section 1956.

7. All financial records including but not limited to bank statements, wire transfer forms, deposits, checks, money orders, money transfer forms, cashier checks, any records evidencing money being transferred to, from or within a financial institution in any form, mortgage insurance documents, organization documents, notices of transfer of servicing, loan applications, credit reports, certificates of deposits register receipts, statements, credit card statements, check book registers and ledgers, sales journals, account ledgers, balance, sheets, financial reports, profit/loss statements, investment records and cash flow statements payroll records (W-2 forms), employee information (W-4 forms), employment verification (I-9 ) forms, employee pay stubs, and income statements for **PSYCHEDELIC BLUR, DREAM WORLD GLASS (a/k/a GLASSWORKS), PAGGREGATE, PALMCORP., NGURU** or any variation of these names associated with the manufacture and distribution of controlled substances, controlled substance analogues, and distribution of misbranded drugs in violation of Title 21, United States Code, Sections 331, 813, 841(a)(1), 846 and the laundering of drug trafficking proceeds in violation of Title 18, United States Code, Section 1956.

8. Any and all documents, data, and records relating to the possession, dominion and control of the computer systems, storage devices, electronic storage devices, and digital storage devices, to be searched and seized;

**Exhibit 3-B**

NC 00015447

9. Computers, electronic storage devices, digital storage devices and all records and archives contained therein to include;

    a. All data files, including but not limited to, records and graphic representations, containing matter pertaining to the manufacture or trafficking in controlled substances or controlled substance analogues, that is, documents and visual depictions of accounting records, websites, marketing, and facilitating records.

    b. Graphic interchange formats and/or photographs, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI and MPEG) containing matter pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

    c. Electronic mail, chat logs, Internet Relay Chat (IRC) log files, and electronic messages, to include short message service (SMS) and multimedia messaging service (MMS), concerning the trafficking of controlled substances and controlled substance analogues through interstate or foreign commerce, including by United States mail or by computer, visual depictions, and records pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

    d. Log files and other records concerning dates and times of connection to the Internet and to websites pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

**Exhibit 3-B**

NC 00015448

e.  Any Instant Message conversations, chats, e-mails, text messages, or letters pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

f.  Call logs pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

**Exhibit 3-B**

NC 00015449

AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Missouri

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| Storage Unit F37, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, Missouri. | )<br>)<br>) | Case No.    4:13MJ07270 SPM |
| | ) | |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, _____Wayne House_____, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

Storage Unit F37, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, Missouri,

located in the _____EASTERN_____ District of _____MISSOURI_____, there is now concealed

see attached List - referred to as "ATTACHMENT D"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 331, 813, 841(a)(1), & 846; | --Manufacturing and Distribution, and Conspiracy to do so, of controlled substances and analogues of Schedule I controlled substances, Distribution of misbranded drugs; and |
| 18 USC 1956 & 1957 | --Money laundering |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

WAYNE HOUSE, Special Agent
Immigration and Customs Enforcement,
Homeland Security Investigations
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____September 25, 2013_____

*Judge's signature*

City and state: _____St. Louis, MO_____

Honorable Shirley P. Mensah, U.S. Magistrate Judge
*Printed name and title*

AUSA:   James C. Delworth

**Exhibit 3-C**

NC 00015426

## LIST OF ITEMS TO BE SEIZED AND SEARCHED

1. Controlled substances and controlled substance analogues, to wit: synthetic cannabinoid products and synthetic cathinone products retail packaging, bulk packaging, and raw chemical forms including but not limited to products under the retail brand names: Mad Hatter, Black Arts, Mega Kush, Dirty Dirt Devil, Devil's Dank, Night Train, Freedom, and Bunker Buster.

2. Packaging material including, but not limited to, retail labeling for the packaging, marketing, and distribution of controlled substances and controlled substance analogues.

3. Materials and supplies related to the manufacture of controlled substances and controlled substance analogues, to wit synthetic cannabinoid products and substitute cathinone products.

4. Currency or other assets representing the proceeds of the distribution of synthetic cannabinoid products and synthetic cathinone products.

5. All business records, books, notes, documents, data records and information, including but not limited to information relating to the transportation, ordering, purchasing, sale and distribution of controlled substances and controlled substance analogues and vendor and/or supplier invoices, of **PSYCHEDELIC BLUR, DREAM WORLD GLASS (a/k/a GLASSWORKS), PAGGREGATE, PALMCORP., NGURU**, or any variation of these names associated with the manufacture and distribution of controlled substances, controlled substance analogues, and distribution of misbranded drugs in violation of Title 21, United States Code, Sections 331, 813, 841(a)(1), 846 and the laundering of drug trafficking proceeds in violation of Title 18, United States Code, Section 1956.

6. All documents regarding all loans, deeds to property and titles to vehicles in the name of **PSYCHEDELIC BLUR,   DREAM   WORLD   GLASS   (a/k/a   GLASSWORKS),**

**Exhibit 3-C**

NC 00015427

**PAGGREGATE, PALMCORP., NGURU** or any variation of these names associated with the manufacture and distribution of controlled substances, controlled substance analogues, and distribution of misbranded drugs in violation of Title 21, United States Code, Sections 331, 813, 841(a)(1), 846 and the laundering of drug trafficking proceeds in violation of Title 18, United States Code, Section 1956.

7. All financial records including but not limited to bank statements, wire transfer forms, deposits, checks, money orders, money transfer forms, cashier checks, any records evidencing money being transferred to, from or within a financial institution in any form, mortgage insurance documents, organization documents, notices of transfer of servicing, loan applications, credit reports, certificates of deposits register receipts, statements, credit card statements, check book registers and ledgers, sales journals, account ledgers, balance, sheets, financial reports, profit/loss statements, investment records and cash flow statements payroll records (W-2 forms), employee information (W-4 forms), employment verification (I-9 ) forms, employee pay stubs, and income statements for **PSYCHEDELIC BLUR, DREAM WORLD GLASS (a/k/a GLASSWORKS), PAGGREGATE, PALMCORP., NGURU** or any variation of these names associated with the manufacture and distribution of controlled substances, controlled substance analogues, and distribution of misbranded drugs in violation of Title 21, United States Code, Sections 331, 813, 841(a)(1), 846 and the laundering of drug trafficking proceeds in violation of Title 18, United States Code, Section 1956.

8. Any and all documents, data, and records relating to the possession, dominion and control of the computer systems, storage devices, electronic storage devices, and digital storage devices, to be searched and seized;

**Exhibit 3-C**

NC 00015428

9. Computers, electronic storage devices, digital storage devices and all records and archives contained therein to include;

    a. All data files, including but not limited to, records and graphic representations, containing matter pertaining to the manufacture or trafficking in controlled substances or controlled substance analogues, that is, documents and visual depictions of accounting records, websites, marketing, and facilitating records.

    b. Graphic interchange formats and/or photographs, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI and MPEG) containing matter pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

    c. Electronic mail, chat logs, Internet Relay Chat (IRC) log files, and electronic messages, to include short message service (SMS) and multimedia messaging service (MMS), concerning the trafficking of controlled substances and controlled substance analogues through interstate or foreign commerce, including by United States mail or by computer, visual depictions, and records pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

    d. Log files and other records concerning dates and times of connection to the Internet and to websites pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

**Exhibit 3-C**

NC 00015429

e.  Any Instant Message conversations, chats, e-mails, text messages, or letters pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

f.  Call logs pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

**Exhibit 3-C**

NC 00015430

AO 93  (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the
Eastern District of Missouri

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | |
| Storage Unit F37, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, Missouri. | ) | Case No.     4:13MJ07270 SPM |
| | ) | |
| | ) | |
| | ) | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the ———— EASTERN ———— District of ———— MISSOURI ————

Storage Unit F37, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, Missouri,

The person or property to be searched, described above, is believed to conceal:

see attached List - referred to as "ATTACHMENT D"

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before ———————— October 7, 2013 ————————
                                                                                                    (not to exceed 14 days)

☑ in the daytime  6:00 a.m. to 10 p.m.     ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
    Shirley P. Mensah                                                                            .
                    (name)

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized (check the appropriate box) ☐for _____ days (not to exceed 30).
                                                                        ☐until, the facts justifying, the later specific date of _____ .

Date and time issued: 9-25-13;  4:30 pm·           _____
                                                                                              Judge's signature

City and state:     St. Louis, MO                     _Honorable Shirley P. Mensah, U.S. Magistrate Judge
                                                                                    Printed name and title

**Exhibit 3-C**                                         NC 00015431

AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Missouri

In the Matter of the Search of )
)
Storage Unit F38, U-LOK STOR, Inc., 13789 St. Charles Rock Road, ) Case No.    4:13MJ07271 SPM
Bridgeton, Missouri. )
)
)

## APPLICATION FOR A SEARCH WARRANT

I, _____Wayne House_____, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

Storage Unit F38, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, Missouri,

located in the _____EASTERN_____ District of _____MISSOURI_____, there is now concealed

see attached List - referred to as "ATTACHMENT D"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 331, 813, 841(a)(1), & 846; | --Manufacturing and Distribution, and Conspiracy to do so, of controlled substances and analogues of Schedule I controlled substances, Distribution of misbranded drugs; and |
| 18 USC 1956 & 1957 | --Money laundering |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

WAYNE HOUSE, Special Agent
Immigration and Customs Enforcement,
Homeland Security Investigations
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____September 25, 2013_____

_____
*Judge's signature*

City and state: _____St. Louis, MO_____

Honorable Shirley P. Mensah, U.S. Magistrate Judge
*Printed name and title*

AUSA:   James C. Delworth

**Exhibit 3-D**

NC 00015432

AO 93  (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Missouri

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | |
| Storage Unit F38, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, Missouri. | ) | Case No.    4:13MJ07271 SPM |
| | ) | |
| | ) | |
| | ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the ——————— EASTERN ——————— District of ——————— MISSOURI ———————

Storage Unit F38, U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, Missouri,

The person or property to be searched, described above, is believed to conceal:

see attached List - referred to as "ATTACHMENT D"

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____ October 7, 2013 _____
*(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.        ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
_____ Shirley P. Mensah _____ .
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐for _____ days *(not to exceed 30).*
☐until, the facts justifying, the later specific date of _____ .

Date and time issued: 9-26-13; 4:33p.m.                    _____
                                                                                              *Judge's signature*

City and state:    St. Louis, MO _____                    _ Honorable Shirley P. Mensah, U.S. Magistrate Judge
                                                                                    *Printed name and title*

**Exhibit 3-D**

NC 00015433

## LIST OF ITEMS TO BE SEIZED AND SEARCHED

1. Controlled substances and controlled substance analogues, to wit: synthetic cannabinoid products and synthetic cathinone products retail packaging, bulk packaging, and raw chemical forms including but not limited to products under the retail brand names: Mad Hatter, Black Arts, Mega Kush, Dirty Dirt Devil, Devil's Dank, Night Train, Freedom, and Bunker Buster.

2. Packaging material including, but not limited to, retail labeling for the packaging, marketing, and distribution of controlled substances and controlled substance analogues.

3. Materials and supplies related to the manufacture of controlled substances and controlled substance analogues, to wit synthetic cannabinoid products and substitute cathinone products.

4. Currency or other assets representing the proceeds of the distribution of synthetic cannabinoid products and synthetic cathinone products.

5. All business records, books, notes, documents, data records and information, including but not limited to information relating to the transportation, ordering, purchasing, sale and distribution of controlled substances and controlled substance analogues and vendor and/or supplier invoices, of **PSYCHEDELIC BLUR, DREAM WORLD GLASS (a/k/a GLASSWORKS), PAGGREGATE, PALMCORP., NGURU,** or any variation of these names associated with the manufacture and distribution of controlled substances, controlled substance analogues, and distribution of misbranded drugs in violation of Title 21, United States Code, Sections 331, 813, 841(a)(1), 846 and the laundering of drug trafficking proceeds in violation of Title 18, United States Code, Section 1956.

6. All documents regarding all loans, deeds to property and titles to vehicles in the name of **PSYCHEDELIC BLUR, DREAM WORLD GLASS (a/k/a GLASSWORKS),**

**Exhibit 3-D**                    NC 00015434

PAGGREGATE, PALMCORP., NGURU or any variation of these names associated with the manufacture and distribution of controlled substances, controlled substance analogues, and distribution of misbranded drugs in violation of Title 21, United States Code, Sections 331, 813, 841(a)(1), 846 and the laundering of drug trafficking proceeds in violation of Title 18, United States Code, Section 1956.

7. All financial records including but not limited to bank statements, wire transfer forms, deposits, checks, money orders, money transfer forms, cashier checks, any records evidencing money being transferred to, from or within a financial institution in any form, mortgage insurance documents, organization documents, notices of transfer of servicing, loan applications, credit reports, certificates of deposits register receipts, statements, credit card statements, check book registers and ledgers, sales journals, account ledgers, balance, sheets, financial reports, profit/loss statements, investment records and cash flow statements payroll records (W-2 forms), employee information (W-4 forms), employment verification (I-9 ) forms, employee pay stubs, and income statements for **PSYCHEDELIC BLUR, DREAM WORLD GLASS (a/k/a GLASSWORKS), PAGGREGATE, PALMCORP., NGURU** or any variation of these names associated with the manufacture and distribution of controlled substances, controlled substance analogues, and distribution of misbranded drugs in violation of Title 21, United States Code, Sections 331, 813, 841(a)(1), 846 and the laundering of drug trafficking proceeds in violation of Title 18, United States Code, Section 1956.

8. Any and all documents, data, and records relating to the possession, dominion and control of the computer systems, storage devices, electronic storage devices, and digital storage devices, to be searched and seized;

**Exhibit 3-D**

NC 00015435

9. Computers, electronic storage devices, digital storage devices and all records and archives contained therein to include;

    a. All data files, including but not limited to, records and graphic representations, containing matter pertaining to the manufacture or trafficking in controlled substances or controlled substance analogues, that is, documents and visual depictions of accounting records, websites, marketing, and facilitating records.

    b. Graphic interchange formats and/or photographs, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI and MPEG) containing matter pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

    c. Electronic mail, chat logs, Internet Relay Chat (IRC) log files, and electronic messages, to include short message service (SMS) and multimedia messaging service (MMS), concerning the trafficking of controlled substances and controlled substance analogues through interstate or foreign commerce, including by United States mail or by computer, visual depictions, and records pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

    d. Log files and other records concerning dates and times of connection to the Internet and to websites pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

**Exhibit 3-D**

NC 00015436

e.  Any Instant Message conversations, chats, e-mails, text messages, or letters pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

f.  Call logs pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

**Exhibit 3-D**

NC 00015437