AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

## for the
### Eastern District of Missouri

In the Matter of the Search of )
21 Winding Stairway, O'Fallon, MO 63368,  further described as a two-story, )
single-family residence located on the west side of the street that has a red brick and stone )
front with two large white pillars holding up the overhanging front porch.  The remaining )
three quarters of the house are white vinyl siding with an attached two-car garage that )
opens to the north side of the house and a deck located on the back of the residence.  At the )
entrance of the driveway, there is a white mailbox located atop of a white square post with )
the numbers "21" located on the post. The rear of the residence is surrounded by a white )
vinyl privacy fence. )

Case No.    4:14MJ07119 SPM

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the —————— EASTERN —————— District of —————— MISSOURI ——————

21 Winding Stairway, O'Fallon, MO 63368 (as more fully described above),

The person or property to be searched, described above, is believed to conceal:

see attached LIST

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or
property.

**YOU ARE COMMANDED** to execute this warrant on or before —————— June 19, 2014 ——————
*(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.     ☐ at any time in the day or night as I find reasonable cause has been
established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property
taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the
place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an
inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
 Shirley P. Mensah                                                .
                        *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay
of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be
searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30)*.

☐ until, the facts justifying, the later specific date of _____.

Date and time issued: June 6, 2014; 3:40 p.m.                     _____
                                                                                    *Judge's signature*

City and state:    St. Louis, MO _____          Honorable Shirely P. Mensah, U.S. Magistrate Judge
                                                                            *Printed name and title*

**Exhibit 9**

NC 00015327

# LIST

**Items to be Seized**

1.      Controlled substances and controlled substance analogues, to wit synthetic cannabinoid products and substitute cathinone products in retail packaging, bulk packaging, and raw chemical forms  including, but not limited to, products under the retail brand names "Avalon," "Bizarro," "Black Arts," "Bunker Buster," "Devil's Dank," "Dirty Dirt Devil," "Freedom," "Full Throttle," "Grave Digger," "Golden Leaf," "Head Trip," "Lights Out," "Mad Hatter," and "Vortex."

2.      Packaging material including, but not limited to, retail labeling for the packaging, marketing, and distribution of controlled substances and controlled substance analogues.

3.      Materials and supplies related to the manufacture of controlled substances and controlled substance analogues, to wit synthetic cannabinoid products and substitute cathinone products.

4.      Currency, monetary instruments, or other assets representing proceeds from the distribution of synthetic cannabinoid products and substitute cathinone products.

5.      All business records of JOSEPH D. GABRICK, BLUE SKY SOLUTIONS, LLC, PSYCHEDLIC BLUR, DREAM WORLD GLASS (aka GLASSWORKS), PAGGREGATE, PALMCORP., NGURU, or other entities associated with the manufacture and distribution of controlled substances, controlled substance analogues, and distribution of misbranded drugs, books; notes, business records, papers, documents, data records, and information related to violations of Title 21, United States Code, Sections 331, 813, 841(a)(1), 846, including, but not limited to, all records, ledgers, documents, or information relating to the transportation, ordering, purchasing, and distribution of controlled substances, controlled substance analogues and misbranded drugs.

**Exhibit 9**

NC 00015328

6.      All documentation related to JOSEPH D. GABRICK, BLUE SKY SOLUTIONS, LLC, PSYCHEDLIC BLUR, DREAM WORLD GLASS (a/k/a GLASSWORKS), PAGGREGATE, PALMCORP, NGURU, or other entities associated with the manufacture and distribution of controlled substances, controlled substance analogues and misbranded drugs, wholesale and retail sales including, but not limited to, sales invoices, Missouri sales and withholding tax returns, customer receipts, vendor and/or supplier invoices, payment processing device or register receipts, bank statements, bank/ATM card statements, credit card statements, check book registers and ledgers, sales journals, payroll records (W-2 forms), employee information (W-4 forms), employment verification (I-9 ) forms, employee pay stubs, and income statements.

7.      All financial records related to JOSEPH D. GABRICK, BLUE SKY SOLUTIONS, LLC, PSYCHEDLIC BLUR, DREAM WORLD GLASS (a/k/a GLASSWORKS), PAGGREGATE, PALMCORP, NGURU, or other entities associated with the manufacture and distribution of controlled substance, controlled substance analogues, and misbranded drugs, books, notes, ledgers, papers, bank records and statements, forms of payment, documents, data, records, and information related to violations of Title 18, United States Code, Section 1956 (laundering of monetary instruments).

8.      Any and all documents, data, and records relating to the possession, dominion and control of computer systems, storage devices, electronic storage devices, and digital storage devices to be searched and seized.

9.      Records and archives contained on or in electronic devices in digital formats to include;

a.      All data files, including but not limited to, records and graphic representations, containing matter pertaining to the manufacture or trafficking in controlled

2

**Exhibit 9**

NC 00015329

substances or controlled substance analogues, that is, documents and visual depictions of accounting records, websites, marketing, and facilitating records.

   b.  Graphic interchange formats and/or photographs, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI and MPEG) containing matter pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

   c.  Electronic mail, chat logs, Internet Relay Chat (IRC) log files, and electronic messages, to include short message service (SMS) and multimedia messaging service (MMS), concerning the trafficking of controlled substances and controlled substance analogues through interstate or foreign commerce, including by United States mail or by computer, visual depictions, and records pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

   d.  Log files and other records concerning dates and times of connection to the Internet and to websites pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

   e.  Any Instant Message conversations, chats, e-mails, text messages, or letters pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

   f.  Call logs pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

3

**Exhibit 9**

NC 00015330

AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of Missouri

In the Matter of the Search of

21 Winding Stairway, O'Fallon, MO 63368,  further described as a two-story, single-family   )
residence located on the west side of the street that has a red brick and stone front with two   )
large white pillars holding up the overhanging front porch.  The remaining three quarters of   )    Case No.    4:14MJ07119 SPM
the house are white vinyl siding with an attached two-car garage that opens to the north side   )
of the house and a deck located on the back of the residence.  At the entrance of the driveway )
there is a white mailbox located atop of a white square post with the numbers "21" located on )
the post. The rear of the residence is surrounded by a white vinyl privacy fence.   )

## APPLICATION FOR A SEARCH WARRANT

I, _____ Wayne House _____, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following  property:

21 Winding Stairway, O'Fallon, MO 63368 (as more-fully described above),

located in the _____EASTERN_____ District of _____MISSOURI_____, there is now concealed

see attached LIST

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 813, 841a1, 846 | --Distribution, and Conspiracy to do so, of controlled substances and analogues of Schedule I controlled substances; and |
| 18 USC 1956 & 1957 | --Money laundering |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

WAYNE HOUSE, Special Agent
Immigration and Customs Enforcement, Homeland Security
Investigations          *Printed name and title*

Sworn to before me and signed in my presence.

Date: _____June 6, 2014_____

*Judge's signature*

City and state:  St. Louis, MO

Honorable Shirely P. Mensah, U.S. Magistrate Judge
*Printed name and title*

AUSA:   James C. Delworth

## Exhibit 9

NC 00015293

# LIST

**Items to be Seized**

1. Controlled substances and controlled substance analogues, to wit synthetic cannabinoid products and substitute cathinone products in retail packaging, bulk packaging, and raw chemical forms  including, but not limited to, products under the retail brand names "Avalon," "Bizarro," "Black Arts," "Bunker Buster," "Devil's Dank," "Dirty Dirt Devil," "Freedom," "Full Throttle," "Grave Digger," "Golden Leaf," "Head Trip," "Lights Out," "Mad Hatter," and "Vortex."

2. Packaging material including, but not limited to, retail labeling for the packaging, marketing, and distribution of controlled substances and controlled substance analogues.

3. Materials and supplies related to the manufacture of controlled substances and controlled substance analogues, to wit synthetic cannabinoid products and substitute cathinone products.

4. Currency, monetary instruments, or other assets representing proceeds from the distribution of synthetic cannabinoid products and substitute cathinone products.

5. All business records of JOSEPH D. GABRICK, BLUE SKY SOLUTIONS, LLC, PSYCHEDLIC BLUR, DREAM WORLD GLASS (aka GLASSWORKS), PAGGREGATE, PALMCORP., NGURU, or other entities associated with the manufacture and distribution of controlled substances, controlled substance analogues, and distribution of misbranded drugs, books; notes, business records, papers, documents, data records, and information related to violations of Title 21, United States Code, Sections 331, 813, 841(a)(1), 846, including, but not limited to, all records, ledgers, documents, or information relating to the transportation, ordering, purchasing, and distribution of controlled substances, controlled substance analogues and misbranded drugs.

**Exhibit 9**

NC 00015294

6.      All documentation related to JOSEPH D. GABRICK, BLUE SKY SOLUTIONS, LLC, PSYCHEDLIC BLUR, DREAM WORLD GLASS (a/k/a GLASSWORKS), PAGGREGATE, PALMCORP, NGURU, or other entities associated with the manufacture and distribution of controlled substances, controlled substance analogues and misbranded drugs, wholesale and retail sales including, but not limited to, sales invoices, Missouri sales and withholding tax returns, customer receipts, vendor and/or supplier invoices, payment processing device or register receipts, bank statements, bank/ATM card statements, credit card statements, check book registers and ledgers, sales journals, payroll records (W-2 forms), employee information (W-4 forms), employment verification (I-9 ) forms, employee pay stubs, and income statements.

7.      All financial records related to JOSEPH D. GABRICK, BLUE SKY SOLUTIONS, LLC, PSYCHEDLIC BLUR, DREAM WORLD GLASS (a/k/a GLASSWORKS), PAGGREGATE, PALMCORP, NGURU, or other entities associated with the manufacture and distribution of controlled substance, controlled substance analogues, and misbranded drugs, books, notes, ledgers, papers, bank records and statements, forms of payment, documents, data, records, and information related to violations of Title 18, United States Code, Section 1956 (laundering of monetary instruments).

8.      Any and all documents, data, and records relating to the possession, dominion and control of computer systems, storage devices, electronic storage devices, and digital storage devices to be searched and seized.

9.      Records and archives contained on or in electronic devices in digital formats to include;

a.      All data files, including but not limited to, records and graphic representations, containing matter pertaining to the manufacture or trafficking in controlled

2

**Exhibit 9**

NC 00015295

substances or controlled substance analogues, that is, documents and visual depictions of accounting records, websites, marketing, and facilitating records.

b.       Graphic interchange formats and/or photographs, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI and MPEG) containing matter pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

c.       Electronic mail, chat logs, Internet Relay Chat (IRC) log files, and electronic messages, to include short message service (SMS) and multimedia messaging service (MMS), concerning the trafficking of controlled substances and controlled substance analogues through interstate or foreign commerce, including by United States mail or by computer, visual depictions, and records pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

d.       Log files and other records concerning dates and times of connection to the Internet and to websites pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

e.       Any Instant Message conversations, chats, e-mails, text messages, or letters pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

f.       Call logs pertaining to the manufacture and distribution of controlled substances and controlled substance analogues and the laundering of proceeds of the same.

**Exhibit 9**

NC 00015296

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

Your affiant, Wayne House, a Special Agent with Immigration and Customs Enforcement (hereinafter "ICE"), Homeland Security Investigations (hereafter HSI), within the Department of Homeland Security, being duly sworn, depose and state the following:

## I.    INTRODUCTION AND AGENT BACKGROUND

1.    I am a Special Agent of ICE HSI, within the Department of Homeland Security, currently assigned to the Resident Agent in Charge St. Louis, Missouri, office. I have been a federal officer for eleven (11) years and have served in ICE HSI's Kansas City and St. Louis field offices and completed a two (2) year tour of duty in a headquarters level programmatic unit. Prior to my employment with ICE, I was employed as a police officer for five (5) years with the City of Chesterfield, Missouri, Police Department. During my employment with ICE HSI and with the City of Chesterfield, I have had the opportunity to lead, conduct, coordinate and/or participate in investigations concerning the importation, smuggling, and trafficking of controlled substances. I have received training focused on the importation, smuggling, and trafficking of controlled substances.

2.    This affidavit is in support of an application for a search warrant for the premises known as the residence of JOESPH D. GABRICK, d/b/a BLUE SKY SOLUTIONS, LLC (hereinafter "**GABRICK**"), located at 21 Winding Stairway, O`Fallon, MO 63368 (hereinafter "**target location**"). This location is being utilized for or facilitating the manufacturing and distribution of controlled substances and controlled substance analogues, distribution of misbranded drugs and money laundering, in violation of Title 21, United States Code, Sections 331, 813, 841, 846 and Title 18, United States Code, Sections 1956 and 1957.

1

**Exhibit 9**

NC 00015297

## II.   LOCATION TO BE SEARCHED:

**21 Winding Stairway, O'Fallon, MO 63368,** further described as a two-story, single-family residence located on the west side of the street that has a red brick and stone front with two large white pillars holding up the overhanging front porch. The remaining three quarters of the house are white vinyl siding with an attached two-car garage that opens to the north side of the house and a deck located on the back of the residence. At the entrance of the driveway, there is a white mailbox located atop of a white square post with the numbers "21" located on the post. The rear of the residence is surrounded by a white vinyl privacy fence (see "Attachment A" - Photograph and Description of 21 Winding Stairway, O'Fallon, MO 63368).

## III.   FEDERAL STATUTES

3.    **CONTROLLED SUBSTANCES**: A person is in violation of Title 21 U.S.C. §841, if that person knowingly or intentionally:

a.      manufactures, distributes, or dispenses, or possesses with intent to manufacture, distribute, or dispense, a controlled substance;

4.    **ANALOGUE CONTROLLED SUBSTANCES ACT**: Under Title 21 U.S.C. §813, a controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law as a controlled substance in Schedule I.

5.    **DEFINITION OF CONTROLLED SUBSTANCE ANALOGUE**: Title 21 U.S.C. §802(32)(A) defines a "controlled substance analogue" as a substance:

a.      the chemical compound of which is substantially similar to the chemical structure of a controlled substance in Schedule I or II; and

b.      which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effects on the central nervous system of a controlled substance in Schedule I or II.

2

**Exhibit 9**

NC 00015298

6.    **DISTRIBUTION/MANUFACTURE OF MISBRANDED DRUGS**: A person is in violation of Title 21 U.S.C. §331 if that person introduces or delivers for introduction into interstate commerce any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded and the manufacture of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded.

7.    **MONEY LAUNDERING**:  A person is in violation of Title 18 U.S.C. §1956 if the person, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity, with the intent to promote the carrying on of specified unlawful activity; or knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

IV.   **CONTROLLED SUBSTANCE ANALOGUES**

8.    I know that in recent years, individuals have begun to manufacture and traffic in smokable synthetic cannabinoid products, many times known on the street as "Spice" or "K2." Smokable synthetic cannabinoid products are a mixture of an organic "carrier" medium, such as the herb-like substance Damiana, which is then typically sprayed or mixed with a synthetic compound chemically similar to THC (tetrahydrocannabinol), the psychoactive ingredient in marijuana.  Currently, there are hundreds of synthetic cannabinoid compounds.  The five most common of these compounds, JWH-018; JWH-073; JWH-200; CP-47, 497 C8 homologue; and 47, 497 cannabicyclohexanol, were "emergency scheduled" by the DEA in March 2011.  In response, clandestine manufacturers and traffickers began distributing smokable synthetic cannabinoid products containing slightly varied synthetic cannabinoid compounds in an attempt

3

**Exhibit 9**

NC 00015299

to circumvent newly enacted federal and state laws.  Smokable synthetic cannabinoid products are commonly purchased in head shops, tobacco shops, convenience stores, adult stores and over the Internet.  They are often marketed as incense, potpourri or "fake weed" and almost always carry the markings "not for human consumption."  These markings are routinely in place in an attempt to fraudulent circumvent the product being identified as a controlled substance analogue. Users of these products have reported effects similar to marijuana, but many times greater to include but not limited to paranoia, panic attacks, increased heart rate and increased blood pressure.

9.      Through experience I know that individuals, in an attempt to circumvent laws in place which make the possession and distribution of certain synthetic drugs illegal, seek out and purchase or produce substances which have a similar but slightly different chemical structure. These substances will produce the same pharmacological effect on the human body when ingested.  In response to this production, Congress enacted the Controlled Substance Analogue Enforcement Act of 1986.

10.     Through research, training and experience, I know that the synthetic cannabinoid 1-pentyl-3-(1-naphthoyl)indole (JWH-018) is a schedule I controlled substance, and that until July 2012 the synthetic cannabinoids: 1-Pentyl-3-(2-methoxyphenylacetyl)indole (JWH-250), 1-Pentyl-3-(4-methyl-1-naphthoyl)indole      (JWH-122)      and      1-(5-Fluoropentyl)-3-(1-naphthoyl)indole (AM2201) met the definition of controlled substance analogues when intended for human consumption.    On July 9, 2012, these substance, JWH-018, JWH-250, JWH-122, AM2201 became permanently scheduled as control substances pursuant to the Synthetic Drug Abuse Act of 2012 (herein "SDAPA").  SDAPA amended the Controlled Substance Act (herein "CSA") by legislatively placing "cannabimimetic agents" and 26 substances in Schedule I.  As

**Exhibit 9**

NC 00015300

referenced earlier, I know these substances to be considered hallucinogens and further affect the human body in a similar way to THC, the active hallucinogen found in the organic drug marijuana.

11.     On May 16, 2013, the Deputy Administrator of DEA issued a final order to temporarily schedule three synthetic cannabinoids under the Controlled Substances Act (CSA) pursuant to the temporary scheduling provisions of Title 21 U.S.C. §811(h). The substances are (1-pentyl-1H-indol-3-yl)(2,2,3,3- tetramethylcyclopropyl)methanone (UR-144), [1-(5-fluoro-pentyl)-1H- indol-3-yl](2,2,3,3-tetramethylcyclopropyl)methanone (5-fluoro-UR-144, XLR11) and N-(1-adamantyl)-1-pentyl-1H-indazole-3-carboxamide (APINACA, AKB48). This action is based on a finding by the Deputy Administrator that the placement of these synthetic cannabinoids and their salts, isomers and salts of isomers into Schedule I of the CSA is necessary to avoid an imminent hazard to the public safety.

12.     According to the DEA Office of Diversion Control, Drug and Chemical Evaluation Section various synthetic cannabinoids (e.g., JWH-018, etc.) laced on plant material have been encountered by law enforcement in recent years. These are promoted under the guise of herbal incense products. These products laced with synthetic cannabinoids are smoked for their psychoactive effects. In response to State and Federal control of these synthetic cannabinoids, a transition to new synthetic cannabinoids laced on plant material has been observed.  AKB48, 5F-AKB48 and XLR -11 are three of the many synthetic cannabinoids recently encountered on the designer drug market.

13.     AKB48 and 5F-AKB48 belong to a structural class with a core indazole structure. They are structurally related to other synthetic cannabinoids with a core indole structure, such as the Schedule I substances JWH-018 and AM2201. These core structures (scaffolds) are

5

**Exhibit 9**                    NC 00015301

substituted at the 1- and 3-positions (R1 and R2, respectively) to give rise to these substances. AKB48 and 5F-AKB48 were not previously reported in the scientific literature prior to their appearance on the designer drug market.   AKB48 is pharmacologically similar to Schedule I substances THC and various synthetic cannabinoids (e.g., JWH-018, AM2201 etc.). In vitro studies show that AKB48, similar to Δ9-THC and various synthetic cannabinoids, binds to the brain cannabinoid CB1 receptors and displays agonist properties in functional assays, suggesting that it would have the same in vivo effects as Δ9-THC and various synthetic cannabinoids.  The binding affinity of AKB48 is higher than that of Δ9-THC.  Based on structure-activity relationship studies, 5F-AKB48 is expected to bind to CB1 receptors as well.  There are no published studies as to the safety of AKB48 or 5F-AKB48 for human use.  AKB48 and 5F-AKB48 were not previously reported in the scientific literature prior to their appearance on the designer drug market.   There are no commercial or medical uses for these substances. Information on user population in the U.S. is limited, and includes information from drug user internet forums. AKB48 and 5F-AKB48 abuse is not monitored by any national drug abuse surveys. Poison control centers continue to report adverse health effects in response to the abuse of herbal incense products.   AKB48 is a schedule I controlled substances under the Federal Controlled Substances Act. If intended for human consumption, 5F-AKB48 may be treated as a "controlled substance analogue" under the CSA pursuant to 21 U.S.C §§802(32)(A) and 813.

14.     PB-22 and 5F-PB-22 are two synthetic cannabinoids recently encountered on the designer drug market.  PB-22 and 5F-PB-22, JWH018 and AM2201 belong to a structural class of substances sharing a core indole structure.  This core structure (scaffold) is substituted at the 1- and -3 positions to give rise to these substances.  Behavioral pharmacology studies show that JWH-018 has activity in animals similar to that of Δ9 – THC but with higher affinity and

6

**Exhibit 9**                    NC 00015302

efficacy than $\Delta 9 - THC$, suggesting that it would have the same effects as $\Delta 9 - THC$ *in vivo*. Based on the structure-activity relationship studies, PB-22 and 5F-PB-22 are expected to have similar effects. PB-22 and 5F-PB-22 were not previously reported prior to their appearance on the designer drug market and there are no commercial or medical uses for these substances. Medical examiners and postmortem toxicology reports demonstrate the involvement of 5F-PB-22 in the death of at least five individuals. Prior to February 10, 2014, PB-22 and 5F-PB-22, if intended for human consumption, may have be treated as a "controlled substance analogue" under the CSA pursuant to 21 U.S.C §§802(32)(A) and 813. On February 10, 2014, the Deputy Administrator of DEA issued a final order to temporarily schedule PB-22 and 5F-PB-22 under the Controlled Substances Act (CSA) pursuant to the temporary scheduling provisions of Title 21 U.S.C. §811(h).

15.     During this investigation, your agents and members of the investigative team were confronted with a new synthetic cannabinoid, AB-FUBINACA. Although AB-FUBINACA does not appear in Schedule I, your agents, through their research have determined that both AB-PINACA and AB-FUBINACA are cannabimimetic indazole-derivatives. These substances were identified as designer drugs in illegal products in Japan. According to the articles that discusses the discovery of the substances (Forensic Toxicol (2013) 31:93–100), the samples used for analysis were three products purchased via the Internet in July 2012 in Japan; one as a chemical and two as herbal products. Each of the herbal products (A and B) contained about 3g of mixed dried plants. The AB-FUBINACA was extracted and isolated out of the 3 gram sample of the herbal product B. According to Wikipdeia, AB-FUBINACA is a drug that acts as a potent agonist for the cannabinoid receptors and was originally developed by Pfizer in 2009 as an analgesic medication but was never pursued for human use. Subsequently in 2012, AB-

7

**Exhibit 9**                    NC 00015303

FUBINACA was discovered as an ingredient in synthetic cannabis blends in Japan, along with a related compound AB-PINACA. (Even if this new substance is not determined to be a controlled substance analogue, manufacturing and distribution of this substance intended for human consumption without proper labeling is in violation of Title 21 U.S.C. §331.) On February 10, 2014, the Deputy Administrator of DEA issued a final order to temporarily schedule AB-FUBINACA under the Controlled Substances Act (CSA) pursuant to the temporary scheduling provisions of Title 21 U.S.C. §811(h).

## V.    DETAILS OF INVESTIGATION

16.    I am currently participating in an Organized Crime Drug Enforcement Task Force ("OCDETF") investigation with Internal Revenue Service Criminal Investigation, Drug Enforcement Administration, Federal Bureau of Investigation, United States Postal Inspection Service, Illinois States Attorney's Office, Effingham Police Department, St. Charles County Sheriff's Office and the United States Attorney's Office concerning the manufacturing and distribution of controlled substance and controlled substance analogues. The investigation initially focused upon **MICHAEL J. LENTSCH Jr**. (hereinafter "**LENTSCH**"), **ANWER N. RAO** (hereinafter "**RAO**") and **GREGORY SLOAN** (hereinafter "**SLOAN**"). **LENTSCH** and **RAO** d/b/a **OPM Midwest, Inc.** and **TS Botanical, Inc**. manufactured and marketed synthetic drugs under the brand name "**CLOUD 9**", along with other synthetic drugs, through a wholesale and retail distribution network known as **NEB DISTRIBUTING, LLC** and the **SILVER ROCKET GROUP, LLC** .

17.    In July, 2012, a number of state and federal search warrants were executed at the residences and business locations owned and or controlled by **RAO, LENTSCH** and **SLOAN** in July 2012. A substantial amount of synthetic drugs were seized along with business records. An

8

**Exhibit 9**

NC 00015304

analysis of business records for **NEB DISTRIBUTING** reflects that from on or about November, 2012 through July, 2012, **WOLFE,** doing business in his own name and the name **PSYCHEDELIC BLUR, LLC,** purchased and redistributed over $2,700,000.00 of synthetic drugs, (designated as herbal incense blends) obtained from **NEB Distributing, LLC**.

18.    Following the execution of search warrants in July, 2012, **LENTSCH, RAO** and **SLOAN** ceased to operate their manufacturing and distribution of synthetic drugs in the same manner and through the same companies.  As further detailed throughout the remainder of this affidavit, investigation reflects that **CHARLES A. WOLFE II d/b/a PSYCHEDELIC BLUR, LLC, DREAM WORLD GLASSWORKS, LLC, MARK PALMER, ANTHONY PALMER, PAGGREGATE, LLC, PALMCORP, LLC** and **NGURU, LLC** and others have now become involved in the manufacture and distribution of synthetic drugs and distribution of misbranded drugs

19.    In September/October 2013, you agents obtained multiple search warrants for **WOLFE's** residence, seven office locations in Bridgeton, Missouri, several storage lockers and a manufacturing facility in Barnhart, Missouri being utilized by **CHARLES A. WOLFE II d/b/a PSYCHEDELIC BLUR, LLC, DREAM WORLD GLASS, LLC** and **MARK PALMER d/b/a PAGGREGATE, LLC, PALMCORP, LLC** and **NGURU, LLC** and others to facilitate the manufacturing and distribution of controlled substances and controlled substance analogues, distribution of misbranded drugs and money laundering.  A manufacturing lab was located at the Barnhart location and a large quantity of synthetic drugs was seized from the Barnhart location, Bridgeton offices and storage lockers. The synthetic drugs were found to contain JWH-018, 5F-PB-22, PB-22, SLR-11, and AB-Fubinaca as well as other substances.

9

**Exhibit 9**

NC 00015305

20.     As a result of the search warrants executed during the course of this investigation, your agents identified **JOSEPH GABRICK dba Blue Sky Solutions, LLC** as an individual that was conspiring with **CHARLES A. WOLFE II d/b/a PSYCHEDELIC BLUR, LLC**, **DREAM WORLD GLASS, LLC** and **MARK PALMER d/b/a PAGGREGATE, LLC**, **PALMCORP, LLC** and **NGURU, LLC** to facilitate the manufacturing and distribution of controlled substances and controlled substance analogues, distribution of misbranded drugs and money laundering.

21.     A review of the records seized reflects that **WOLFE** and **GABRICK** were sharing office and storage space at one or more of those locations, that MARK PALMER d/b/a Paggregate, LLC invoiced  **WOLFE d/b/a PSYCHEDELIC BLUR, LLC and GABRICK d/b/a BLUE SKY SOLUTIONS, LLC** for the synthetic drugs he sold them under names including "Avalon," "Bizarro," "Black Arts," "Bunker Buster," "Devil's Dank", "Dirty Dirt Devil," "Freedom," "Full Throttle," "Grave Digger," "Golden Leaf" "Head Trip," "Lights Out," "Mad Hatter," and "Vortex" under the entity name **"Mr. Mo Fan."**  In addition, your agents found copies of checks written by **GABRICK d/b/a BLUE SKY SOLUTIONS, LLC** payable to **MARK PALMER's** company **NGURU.**

22.     According to the Missouri Secretary of State, **GABRICK** is the registered Organizer and Registered Agent of **BLUE SKY SOLUTIONS, LLC** which filed its Articles of Incorporation with the Missouri Secretary of State on June 20, 2013.  As the Registered Agent **GABRICK** lists 21 Winding Stair Way, O` Fallon, MO 63368 (**target location**) as the **BLUE SKY SOLUTION's** registered address.  As the Organizer of **BLUE SKY SOLUTIONS, LLC**, **GABRICK** lists his address as 6209 Mid Rivers Mall Drive, Suite 120, St. Peters, MO 63376.

10

**Exhibit 9**

NC 00015306

23.     In addition to **BLUE SKY SOLUTIONS, LLC** your agents determined that **GABRICK** is the Registered Agent for the following entities:  MS Investments, LLC, Gold Stop, LLC and Midwest Vapor, LLC.

a.     MS Investments, LLC filed its Articles of Incorporation with the Missouri Secretary of State on or about November 16, 2006.  As the Registered Agent, GABRICK lists 21 Winding Stair Way, O` Fallon, MO 63368 (**target location**).

b.     Gold Stop, LLC filed its Articles of Incorporation with the Missouri Secretary of State on May 25, 2010.  As the Registered Agent GABRICK, lists 21 Winding Stair Way, O` Fallon, MO 63368 (**target location**).

c.     Midwest Vapor, LLC filed its Articles of Incorporation with the Missouri Secretary of State on February 18, 2014.  As the Registered Agent GABRICK lists 21 Winding Stair Way, O` Fallon, MO 63368 (**target location**).

24.     In December 2013, your agents obtained search warrants issued in the Eastern District of Missouri for the email accounts known to be used by **CHARLES WOLFE** and others associated with the investigation. Your agents reviewed the evidence collected through the email search warrants used by **CHARLES WOLFE** and others associated with the investigation and determined the following:

a.     On or about June 6, 2013, **GABRICK** emailed **WOLFE** a pick sheet for a customer referred to as "Cedar Rapids."  The pick sheet indicated that customer needed the following products:

| Quantity | Number/Size | Description |
|----------|-------------|-------------|
| 800      | 1.5         | Black Arts  |
| 400      | 4           | Black Arts  |

11

**Exhibit 9**

NC 00015307

| Quantity | Number/Size | Description |
|----------|-------------|-------------|
| 400 | 1 | Freedom |
| 400 | 3 | Freedom |
| 1200 | 1 | Lights Out |
| 600 | 4 | Lights Out |
| 400 | 10 | Lights Out |
| 400 | 4 | Full Throttle |
| 200 | 10 | Full Throttle |
| 600 | 1 | Grave Digger |
| 400 | 6 | Grave Digger |
| 600 | 4 | Head Trip |

b.      On or about June 8, 2013, **GABRICK** emailed **WOLFE** a pick sheet for a customer referred to as "Duluth."  The pick sheet indicated that customer needed the following products:

| Quantity | Number/Size | Description |
|----------|-------------|-------------|
| 200 | 4 | Black Arts |
| 400 | 10 | Black Arts |
| 100 | 3 | Freedom |
| 400 | 10 | Freedom |
| 400 | 4 | Lights Out |
| 600 | 10 | Lights Out |
| 100 | 4 | Night Train |
| 300 | 10 | Night Train |

12

**Exhibit 9**

NC 00015308

| Quantity | Number/Size | Description |
|---|---|---|
| 100 | 4 | Devils Dank |
| 200 | 10 | Devils Dank |
| 200 | 4 | Full Throttle |
| 400 | 10 | Full Throttle |
| 300 | 6 | Grave Digger |
| 200 | 10 | Grave Digger |
| 200 | 4 | Head Trip |
| 400 | 10 | Head Trip |

     c.     On or about June 28, 2013, **WOLFE** forwarded an email he received from paggregate@yahoo.com to **GABRICK**.   The email **WOLFE** forwarded to **GABRICK** contained electronic copies of lab reports prepared by American International Biotechnology, LLC (herein AI Biotech, LLC).   These laboratory analysis reports were for the following products and reported the following items detected:

| Product Name | Test Results |
|---|---|
| Head Trip | PB-22 and 5F PB-22[1] |
| Night Train | PB-22 and 5F PB-22 |
| Dirty Dirt Devil | PB-22 and 5F PB-22 |

[1] According to DEA, prior to February 10, 2014, PB-22 and 5F-PB-22, if intended for human consumption, may be treated as a "controlled substance analogue" under the CSA pursuant to Title 21 U.S.C. §§802(32)(A) and 813.  On February 10, 2014, the Deputy Administrator of DEA issued a final order to temporarily schedule PB-22 and 5F-PB-22 under the Controlled Substances Act (CSA) pursuant to the temporary scheduling provisions of Title 21 U.S.C. §811(h).

13

**Exhibit 9**

**NC 00015309**

     d.     On or about June 28, 2013, **WOLFE** forwarded two emails he received from palmcorp@hushmail.com to **GABRICK**. The email **WOLFE** forwarded to **GABRICK** contained electronic copies of lab reports prepared by Research Triangle Park Laboratories, Inc. (herein "RTP Labs") addressed to Palmcorp, St. Louis, MO 63125, dated June 19, 2013. These laboratory analysis reports included but were not limited to the following products and reported the following items detected:

| Product Name | Test Results |
|---|---|
| Devil's Dank | 5FPB-22 |
| Grave Digger | 5FPB-22 |
| Dirty Dirt Devil | 5FPB-22 |
| Full Throttle | 5FPB-22 |
| Head Trip | 5FPB-22 |
| Black Arts | 5FPB-22 |
| Golden Leaf | 5FPB-22 |

     e.     On or about August 21, 2013, **GABRICK** emailed something he referred to in the subject line of the email as "Labs" to mrsmosharairei@yahoo.com, who your agents based upon information and believe is Melissa Alsharairei. Melissa Alsharairei and her husband (Mohammad Alsharairei) own and operate the Puff n Stuff stores located in Cedar Rapids, IA.

     f.     On or about January 7, 2014, **WOLFE** forwarded an email he received from mrgehls@husmail.com to **GABRICK**. The email contained electronic files referred to as "bag proofs" in the email for "Avalon Herbal Blend 5g," "Bunker Buster Herbal Blend 5g," "Golden Leaf 3g," "Mad Hatter Herbal Blend 3g" and "Vortex Premium Potpourri 4g."

14

**Exhibit 9**

NC 00015310

25.     Your agents obtained and reviewed bank records from numerous financial institutions throughout this investigation.  Your agents obtained the bank records associated with the **BLUE SKY SOLUTIONS, LLC** account **GABRICK** opened at Bank of America, N.A. **GABRICK** opened **BLUE SKY SOLUTIONS, LLC** account ending in ********0846 on or about June 24, 2013.  **GABRICK** provided Bank of America, N.A. with a business address of 6209 Mid Rivers Mall Drive, Suite 120, St. Peters, MO 63304 and an email address of joegabrick@aol.com.

26.     For the period June 24, 2013 through on or about April 7, 2014, **GABRICK** had total deposits/credits of approximately $2,322,039.68 made to **BLUE SKY SOLUTIONS, LLC's** account ending in ********0846.  The source of most of these deposits were as follows:

| Source and Origin | Period | Total Deposits from Sources |
|---|---|---|
| Evolution: Records Tapes & More, Ltd._Baytown, TX | 02/26/2013 – 01/23/2014 | $353,814.25 |
| Northshore Video & Smoke, Inc._ Houston, TX | 10/02/2013 – 12/27/2013 | $123,625.00 |
| Puff n Stuff_Cedar Rapids, IA | 08/26/2013 – 12/20/2013 | $650,704.00 |
| The Shanty, LLC_Fenton MO | 10/03/2012 – 02/10/2014 | $23,496.20 |
| Tidwell Corporation_Gilmer TX | 07/11/2013 – 01/13/2013 | $755,787.00 |
| Zombies, LLC_Iowa City, IA | 11/10/2013 – 12/08/2013 | $142,750.00 |
| **TOTAL** | | **$2,050,176.45** |

27.     For the period June 24, 2013 through on or about April 7, 2014, **GABRICK** had total checks/debits of approximately **$2,311,784.00** made against **BLUE SKY SOLUTIONS, LLC's** account ending in ********0846.  The destination of most of these checks/debits were as follows:

15

**Exhibit 9**

NC 00015311

| Destination | Period | Total Check/Debits for Destination |
|---|---|---|
| Behling Corporation | 10/21/2013 – 12/17/2013 | $103,615.00 |
| Chickadee Enterprises | 10/21/2013 – 01/22/2014 | $108,050.00 |
| Innovative Products | 12/31/2014 | $34,000.00 |
| Joseph Gabrick | 07/16/2013 - 03/02/2014 | $303,471.00 |
| MS Investments LLC | 07/21/2013 – 12/31/2013 | $5,000.00 |
| Nasif Bahhur | 11/10/2013 – 12/07/2013 | $45,000.00 |
| NGURU | 07/14/2014 – 12/31/2013 | $1,031.302.50 |
| Palmcorp | 11/04/2013 – 12/24/2013 | $293,000.00 |
| **TOTAL** | | **$1,923,438.50** |

28.     In addition to the checks listed above, GABRICK had the following ATM card purchases that were debited from this account:

        a.      For the period July 2013 through April 2014, GABRICK had $3,024.47 in ATM card purchases at FedEx.

        b.      For the period July 2013 through April 2014, GABRICK had $8,844.85 in ATM card purchases at Avis –Budget Rent a Car.

        c.      For the period July 2013 through April 2014, GABRICK had food, fuel and lodging ATM purchases at numerous locations in the State of Texas on a weekly basis.

29.     On March 10, 2014 your agents met with Mohammad AL SHARAIREI (herein "AL SHARAIREI") to interview him in reference to the synthetic drug distribution activities of **WOLFE**.   AL SHARAIREI was encountered by HSI Cedar RAPIDS and DEA Cedar Rapids as part of a task force synthetic drug investigation of PUFF and STUFF in Cedar Rapids, IA.

16

**Exhibit 9**

NC 00015312

30.     AL SHARRAIREI stated he began selling synthetic drug products out of his hookah shop in 2011. AL SHARRAIREI  initially bought synthetic marijuana from Indian or Arab suppliers  from the Chicago, IL area, but had been buying directly from **WOLFE** during the last seven (7) months. AL SHARRAIREI cited "Raj" LNU as a main source of supply out of the Chicago area. When "Raj" started experiencing pressure from law enforcement, "Raj" apparently referred or gave AL SHARRAIREI's name or account to **WOLFE**.

31.     Shortly before June 2013, **WOLFE** visited AL SHARRAIREI at his store in Cedar Rapids, IA, PUFF AND STUFF, as a sales call on his way to Duluth, Minnesota. **WOLFE** later told AL SHARRAIREI that he delivered to the Last Place on Earth smoke shop in Duluth, MN.

32.     AL SHARRAIREI began buying all, "100 percent" of his synthetic marijuana products directly from **WOLFE**. The products were all hand delivered and never mailed to avoid detection. AL SHARRAIREI was mainly purchasing Platinum XXX and Bizarro branded products from **WOLFE**.

33.     AL SHARRAIREI would go on to develop a close business and personal relationship with **WOLFE**. AL SHARRAIREI stated **WOLFE** knew "all the tricks" to covering himself legally in selling the synthetic marijuana. AL SHARRAIREI stated **WOLFE** would only drive rented cars to avoid having them seized and would jingle change in his pocket while speaking to act as background noise and distortion in case he was being recorded. SA House asked AL SHARRAIREI if this was AL SHARRAIREI's observations or tips **WOLFE** conveyed to him. AL SHARRAIREI stated these were things **WOLFE** told and taught him. **WOLFE** also tutored AL SHARAIREI on what to say if encountered by law enforcement.

34.     AL SHARRAIREI would pay **WOLFE** via **BLUE SKY** (SOLUTIONS), which he knew as **WOLFE'S** business. AL SHARRAIREI would pay by cashier's check, mostly issued by

17

**Exhibit 9**                    NC 00015313

Guaranteed Bank in Cedar Rapids. AL SHARRAIREI would call or text **WOLFE** his order. AL SHARRAIREI sometimes called **WOLFE's** right hand man, **Joe** (known to the agents as **Joe GABRICK**), to place an order.

35.   **WOLFE** only delivered product himself a handful of times.  Products would usually get delivered by **WOLFE's** delivery men, **Joe** and early on, "Big John" (known to the agents as John GALVIN).  AL SHARRAIREI provided a physically description of "Big John" matching GALVIN. **GABRICK** told AL SHARRAIREI that GALVIN got stopped by police somewhere in Missouri. (Note:  In September, 2013, John Galvin was stopped by law enforcement and found to be in possession of a large quantity of packed synthetic drugs which he was delivering to a head shop in Springfield, Missouri on behalf of **WOLFE**.)  **GABRICK** stated GALVIN "freaked out" and talked to the police about the synthetic marijuana distribution activities of **WOLFE**. AL SHARRAIREI understood this to be the reason GALVIN stopped working for **WOLFE**.

36.   SA House showed AL SHARAIREI a photo line-up card containing **WOLFE's** Driver's license photo in the number 4 position and five other similar photos of unknown persons compiled by a HSI St. Louis Intelligence Research Specialist.   AL SHARAIREI identified **WOLFE's** photograph in the number 4 position, circled the number 4 and initialed the card.

37.   SA House showed AL SHARAIREI a photo line-up card containing **GABRICK's** Driver's license photo in the number 4 position and five other similar photos of unknown persons compiled by a HSI St. Louis Intelligence Research Specialist.   AL SHARAIREI identified **GABRICK's** photograph in the number 4 position, circled the number 4 and initialed the card.

38.   **WOLFE** told AL SHARRAIREI that he has been in business for years, and that "the Feds" cannot make a case on him.  **WOLFE** told AL SHARRAIREI about losing $100,000 in a raid (Note:  Pursuant to the execution of a federal search warrant on September 25, 2013 at **WOLFE's** residence, approximately $109,000.00 was seized.)  **WOLFE** told AL SHARRAIREI that the

18

**Exhibit 9**

NC 00015314

authorities hit the warehouse that he (**WOLFE**) needed them to go, alluding that **WOLFE** had a larger cache or operation at another location. **WOLFE** told AL SHARRAIREI that there are no firm laws on synthetic marijuana, and that it is a grey/shady area.   **WOLFE** told AL SHARRAIREI that he (**WOLFE**) might do a couple years in jail for his business.

39.   AL SHARRAIREI stated that he had been to the warehouse that was raided and gave an area description that matched the 13761 and 13765 St. Charles Rock Rd. locations that were the target locations of multiple search warrants on September 25, 2013. This was the only warehouse AL SHARRAIREI ever visited.

40.   AL SHARRAIREI stated the synthetic marijuana was **WOLFE's** primary business. AL SHARRAIREI knew **WOLFE** owned a vapor (e-cigarette) business and was an investor (only) in a glass (smoking apparatuses) business.

41.   **WOLFE** calls AL SHARRAIREI every three to four days.  AL SHARRAIREI owes **WOLFE** about $55,000 for synthetic marijuana that **WOLFE** sold him, which AL SHARRAIREI cannot pay for. AL SHARRAIREI last ordered from **WOLFE** about two or three months prior to interview.  That order was placed through **GABRICK**.

**Trash Run Evidence Collected at 21 Winding Stairway O`Fallon MO 63368**

42.   From December 2013 through May 2014, your agents conducted trash runs at **GABRICK's** residence located at 21 Winding Stairway, O`Fallon MO 63368 (**target location**). The following is a summary of some of the evidence collected from those trash runs as they relate to 21 Winding Stairway, O`Fallon MO 63368:

19

**Exhibit 9**

NC 00015315

| Item # | Date of Trash Run | Description of Evidence |
|---|---|---|
| 1 | 12/23/2013 | A FedEx Shipping label from MD, 11230 Gold Express Drive, Ste 310-330, Gold River CA, 95670 to Phil, Paggregate, LLC 2025 Zumbehl Road, Ste 192, St. Charles, MO 63303 |
| 2 | 12/23/2013 | An empty box for a shipment that orginated in China: EE561164474CN delivered to O Fallon MO 0n 09/14/2012. |
| 3 | 01/31/2014 | Three "Original Bizarro" 1.5 gram product stickers and several "Directions for Use" stickers |
| 4 | 01/31/2014 | Financial Statement of Joseph D. Gabrick and Lori Gabrick |
| 5 | 01/31/2014 | Printed copies of emails records for "joebabrick@aol.com" |
| 6 | 02/14/2014 | Miscellaneous notes with references to product names, sizes and amounts to order, Boost Mobile Phone Store receipt for a phone with the telephone 213.804.4851 purchased on 1/28/2014, an order sheet for several thousand packages of synthetic drugs dated 1/25/2014, a note referencing "Linda at The Vise at 101 Harvester Court, 63304, a currency band with the amount "2,000" written on the outside. |
| 7 | 02/14/2014 | Mailing envelopes from following financial institutions: Commerce Bank, First Bank and Bank of America and UPS Store Delivery receipts for packages delivered to the UPS Store #3818, 2977 Highway K, O`Fallon MO 63368. |
| 8 | 02/14/2014 | Avis Rental Car Receipts for cars Returned on 12/10/1013, 1/07/2014, |
| 9 | 02/14/2014 | Several hundred feet of the paper sticker backing for product labels, direction for use labels and size labels used in the manufacturing of synthetic drugs. |
| 10 | 03/07/2014 | Several hundred feet of the paper sticker backing for product labels, direction for use labels and size labels used in the manufacturing of synthetic drugs |
| 11 | 03/07/2014 | A sticky note that lists "1st 80,121" and "BOA 16,720" a receipt from the ATT O Fallon Retail Store for the purchase of an IPhone 5s for customer Lori Gabrick 636.288.1467. |

20

**Exhibit 9**

NC 00015316

| Item # | Date of Trash Run | Description of Evidence |
|--------|-------------------|-------------------------|
| 12 | 03/07/2014 | Invoices for several thousand packages of synthetic drugs sold to A51 and the Shanty dated February 2014 along with miscellaneous drug notes |
| 13 | 03/07/2014 | An empty Wells Fargo cash envelope and receipt for a check cashed in the amount of $8,000.00 on 2/14/2014. |
| 14 | 04/04/2014 | Sticky Note with a list of synthetic drug customers, a piece of notebook paper that lists out MO- BA owes 25 K, Labs are not done yet?, and a $2,000.00 cash band |
| 15 | 04/04/2014 | Avis Rental Car Receipts for cars rented in the name Charles Crawford returned on 02/14/2014, Receipts for FedEx Shipments, an envelope labeled "Shanty, BSS, Chuck" and several currency straps in amounts $2,000.00, $250.00 and $30.00 |
| 16 | 05/09/2014 | Invoices for several hundred packages of synthetic drugs sold to Shanty dated April 8, 2014 along with miscellaneous drug notes, Receipts for FedEx Shipments, an envelope labeled Joe/Mark with an amount of $790.00 dated 4/03/2014, an purchase order and envelope from Mystick, Inc. located in Orlando Florida for several hundred packages of synthetic drugs addressed to BSS Inc., 6209 Mid Rivers Mall Drive, #120, St. Peters, MO 63304. |

43.    On June 5, 2014, a federal indictment was returned in the Eastern District of Missouri, charging Joseph GABRICK, Charles WOLFE, and four other defendants with federal violations including conspiracy to distribute and possess with the intent to distribute controlled substances and controlled substance analogues.

## VI.    TRAINING EXPERIENCE OF INVESTIGATIVE TEAM

44.    With my experience and training, and that of other special agents and police officers on the investigating team, we have accumulated information and training in the areas of narcotics-based economic crime. The distribution of controlled substance analogues such as

**Exhibit 9**

NC 00015317

synthetic cannabinoid products and substituted cathinone products is often done through small, home based or internet businesses selling products to convenience stores, adult product stores, head shops and gas stations. These products which are often purchased or manufactured at a small price are sold at prices generating very large profit margins. Some of the money generated is utilized to continue the business operations.

45.     Additionally, based upon my training, experience, and participation in investigations involving importation of controlled substances and analogues through the Drug Enforcement Administration; my investigation into controlled substances, analogues, and dangerous drugs; from speaking with other Agents and Officers; and my investigation further detailed in this affidavit, I have learned the following:

a.     Controlled substance importers and distributors often intentionally mislabel parcels to hide the fact that the package actually contains controlled substances to avoid the substances being seized;

b.     Distributors of controlled substance analogues will often mislabel wholesale or retail packaging to hide the fact that the substance will be utilized for human consumption and maintain labeling and packaging material;

c.     Persons involved in importing and distributing controlled substances, in particular those who import controlled substance chemicals or controlled substance analogue chemicals typically possess items or documents showing the lab testing of the chemicals or or like substances (e.g. analogues), maintain inventories of organic material to which the controlled substances are applied, and maintain packaging materials for the controlled substances or the products manufactured from the controlled substances;

22

**Exhibit 9**

NC 00015318

d.      Persons involved in the production of smokable synthetic cannabinoid products or substituted cathinones products (which are both analogues of controlled Schedule I substances) typically illegally import analogue substances into the United States using the United States Postal Service or a similar postal carrier.  Once the analogues have entered the United States, these persons typically, in the case of smokable synthetic cannabinoid products, spray the analogue substance onto an organic material and allow it to dry or, in the case of substituted cathinones products, mix the analogue substances with other compounds to produce the desired mixture.  These persons then sell the altered organic compound for human consumption under the street names of "spice" and/or "bath salts" utilizing various product names;

e.      Persons involved in setting up a home business operation for the distribution of synthetic cannabinoid products or substituted cathinones will often utilize storage facilities, warehousing facilities, or business locations to manufacture and store  products for wholesale or retail sale until it can be distributed;

f.      The trafficking of illicit controlled substances or controlled substance analogues and the products manufactured from such is a cash-intensive enterprise, similar to the trafficking of "traditional" illicit drugs such as marijuana or cocaine.  Persons involved in distributing large quantities of synthetic cannabinoid  products or cathinone products generate large amounts of money which may be concealed within a residence, vehicle, business, other storage facility, as well as financial institutions, within their dominion and control are easily converted to other assets such as precious metals.  The proceeds are easily converted to other investment vehicles or financial instruments to include precious metals in an attempt to launder or conceal the monetary gains;

23

**Exhibit 9**

NC 00015319

g.     Persons involved in the distribution of synthetic cannabinoid products or substituted cathinones will disguise the distribution through the appearance of a legitimate business operation and maintain business records regarding the purchase of the substances, sale of the substances, distributors and other information, including but not limited to, business records and archived business conversations. I also know from my experience and training that such records and documents are kept and stored in computers, electronic and digital storage devices, and mobile devices in addition to or in lieu of hard-copy versions of this data. Similar to filing cabinets, boxes, or other physical devices for such records and documents, computers, electronic storage media and peripherals are commonplace and are often located inside residences. Further, documents and records can be "hidden" within such electronic storage media. Based on my knowledge, training, and experience, and the knowledge, training and experience of the investigators with expertise in computer and electronic/digital evidence, I am aware of the following search considerations and factors:

i.     Volume of evidence: Computer storage devices, including but not limited to hard disks, diskettes, tapes, CDs, DVDs, and thumb drives, can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instruments of a crime. This sorting process can take weeks or months, depending on the volume of data stored;

ii.     Technical requirements: Searching computer systems for criminal evidence can be a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even

24

**Exhibit 9**                    NC 00015320

computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden", erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap") a controlled environment is essential to its complete and accurate analysis;

iii.     Data analysis may use several different techniques to search electronic data for evidence or instrumentalities of a crime. These include, but are not limited to the following:  examining file directories and subdirectories for the lists of files they contain, "opening" or reading the first few "pages" of selected files to determine their contents, scanning for deleted or hidden data, searching for key words or phrases ("string searches"). In view of the forgoing, computer related items sought to be searched include the following:

1.     Hardware - Computer hardware consists of any and all computer equipment capable of being linked together in a local area network (LAN) (to include any equipment which has remote access capabilities) including all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes, but not limited to, any data-processing devices (such as central processing units, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as hard drives, fixed disks, external

25

**Exhibit 9**

NC 00015321

hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, flash drives, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communication devices (such as modems, cables, and connections); as well an any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks);

2.      Software - Computer software is digital information which can be interpreted by a computer and any related components to direct the way the work. Software is stored in electronic, magnetic, optical, or digital form. It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs), utilities, compilers, interprets, and communications programs;

3.      Documentation - Computer related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items;

4.      Mobile devices - advances in mobile technology, such as "smart" phones, have made it possible for persons or representatives of businesses and criminal organizations to conduct activities on personal mobile devices, such as phones, or personal electronic tablet devices, such as an iPad, which are capable of sending electronic communications including electronic mail and electronic "text" messages. These devices also make it possible for an individual to access the Internet to operate email, websites, or digital and electronic information;

26

**Exhibit 9**

NC 00015322

5.      Electronically Store Data - Any and all such data concerning the sales of imitation controlled substances and drug paraphernalia, laundering of monetary instruments, and engaging in monetary transactions in property derived from specified unlawful activity.  Any and all identification documents and such data consisting of information stored on back-up tapes, computer hard drives, and/or any other form or manner;

6.      Passwords and Data Security - Computer passwords and other data security devices are designated to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming codes.  A password (a string of alphanumeric characters) usually operates as a sort of digital key to "unlock" particular date security devices, chips, and circuit boards.  Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it;

7.      All documentation relating to retail sales including, but not limited to, sales invoices, Missouri sales/withholding tax returns, customer receipts, vendor/supplier invoices, cash register sales receipts, bank statements, bank/ATM card statements, credit card statements, check book and check registers, general ledgers, sales journals, payroll records (W-2 forms), employee information (W-4 forms), employment verification (I-9 forms), employee pay stubs, and income statements.  All of the foregoing items of evidence in whatever form and by

27

**Exhibit 9**

NC 00015323

whatever means such items may have been created or stored on the computer to be searched, all of, which constitute evidence of violations of Title 21, United States Code Sections 813, 841 and 846, and Title 18, United States Code, Section 1956, found within the vehicles and premises:

h.      It is also in the experience of your affiant that drug trafficking organizations, to include traffickers of synthetic drugs, rely heavily on mobile phones and devices to conduct activities related to and in furtherance of the criminal activity. Mobile phones are used to pass communications such as instructions, negotiations, directions, and locations, both verbally and in writing via electronic message; and

i.      Advances in mobile technology, such as "smart" phones, have made it possible for persons or representatives of businesses and criminal organizations to conduct activities on personal mobile devices, such as phones, or personal electronic tablet devices, which are capable of sending electronic communications including electronic mail and electronic "text" messages. These devices also make it possible for an individual to access the Internet to operate websites or store digital and electronic information and records in furtherance of the criminal activity.

## VII.   CONCLUSION

46.      As a result, based on the foregoing facts presented above and contained herein, my training and experience, and training and experience of the investigative team, your affiant believes there is probable cause to believe that evidence of a violation of Title 21, United States Code, Sections  331, 813, 841(a)(1) and 846, and Title 18, United States Code, Section 1956, will be found at the residence of JOSEPH GABRICK located at 21 Winding Stairway O'Fallon, MO 63368.

**Exhibit 9**

NC 00015324

47.    The disclosure of the contents of the Application, Affidavit, and Search Warrant could compromise and jeopardized an ongoing investigation and witnesses who have provided information to the agents conducting the same; therefore it is respectfully requested that these materials be filed under seal.

29

**Exhibit 9**

NC 00015325

# ATTACHMENT A

### 21 Winding Stairway, O`Fallon, MO 63368



The premises known as **21 Winding Stairway, O`Fallon MO 63368**, is located in the Twin Chimneys Subdivision and is further described as a two-story, single-family residence located on the west side of the street that has a red brick and stone front with two large white pillars holding up the overhanging front porch.  The remaining three quarters of the house are white vinyl siding with an attached two-car garage that opens to the north side of the house and a deck located on the back of the residence.  At the entrance of the driveway, there is a white mailbox located atop of a white square post with the numbers "21" located on the post.  The rear of the residence is surrounded by a white vinyl privacy fence.

30

**Exhibit 9**

NC 00015326