**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:14 CR 175 AGF / DDN |
| ) | |
| MARK PALMER, et al., ) | |
| ) | |
| Defendants. ) | |

**ORDER AND RECOMMENDATION**
**ON MOTIONS FOR *FRANKS* HEARING**
**AND TO SUPPRESS EVIDENCE**

Before the court are several pretrial motions filed by defendants, which were referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b).  Defendants Charles Wolfe, Samuel Leinicke, Mark Palmer, and Robert Wolfe have filed separate general motions to suppress evidence (ECF Nos. 64, 67, 73, and 76 respectively), and jointly for a hearing under *Franks v. Delaware* (ECF No. 224) and to suppress evidence (ECF No. 225).  An evidentiary hearing on these motions was held on May 27, 2016. (ECF No. 263, *Transcript of Hearing*.)

Defendants are charged by indictment in Count 1 with conspiring to traffic in controlled substances and controlled substance analogues, in violation of 21 U.S.C. §§ 813 and 846; in Count 2 with conspiracy to introduce and to receive misbranded drugs in interstate commerce, in violation of 18 U.S.C. § 371 and 21 U.S.C. §§ 331, 333, and 352; in Count 3 with conspiracy to launder money, in violation of 18 U.S.C. §§ 1956 and 1957; in Count 4 with conspiracy to import controlled substances and controlled substance analogues, in violation of 21 U.S.C. §§ 952, 960, and 963; and in Count 5 with conspiracy to traffic in smuggled goods, in violation of 18 U.S.C. §§ 371 and 545.

In their separate motions to suppress, defendants similarly reserve their opportunity until after the pretrial evidentiary hearing to provide the court specific

reasons for suppressing the government's evidence.  (ECF Nos. 64, 67, 73, 76).

By their joint motion for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), defendants argue that certain statements made in the affidavits supporting 24 specific search warrants were false, inaccurate, or misleading.  These statements  relate to the science of manufacturing and trafficking in smokable synthetic cannabinoid products under investigation.  (ECF No. 224 at 2-3).  Defendants would have the court remove these statements from consideration of whether the affidavits were legally sufficient as bases for the issuance of the search warrants.  Defendants argue that if the court, in the application of *Franks v. Delaware*, concludes the search warrants were constitutionally defective because of these statements, evidence seized in the searches conducted pursuant to the warrants should be suppressed.  (*Id.* at 15).

To a substantial extent defendants' joint motion to suppress depends upon the court granting relief under their *Franks v. Delaware* motion.  In their joint motion to suppress, defendants argue that between September 2013 and June 2014, the 24 subject search warrants were applied for, issued, and executed.  In the execution of the warrants, the government seized items of evidence it intends to offer at trial.  Defendants argue the affidavits filed in support of the warrants were legally insufficient under the Fourth Amendment, because (1) they contained reckless statements that were false, inaccurate, or misleading about facts necessary to establish probable cause; and (2) the affiants were not qualified to make the statements in the affidavits, because the affiants were not experts regarding the scientific relationship between the subject controlled substances and the asserted violations of law.  Defendants argue that, if the court grants the defendants relief under their joint motion for a hearing under *Franks v. Delaware*, and removes the subject statements of the affiants from consideration of the legal sufficiency of the affidavits, the court must conclude that the affidavits lack probable cause to support the issuance of the search warrants, because without the subject statements the affidavits do not describe unlawful activity.  (ECF No. 225).

After considering the evidence adduced during the hearing held on May 27, 2016, the undersigned makes the following findings of relevant facts and conclusions of law:

## FACTS

1.      On July 11, 2013, in the United States District Court for the Western District of Tennessee, Immigration and Customs Enforcement Special Agent Wayne House submitted his sworn written affidavit in support of his application for a search warrant to search UPS Store #869, at 6025 Stage Road, Bartlett, Tennessee, to seize certain identified Express Mail packages belonging to Anthony Palmer or Mark Palmer. This affidavit submitted by Agent House in this matter contained paragraphs with similar scientific information as those paragraphs quoted below.  (ECF No. 227, Ex. 1). However, those paragraphs are not quoted in this finding, because they are not specifically referenced by Allen S. Kesselring, Ph.D., defendants' scientific expert whose declaration is filed by defendants in support of their motion for a *Franks* hearing. (ECF No. 227, Exs. 10 through 14).   Nevertheless, Agent House's affidavit in this search warrant matter is subject to the court's ultimate determination of defendants' motion for a *Franks* hearing.

2.      a.      On September 24, 2013, Special Agent House submitted one affidavit (Gov. Ex. 1) in support of his applications for search warrants for the following locations:

(1) 1901 Williamstown Drive, St. Peters, Missouri (No. 4:13 MJ 7219) (Gov. Ex. 3);

(2) 13761 St. Charles Rock Road, Suite 118, Bridgeton, Missouri (No. 4:13 MJ 7220);

(3) 13765 St. Charles Rock Road, Suite 101 (No. 4:13 MJ 7221);

(4) 13765 St. Charles Rock Road, Suite 102 (No. 4:13 MJ 7222);

(5) 13765 St. Charles Rock Road, Suite 111 (No. 4:13 MJ 7223);

(6) 13765 St. Charles Rock Road, Suite 115 (No. 4:13 MJ 7224);

(7) 13765 St. Charles Rock Road, Suite 116 (No. 4:13 MJ 7225);

(8) 13765 St. Charles Rock Road, Suite 121 (No. 4:13 MJ 7226); and

(9) 4738 Orchard Drive, Barnhart, Missouri (No. 4:13 MJ 7227).

b.      On the same day, the court issued search warrants for each of those locations to search for nine categories of items that included contraband controlled substances and controlled substance analogues, including synthetic cannabinoid products,

synthetic cathinone products, and materials used for trafficking in such contraband.  (4:13 MJ 7219, ECF No. 2).

        c.      In the Gov. Ex. 1 affidavit (*e.g.* 4:13 MJ 7227, ECF No. 1), Agent House made the following statements that are relevant to defendants' motion arguments:[1]

1. I am a Special Agent of ICE HSI, within the Department of Homeland Security, currently assigned to the Resident Agent in Charge St. Louis, Missouri office.  I have been a federal officer for ten (10) years and have served in ICE HSI's Kansas City and St. Louis field offices and completed a two (2) year tour of duty in a headquarters level programmatic unit.  Prior to my employment with ICE, I was employed as a police officer for five (5) years with the City of Chesterfield, Missouri, Police Department.  During my employment with ICE HSI and with the City of Chesterfield, I have had the opportunity to lead, conduct, coordinate and/or participate in investigations concerning the importation, smuggling, and trafficking of controlled substances.  I have received training focused on the importation, smuggling, and trafficking of controlled substances.

(No. 4:13 MJ 7227, ECF No. 1 at 6).

16. I know that in recent years, individuals have begun to manufacture and traffic in smokable synthetic cannabinoid products, many times known on the street as "Spice" or "K2." Smokable synthetic cannabinoid products are a mixture of an organic "carrier" medium , such as the herb-like substance Damiana, which is then typically sprayed or mixed with a synthetic compound chemically similar to THC (tetrahydrocannabinol) , the psychoactive ingredient in marijuana. Currently, there are hundreds of  synthetic cannabinoid compounds.

---

[1] The undersigned has endeavored to include in this Order and Recommendation Portable Document Format (pdf) image copies of the parts of the affidavits referenced by defendants' expert Allen S. Kesselring, Ph.D., in his sworn declaration that was filed with the court.  (ECF No. 227).

The five most common of these compounds, JWH-018 ; JWH-073 ; JWH- 200; CP-47, 497 C8 homologue; and 47, 497 cannabicyclohexanol , were "emergency scheduled" by the DEA in March 2011. In response, clandestine manufacturer s and trafficker s began distributing smokabl e synthetic cannabinoid product s containing slightly  varied synthetic cannabinoid compounds in an attempt to circumvent  newly  enacted federal and state laws. Smokable synthetic cannabinoid  products  are  commonly purchased in  head shops, tobacco shops, convenience stores, adult stores and over the  Internet. They are often marketed as incense, potpourri or "fake weed" and almost always carry the marking s "not for human consumption."    These marking s are routinely in place  in an attempt to fraudulent circumvent the product being identified as a controlled substance analogue. Users of these products have reported effects similar to marijuana , but many times greater to include but not limited to paranoia, panic attacks, increased heart rate and increased blood pressure.

(*Id.* at 19).

17. Through experience I know that individuals, in an attempt to circumvent laws in place which make the possession and distribution of certain synthetic drugs illegal, seek out and purchase or produce substances which have a similar but slightly different chemical structure.  These substances will produce the same pharmacological effect on the human body when ingested.  In response to this production, Congress enacted the Controlled Substance Analogue Enforcement Act of 1986.

18. Through research, training and experience, I know that the synthetic cannabinoid 1-pentyl-3-(1-naphthoyl)indole (JWH-018) is a schedule I controlled substance, and that until July 2012 the synthetic cannabinoids: 1-Pentyl-3-(2-methoxyphenylacetyl)indole (JWH-250), 1-Pentyl-3-(4-methyl-1-naphthoyl)indole (JWH-122) and 1-(5-Fluoropentyl)-3-(1-naphthoyl)indole (AM2201) met the definition of controlled substance analogues when intended for human consumption.   On July 9, 2012, these substance, JWH-018, JWH-250, JWH-122, AM2201 became permanently scheduled as control substances pursuant to the Synthetic Drug Abuse Act of 2012 (herein "SDAPA").   SDAPA amended the Controlled Substance Act (herein "CSA") by legislatively placing "cannabimimetic agents" and 26 substances in Schedule I.   As referenced earlier, I know these substances to be considered hallucinogens and further affect the human body in a similar way to THC, the active hallucinogen found in the organic drug marijuana.

(*Id.* at 20).


19. According to the DEA Office of Diversion Control, Drug and Chemical Evaluation Section various synthetic cannabinoids (e.g., JWH-018, etc.) laced on plant material have been encountered by law enforcement in recent years. These are promoted under the guise of herbal incense products. These products laced with synthetic cannabinoids are smoked for their psychoactive effects. In response to State and Federal control of these synthetic cannabinoids, a transition to new synthetic cannabinoids laced on plant material has been observed. AKB48, 5F-AKB48 and XLR -11 are three of the many synthetic cannabinoids recently encountered on the designer drug market.

6

20. On May 16, 2013, the Deputy Administrator of DEA issued a final order to temporarily schedule three synthetic cannabinoids under the Controlled Substances Act (CSA) pursuant to the temporary scheduling provisions of Title 21, U.S.C. § 811(h). The substances are (1-pentyl-l H-indol-3-yl )(2,2,3 ,3- tetrameth ylcyclopropy l)methanone (UR- 144), [1-(5-fluoro-pentyl)-1 H- indol-3-yl](2,2,3,3-tetramethylcyclopropyl)methanone (5- fluoro-UR-144, XLR l 1) and N-(l -adamantyl)-1-pentyl- l H-indazole-3-carboxamide (APINACA, AKB48). This action is based on a finding by the Deputy Administrator that the placement of these synthetic cannabinoids and their salts, isomers and salts of isomers into Schedule I of the CSA is necessary to avoid an imminent hazard to the public safety.

(*Id.* at 20-21).

21. AKB48 and 5F-AKB48 belong to a structural class with a core indazole structure. They are structurally related to other synthetic cannabinoids with a core indole structure, such as the Schedule I substances JWH-018 and AM2201. These core structures (scaffolds) are substituted at the 1- and 3-positions (R1 and R2, respectively) to give rise to these substances.   AKB48 and 5F-AKB48 were not previously reported in the scientific literature prior to their appearance on the designer drug market.   AKB48 is pharmacologically similar to Schedule I substances THC and various synthetic cannabinoids (e.g., JWH-018, AM2201 etc.). In vitro studies show that AKB48, similar to Δ9-THC and various synthetic cannabinoids, binds to the brain cannabinoid CB1 receptors and displays agonist properties in functional assays, suggesting that it would have the same in vivo effects as Δ9-THC and various synthetic cannabinoids.  The binding affinity

of AKB48 is higher than that of Δ9-THC. Based on structure-activity relationship studies, 5F-AKB48 is expected to bind to CB1 receptors as well. There are no published studies as to the safety of AKB48 or 5F-AKB48 for human use. AKB48 and 5F-AKB48 were not previously reported in the scientific literature prior to their appearance on the designer drug market. There are no commercial or medical uses for these substances. Information on user population in the U.S. is limited, and includes information from drug user internet forums. AKB48 and 5F-AKB48 abuse is not monitored by any national drug abuse surveys. Poison control centers continue to report adverse health effects in response to the abuse of herbal incense products. AKB48 is a schedule I controlled substances under the Federal Controlled Substances Act. If intended for human consumption, 5F-AKB48 may be treated as a "controlled substance analogue" under the CSA pursuant to 21 U.S.C §§802(32)(A) and 813.

(*Id.* at 21-22).

22. During this investigation, your agents and members of the investigative team were confronted with a new synthetic cannabinoid, AB-FUBINACA. Although AB-FUBINACA does not appear in Schedule I, your agents, through their research have determined that both AB-PINACA and AB-FUBINACA are cannabimimetic indazole-derivatives. These substances were identified as designer drugs in illegal products in Japan. According to the articles that discusses the discovery of the substances (Forensic Toxicol (2013) 31:93–100), the samples used for analysis were three products purchased via the Internet in July 2012 in Japan; one as a chemical and two as herbal products. Each of the herbal products (A and B) contained about 3g of mixed dried plants. The AB-FUBINACA was extracted and isolated out of the 3

gram sample of the herbal product B. According to Wikipdeia, AB-FUBINACA is a drug that acts as a potent agonist for the cannabinoid receptors and was originally developed by Pfizer in 2009 as an analgesic medication but was never pursued for human use. Subsequently in 2012, AB-FUBINACA was discovered as an ingredient in synthetic cannabis blends in Japan, along with a related compound AB-PINACA. (Even if this new substance is not determined to be a controlled substance analogue, manufacturing and distribution of this substance intended for human consumption without proper labeling is in violation of 21 U.S.C § 331.)

(*Id.* at ¶ 22, at 22-23).

36. An investigation was conducted for information relating to **MARK A. PALMER and ANTHONY L. PALMER,** their businesses **PAGGREGATE, LLC, NGURU, LLC and PALM CORP, LLC.** As a result of that investigation your agents determined the following:

   a. On March 6, 2013 at approximately 9:19 am, Department of Homeland Security (DHS), Customs and Border Protection (CBP) in Anchorage, Alaska, hereafter "CBP Anchorage", seized 3.09 Kilograms of AKB48 N-(5-fluoropentyl), a synthetic cannabinoid controlled substance analogue per DEA control # 7201, from a parcel inbound to the United States and previously detained on January 26, 2013. The parcel was addressed to **PAGGREGATE LLC** with a point of contact listed as **MARK PALMER** at 1138 Germantown Parkway, Cordova, Tennessee, 38016 from Deqing Shilin Yngsheng Co. LTD, in China with a point of contact listed as Liu Qi per waybill #8021-1433-7352. The parcel's contents were

9

manifested as "Sample of Antioxidant" and valued at $15.00 USD. Upon intensive examination on January 26, 2013 pursuant to CBP's border search authority derived from 19 CFR 162.6 and 19 USC 1467, CBP Anchorage discovered the parcel's contents to be a box labeled "product name: Antioxidant 1010" containing three (3) aluminum foil pouches that further contained three (3) clear PVC bags of an off-white powder. CBP Anchorage detained the parcel and sent a sample of its contents to the CBP laboratory in San Francisco, California. Upon the lab's determination of the sample as AKB48 N-(5-fluoropentyl), CBP Anchorage completed the seizure of the parcel on March 6, 2013. CBP Anchorage appraised the value of the 3.09 kilograms of AKB48 N-(5-fluoropentyl) to be $27,831.19 USD.

b. On April 23, 2013 at approximately 14:00 pm, Department of Homeland Security (DHS), Customs and Border Protection (CBP) in Chicago, Illinois, hereafter "CBP Chicago", seized 3.05 Kilograms of XLR -11 [1-(5-Fluoro-pentyl)1Hindol-3-yl](2,2,3,3-tetramethylcyclopropyl)methanone a synthetic cannabinoid controlled substance analogue per DEA control # 7011, from a parcel inbound to the United States and previously detained on April 23, 2013. The parcel was addressed to **TONY PALMER** at 4117 Hillsboro Pike, Nashville, Apt/Suite 103 - 363, Tennessee, 37215 from Firmenich Aromatics in China. The parcel's contents were manifested as "sodium tripolyphosphate same" with and undeclared value. Upon intensive examination on April 23, 2013 pursuant to CBP's border search authority derived from 19 CFR 162.6 and 19 USC 1467, CBP Chicago discovered the parcel's contents to be a 3.05 Kilograms of a light powder. CBP

10

Chicago detained the parcel and sent a sample of its contents to the CBP laboratory in Chicago, Illinois.  Upon the lab's determination of the sample as XLR            -11                   [1-(5-Fluoro-pentyl)1Hindol-3-yl](2,2,3,3-tetramethylcyclopropyl)methanone a synthetic cannabinoid controlled substance analogue per DEA control # 7011, CBP Chicago completed the seizure of the parcel on April 23, 2013.  Pursuant to CBP Chicago policy and procedures, the contraband contained in the mailing was summarily forfeited and subsequently destroyed on May 23, 2013.

(*Id.* at 30-32).

3.    On September 25, 2013, in this court, Special Agent House submitted his sworn written affidavit in support of his application for search warrants to search Storage Units F80, F-81, F-37, F-38, all at U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, Missouri, to seize certain identified items relating to the trafficking in controlled substances and controlled substance analogues.  (Nos. 4:13 MJ 7268, 7269, 7270, 7271).  This affidavit contained paragraphs with scientific information similar to those paragraphs quoted above in this Order and Recommendation.  (ECF No. 227, Ex. 3).  However, those paragraphs are not set out in this finding, because they are not specifically referenced by Dr. Kesselring, defendants' scientific expert whose declaration is filed by defendants in support of their motion for a *Franks* hearing. (ECF No. 227, Exs. 10 through 14).  Nevertheless, Agent House's affidavit in this search warrant matter is subject to the court's ultimate determination of defendants' motion for a *Franks* hearing.

4.    On September 30, 2013, in this court, Special Agent House submitted his sworn written affidavit in support of his application for search warrants to search Storage Units D17 and D21 at U-LOK STOR, Inc., 13789 St. Charles Rock Road, Bridgeton, Missouri (Nos. 4:13 MJ 6184, 6185), and Storage Unit E004 at PUBLIC STORAGE, 3760 Pennridge Drive, Bridgeton, Missouri (No. 4:13 MJ 6186), to seize certain identified items relating to the trafficking in controlled substances and controlled

substance analogues.   This affidavit contained paragraphs with similar scientific information as those paragraphs quoted elsewhere in this Order and Recommendation. (ECF No. 227, Ex. 3).  However, those paragraphs are not quoted in this finding, because they are not specifically referenced by Dr. Kesselring, defendants' scientific expert whose declaration is filed by defendants in support of their motion for a *Franks* hearing.  (ECF No. 227, Exs. 10 through 14).   Nevertheless, Agent House's affidavit in this search warrant matter is subject to the court's ultimate determination of defendants' motion for a *Franks* hearing.

    5.    On January 10, 2014, Internal Revenue Service Criminal Investigation Special Agent Robert J. Anderson submitted his affidavit (Gov. Ex. 2) in support of his applications for warrants to acquire from Yahoo! Inc. records and information relating to the use of the following email accounts:

    a.    email account bearing the address ******61@yahoo.com (No. 4:14 MJ 7001, ECF No. 1)  (Gov. Ex. 2).  On that day, the court issued a search warrant for all information relating to that account.  (*Id.* at ECF No. 2.)

    b.    email account bearing the address ******1971@yahoo.com (No. 4:14 MJ 7002, ECF No. 1).   On that day, the court issued a search warrant for all information relating to that account.  (*Id.* at ECF No. 2.)

    c.    In the affidavit filed in No. 4:14 MJ 7002 (ECF No. 1), Agent Anderson made the following statements that are relevant to defendants' motion arguments:

    25. XLR11 (also known as 5F-UR144 also known by the chemical name [1-(5-fluoropentyl)-1*H*-indol-3-yl](2,2,3,3- tetramethylcyclo-propyl)methanone), JWH-018, and AM2201 belong to a structural class of substances sharing a core indole structure. This core structure (scaffold) is substituted at the 1- and 3-positions (R1 and R2, respectively) to give rise to these substances. Behavioral pharmacology studies show that 5F-UR144 and XLR11, similar to JWH-018, have

Δ9-THC-like activity in animals.  In mice, these substances decrease overall activity, produce

analgesia, decreases body temperature, and produce catalepsy. Together, these four effects are

used by scientists to predict Δ9-THC-like psychoactivity in humans.  In drug discrimination

studies in mice, 5F-UR144 and XLR11 generalized to Δ9-THC similarly to JWH-018, i.e.

produced subjective effects similar to those of Δ9-THC. *In vitro* studies show that 5F-UR144 and

XLR11 bind to the brain cannabinoid receptor (CB1 receptor) similarly to JWH- 018 and

AM2201. There are no published studies as to the safety of 5F-UR144 or XLR11 for human use.

XLR11 was not previously reported prior to encountering on the designer drug market. There are

no commercial or medical uses for these substances.  Information on user population in the U.S.

is limited, and includes information from drug user internet forums. 5F-UR144 and XLR11 abuse

is not monitored by any national drug abuse surveys. Poison control centers continue to report

adverse health effects in response to the abuse of herbal incense products and this abuse is both a

public health and safety concern.  XLR11 is a schedule I controlled substances under the Federal

Controlled Substances Act.

(No. 4:14 MJ 7002, ECF No. 1, at 9-10).

6.     On April 10, 2014, in the United States District Court for the Middle District of Tennessee, U.S. Postal Inspector James V. O'Hanlon submitted his sworn written affidavit in support of his application for a search warrant to search International Express Mail Package EE931645513CN, to seize certain identified items relating to the trafficking in controlled substances and controlled substance analogues.  (M.D. Tenn. No. 14-2007).  This affidavit contained paragraphs with similar scientific information as those paragraphs quoted elsewhere in this Order and Recommendation.  (ECF No. 227, Ex. 6). However, those paragraphs are not quoted in this finding, because they are not specifically referenced by Dr. Kesselring, defendants' scientific expert whose declaration is filed by defendants in support of their motion for a *Franks* hearing. (ECF No. 227, Exs. 10 through 14).  Nevertheless, Postal Inspector O'Hanlon's affidavit in this search warrant

matter is subject to the court's ultimate determination of defendants' motion for a *Franks* hearing.

7.      On April 14, 2014, in the United States District Court for the Western District of Kentucky, Postal Inspector O'Hanlon submitted his sworn written affidavit in support of his application for a search warrant to search two specifically identified packages located at the UPS Store #5369 in Louisville, Kentucky, to seize certain identified items relating to the trafficking in controlled substances and controlled substance analogues.  (W.D. Ky. No. 3:14 MJ 196).  This affidavit contained scientific information similar to that contained in paragraphs quoted elsewhere in this Order and Recommendation.  (ECF No. 227, Ex. 7).  However, those paragraphs are not quoted in this finding, because they are not specifically referenced by Dr. Kesselring, defendants' scientific expert whose declaration is filed by defendants in support of their motion for a *Franks* hearing. (ECF No. 227, Exs. 10 through 14).   Nevertheless, Postal Inspector O'Hanlon's affidavit in this search warrant matter is subject to the court's ultimate determination of defendants' motion for a *Franks* hearing.

8.      a.      On June 6, 2014, Special Agent House submitted his affidavit (Gov. Ex. 3) in support of his application for a warrant to search the residence located at 21 Winding Stairway, O'Fallon, Missouri.   On that day the court issued the requested warrant to search for nine categories of items that included contraband controlled substances and controlled substance analogues, including synthetic cannabinoid products, substitute cathinone products, and materials used for trafficking in such contraband.  (*E.g.* 4:14 MJ 7119, ECF No. 2).

b.      In the affidavit filed in No. 4:14 MJ 7119, ECF No. 1, Agent House made the following statements that are relevant to defendants' motion arguments:

14.    PB-22 and 5F-PB-22 are two synthetic cannabinoids recently encountered on the designer drug market.  PB-22 and 5F-PB-22, JWH018 and AM2201 belong to a structural class of substances sharing a core indole structure.  This core structure (scaffold) is substituted at the

1- and -3 positions to give rise to these substances.  Behavioral pharmacology studies show that JWH-018 has activity in animals similar to that of $\Delta 9$ – THC but with higher affinity and efficacy than $\Delta 9$ – THC, suggesting that it would have the same effects as $\Delta 9$ – THC *in vivo*. Based on the structure-activity relationship studies, PB-22 and 5F-PB-22 are expected to have similar effects.  PB-22 and 5F-PB-22 were not previously reported prior to their appearance on the designer drug market and there are no commercial or medical uses for these substances. Medical examiners and postmortem toxicology reports demonstrate the involvement of 5F-PB-22 in the death of at least five individuals.  Prior to February 10, 2014, PB-22 and 5F-PB-22, if intended for human consumption, may have be treated as a "controlled substance analogue" under the CSA pursuant to 21 U.S.C §§802(32)(A) and 813.  On February 10, 2014, the Deputy Administrator of DEA issued a final order to temporarily schedule PB-22 and 5F-PB-22 under the Controlled Substances Act (CSA) pursuant to the temporary scheduling provisions of Title 21 U.S.C. §811(h).

(No. 4:14 MJ 7119, ECF No. 1, at 10-11).

      9.      On June 11, 2014, in this United States District Court, Special Agent House submitted his sworn written affidavit in support of his application for search warrants to search Storage Units G730 and I606 at the Ample Storage Facility in St. Charles, Missouri, to seize certain identified items relating to the trafficking in controlled substances and controlled substance analogues.  (Nos. 4:14 MJ 6111, 6112).  This affidavit contained paragraphs with similar scientific information as that contained in paragraphs quoted elsewhere in this Order and Recommendation.  (ECF No. 227, Ex. 8). However, those paragraphs are not quoted in this finding, because they are not specifically referenced by Dr. Kesselring, defendants' scientific expert whose declaration is filed by defendants in support of their motion for a *Franks* hearing. (ECF No. 227, Exs. 10 through 14).  Nevertheless, Postal Inspector O'Hanlon's affidavit in this search warrant matter is subject to the court's ultimate determination of defendants' motion for a *Franks* hearing.

15

## CONCLUSIONS OF LAW

At issue is the legal sufficiency of several search warrants issued by this district court and other district courts by which evidence, subject matter of the indictment's allegations, was seized.   Defendants argue that certain statements in the affidavits supporting these search warrants were made with reckless disregard for the truth.   They argue that they are therefore entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), and that these statements should be removed from consideration of the supporting affidavits.   Once removed, defendants argue that the remaining statements in the affidavits do not support the finding of probable cause required under the Fourth Amendment.   They move to suppress the evidence seized under these warrants, and other evidence as fruit of the poisonous tree.

## 1.  Defendants' Motion for a *Franks* Hearing

The Fourth Amendment protects against "unreasonable" searches and seizures, and it vindicates this goal with the mandate that "[n]o warrants shall issue, but upon probable cause, supported by Oath or affirmation."   U.S. Const. amend. IV.   The probable cause requirement is normally satisfied by an affidavit executed by an investigating officer.   *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983).   Probable cause exists if, "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*

In *Franks v. Delaware*, the Supreme Court established a two-part rule by which defendants might overturn the probable cause findings of the subject search warrants. 438 U.S. at 171.   To obtain relief under *Franks*, a defendant must make "a substantial preliminary showing" that (1) the affiant deliberately or recklessly included a false statement or misleading omission in the warrant affidavit and (2) the allegedly false statement or omission is necessary for a finding of probable cause.   *Franks*, 438 U.S. at 155-56; *United States v. Smith*, 581 F.3d 692, 695 (8th Cir. 2009).   To determine that an affiant recklessly included a false statement or made a misleading omission, "the test is

16

whether, after viewing all the evidence, that affiant must have entertained serious doubts as to the truth of his statement or had obvious reasons to doubt the accuracy of the information he reported." *United States v. McIntyre*, 646 F.3d 1107, 1113-14 (8th Cir. 2011) (citations omitted).   A showing of mere negligence or an innocent mistake is insufficient.  *United States v. Mashek*, 606 F.3d 922, 928 (8th Cir. 2010).

This substantial showing "is not lightly met."  *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998).  "A mere allegation standing alone, without an offer of proof in the form of a sworn affidavit of a witness or some other reliable corroboration, is insufficient to make the difficult preliminary showing." *Id*.

The affidavits supporting the warrants in this case contain multiple scientific statements by law enforcement agents.   Defendants argue they are entitled to a *Franks* hearing because (1) the law enforcement affiants were not qualified to make these statements and (2) the affidavits contained statements and omissions that were false, inaccurate, or misleading about facts necessary to establish probable cause.

### a.   The Affiants' Scientific Qualifications Are Irrelevant

As to the first, more general allegation, the defendants note that the agents' qualifications listed in the affidavit do not include "relevant training in identification of controlled substance analogues or cannabimimetic agents," but only experience and training in investigating drug transportation and trafficking and "narcotics-based economic crime."  (ECF No. 224 at 6).  Defendants challenge paragraphs 16-22[2] of an example affidavit as misleading because a person without formal scientific training "would not have sufficient knowledge or understanding to reach the scientific conclusions set forth in [these paragraphs]."  (ECF No. 224 at 7).  Defendants corroborate this assertion with the sworn declaration of chemist Allen S. Kesselring, Ph.D.  (ECF No. 227, Ex. 12).   While defendants' assertion is supported by an offer of proof, for the

---

[2] Styled as paragraphs "A-G" in Defendants' motions and exhibits.  (ECF Nos. 224, 227).

reasons below, the undersigned concludes that defendants have not made the substantial showing required by *Franks*.

The Supreme Court has held that a probable cause warrant proceeding seeks to determine "not guilt beyond reasonable doubt but probable cause for believing the occurrence of a crime[.]" *United States v. Harris*, 403 U.S. 573, 584 (1971). Indeed, "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Gates*, 462 U.S. at 235. Whether law enforcement affiants are qualified to determine if the chemical structures of substances are, in fact, substantially similar to controlled substances is irrelevant. The agents only need to provide the issuing judge with "probable cause" that the substances were substantially similar to controlled substances.

Probable cause is a "fluid concept." *Gates*, 462 U.S. at 238-39. Determining whether probable cause supports a warrant is a "practical, common-sense decision," not one that rests on expert testimony or cross-examination. *See Harris*, 403 U.S. at 584. It is not even a decision that rests on the limitations of the rules of evidence. *Id.*[3] Instead, it is the product of a totality-of-the-circumstances analysis, in which the veracity and basis of knowledge of the person making the supporting affidavit are factors a judge considers in issuing a warrant. *Gates*, 462 U.S. at 238. Accordingly, there is no *Daubert*-like inquiry. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993).

Other courts have reached this conclusion on similar challenges. The District of Nevada rejected a defense claim that a law enforcement affidavit alleging distribution of controlled substance analogues was invalid because it was not supported by an affidavit

---

[3] *See also Brinegar v. United States*, 338 U.S. 160, 174 n. 12 (1949) (citing 1 Wigmore, Evidence 19 (3d ed. 1940) ("The inappropriateness of applying the rules of evidence as a criterion to determine probable cause is apparent in the case of an application for a warrant before a magistrate, the context in which the issue of probable cause most frequently arises. The ordinary rules of evidence are generally not applied in ex parte proceedings, partly because there is no opponent to invoke them, partly because the judge's determination is usually discretionary, partly because it is seldom final, but mainly because the system of Evidence rules was devised for the special control of trials by jury.").

from a trained chemist. *United States v. Riley,* 2014 WL 537013, at *3 (D. Nev. Feb.7, 2014). That court reasoned that the law enforcement officers, "[a]s members of federal agencies tasked with enforcing the drug laws, were qualified to make [the probable cause] assessment." *Id.* On a similar claim, the Western District of Virginia held that "[f]or purposes of a search warrant, law enforcement does not need to definitely prove that the substances at issue were indeed controlled substance analogues, but merely to show that there is a "fair probability" that they are." *United States v. Stephens*, 2014 WL 4955713, at *3 (W.D. Va. Oct. 1, 2014).

The law enforcement affiants in this case had extensive training and experience in general narcotics investigations as well as synthetic cannabinoid investigations. (*E.g.*, Gov. Ex. 1, at 1, 14-15). The officers may not have had training in organic chemistry or molecular structure, but they attested that they researched various synthetic cannabinoids and relied on materials produced by the DEA Office of Diversion Control (*id.* at 15), the DEA Deputy Administrator (*id.* at 16), drug user internet forums (*id.* at 17), Wikipedia (*id.*), and several unidentified studies and surveys (*id.* at 16-17). While these sources might not survive a *Daubert* hearing, they could provide a basis to support the affiants' scientific statements to a "fair probability." The record discloses no reason to doubt the officers' ability to rely on these materials, in addition to their experience, in communicating this probable cause information. The record does not indicate any basis for concluding that the law enforcement affiants entertained serious doubts about the truth and accuracy of the information they submitted.

Accordingly, defendants' challenge to these statements based on the affiants' perceived lack of sufficient scientific training is without merit.

### b.  The Affidavits Do Not Contain False Statements Or Omissions

The court now turns to the specific statements that defendants challenge as entitling them to a *Franks* hearing. Defendants identify two omissions and three affirmative statements they argue were made with a reckless disregard for the truth.

19

i.  Omissions as to AKB48 and 5F-AKB48

First, defendants dispute the affidavit's statement that AKB48 and 5F-AKB48 "are structurally related to other synthetic cannabinoids with a core indole structure, such as Schedule I substances JWH-018 and AM2201."  (ECF No. 227, Ex. 2-I, ¶ 21).  They argue that the affidavit omits these material facts:

(a) that "structurally related" is an undefined term without a precise scientific meaning (*id.* at Ex. 12, ¶ 7); and

(b) that AKB48 and 5F-AKB48 do not fall within any of the five classes of compounds formally defined as cannabimimetic agents in 21 U.S.C. § 812.  (ECF No. 224 at 7-8).

Quoting Dr. Kesselring, defendants argue that these omissions make the affidavit misleading, because the unqualified statements in the affidavit suggest that a similar structural relationship alone makes a substance "substantially similar to" controlled substances:

> To conclude that AKB48 and 5F-AKB48 are controlled substance analogues of JWH-018 and AM2201 on that basis [(that they have a similar structural relationship to schedule I substances)] would be to say that "structurally related" is sufficient to meet the § 802(32)(A)(i) criteria of "substantially similar to".  If this were scientifically true (which it is not), then the common and essential amino acid tryptophan, having structural relation to several schedule I controlled substances, could be considered a controlled substance analog on the same basis (which it is not).

(ECF No. 227, Ex. 12, ¶ 7.).

Recklessness as to the truth of a statement "may be inferred . . . when the material omitted would have been clearly critical to the finding of probable cause."  *United States v. Williams*, 477 F.3d 554, 559 (8th Cir. 2007) (citations omitted).  The affidavit provides the statutory language of § 802(32)(A)(i) requiring "substantial" similarity in chemical structure.  (ECF No. 227, Ex. 2-I, ¶ 13).  The affidavit does not state that AKB48 and 5F-AKB48 are substantially similar to controlled substances.  The affidavit states only that (1) these substances are "structurally related" to other synthetic cannabinoids recognized as Schedule I substances and (2) these substances are the result of certain substitutions in

20

the core structures of Schedule I substances.  The omissions complained of are fairly implied in the statements made; that is, if AKB48 and 5F-AKB48 were within the formally defined classes of compounds in § 812, it would be expected that this would be stated.  The fact that this assertion was not made in the affidavit fairly implied to the issuing judge that these substances were outside of the statutory classes.  Even if the affidavit had explicitly stated the substances were not formally defined as cannabimimetic agents, rather than only alluding to this fact, this would not have been fatal to a finding of probable cause.

Furthermore, structural similarity is not the end of the analysis under § 802(32)(A).  That provision defines a "controlled substance analogue" as a substance:

(i)     the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;

(ii)    which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or

(iii)   with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

21 U.S.C. § 802(32)(A).  Even if this court were to find that the affidavit's use of the term "structurally related" was misleading, the affidavit supporting the warrant also states that AKB48 and 5F-AKB48 have similar effects on the central nervous system as Schedule I substances, which satisfies an alternative prong of § 802:

In vitro[4] studies show that AKB48, similar to Δ9-THC and various synthetic cannabinoids, binds to the brain cannabinoid CB1 receptors and

---

[4] "Pertaining to a biological reaction taking place in an artificial apparatus."  McGraw-Hill Dictionary of Scientific and Technical Terms (6th ed. 2003), *available at* http://www.accessscience.com/search?q=in+vitro.

displays agonist[5] properties in functional assays, suggesting that it would have the same in vivo[6] effects as Δ9-THC and various synthetic cannabinoids.  The binding affinity of AKB48 is higher than that of Δ9-THC.  Based on structure-activity relationship studies, 5F-AKB48 is expected to bind to CB1 receptors as well.

(ECF No. 227, Ex. 2-I, ¶ 21).  The affidavit notes that there are no published studies about the use of these substances for commercial or medical purposes.

A defendant seeking a *Franks* hearing must show that the allegedly false statement or omission "is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-56. Even if the omissions about the chemical structures were misleading, which the undersigned does not find, the challenged statements would not be necessary to the finding of probable cause.  The affidavit provides other sufficiently reliable, independent information from which a judge could find there was a fair probability these substances were analogue drugs because of their purported effects on the nervous system.      For

For these reasons, defendants are not entitled to a *Franks* hearing on this argument.

### ii.  Omissions as to AB-PINICA and AB-FUBINACA

Defendants make similar arguments as to the affidavit's statement that "AB-PINICA and AB-FUBINACA are cannabimimetic indazole-derivatives."  (ECF No. 227 Ex. 2-I, ¶ 22).  Relying on the testimony of Dr. Kesselring, they argue that this statement is misleading because it omits the fact that AB-PINICA and AB-FUBINACA are not within any of the defined structural classes of 21 U.S.C. § 812.  (*Id.* at Ex. 12, ¶¶ 6, 9, 14, 17, 19).

For reasons similar to those discussed previously, the undersigned does not find that this omission was necessary to a finding of probable cause.  The structural classes

---

[5] "A drug or other substance that combines with a receptor to produce a specific physiological effect."  OED ONLINE (September 2016), *available at* http://www.oed.com/view/Entry/4096?redirectedFrom=agonist.

[6] "Pertaining to a biological reaction taking place in a living cell or organism." MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS (6th ed. 2003), *available at* http://www.accessscience.com/search?q=in+vivo.

listed in 21 U.S.C. § 812, Schedule I (d)(2)(A) are part of a schedule of already-identified controlled substances.  Because the affidavit states that the substances in question are analogues (ECF No. 227, Ex. 2-I, ¶ 22), the fact that they do not have the same chemical makeup as the "cannabimimetic agents" defined in Schedule I is not dispositive.  Indeed, the affidavit states that AB-FUBINACA is "a new synthetic cannabinoid."  (*Id.*)  It cites a journal article, "Forensic Toxicol (2013) 31:93-100," which identifies these substances as "cannabimimetic indazole derivatives" used in illegal designer drugs in Japan.  (*Id.*)  This is not inconsistent with the omitted statement.  A substance can still be considered a controlled substance analogue without being within a recognized structural class of cannabimimetic agents.  21 U.S.C. § 802(32)(A).  Had the affidavit affirmatively stated that AB-PINICA and AB-FUBINACA were not in the structural classes of cannabimimetic agents, the issuing judge could still find by a fair probability that the substances were new analogue drugs not yet listed in the schedule but structurally similar under the definition of § 802.

Additionally, even if the undersigned were to find that the omission was misleading (which the undersigned does not find), the affidavit states that manufacturing and distribution of this substance without proper labeling, when intended for human consumption, violates 21 U.S.C. § 331.  (*Id.*)  This is an independent basis upon which the finding of probable cause could have been made.

For these reasons, this argument is insufficient to support entitlement to a *Franks* hearing.

### iii.  References to "R1" and "R2"

Defendants also challenge the affidavits' references to "R1" and "R2" in ¶ 21 of the "Orchard Drive" affidavit and ¶¶ 24 and 25 of the "Yahoo Email" affidavit.  (ECF No. 227, Ex. 12, ¶¶ 11, 15, 20).  In chemical illustrations, "R" functions as a placeholder and can represent a variety of chemical chains.  *See, e.g., United States v. Fedida*, 942 F. Supp. 2d 1270, 1278 (M.D. Fla. 2013) for an illustration of the use of "R."  The affidavits at issue state that:

AKB48 and 5F-AKB48 . . . are structurally related to other synthetic cannabinoids with core indole structure, such as the Schedule I substances JWH-018 and AM2201.    These core structures (scaffolds) are substituted at the 1- and 3- positions (*R1 and R2, respectively*) to give rise to the substances.

(ECF No. 227, Ex. 2-I, ¶ 21; Ex. 5-A, ¶ 24) (emphasis added).   The Yahoo Email affidavit also provides that "XLR11 . . . JWH-018, and AM2201 belong to a structural class of substances sharing a core indole structure.   This core structure (scaffold) is substituted at the 1- and 3- positions (*R1 and R2, respectively*) to give rise to these substances."   (*Id.* at Ex. 5-A, ¶ 25) (emphasis added).

Defendants argue that using the R1 and R2 references in the affidavit without a corresponding structural illustration requires the reader to make misleading assumptions regarding the substitution positions of R1 and R2.    (ECF No. 224 at 9).   While an illustration might have been helpful to the issuing judges, defendants do not argue that this statement is not truthful or even that it is misleading as to its truth.   Defendants only argue that it is misleading as to the qualifications of the affiant.   They state that the fact that the affiant made this statement suggests that the affiant likely did not understand the information.   However, this is not the test for a *Franks* hearing.   Dr. Kesselring states that these statements "appear to be drawn from sources that [the agent] does not cite and which presumably he did not author.   I believe this to be the case because by conducting internet searches, I found text of documents that closely matched the text of the affidavit."   (ECF No. 227, Ex. 12, ¶ 11).   The undersigned does not find that the record indicates the affiant must have entertained serious doubts as to the truth of this statement or had obvious reasons to doubt the accuracy of this information.   At most, it might have been negligent for the affiant to restate the analysis of other scientific sources without naming those sources or providing more context.   This does not rise to reckless disregard for the truth and does not entitle defendants to a *Franks* hearing.

Furthermore, and as discussed in detail above, even if the challenged statements were omitted, the affidavits provide additional information as to the substances' pharmacological effects.   (ECF No. 227, Ex. 2-I, ¶ 21; Ex. 5-A, ¶¶ 24 and 25).   This would provide the issuing judge an independent basis from which to find probable cause

that the substances were analogue drugs under § 802(32)(A)(ii) because of their effects on the central nervous system.

### iv.  Citations to DEA Control Number 7201

Defendants also challenge the following statement made by a law enforcement affiant: "[o]n March 6, 2013 at approximately 9:19 am, Department of Homeland Security . . . seized 3.09 Kilograms of AKB48 N-(5-fluoropentyl), a synthetic cannabinoid controlled substance analogue per DEA control #7201[.]"  (ECF No.227 Ex. 2-I, ¶ 36(a)).  DEA control number 7201 concerns the substance AM2201.  (ECF No. 227, Ex. 12, ¶ 10).  Defendants rely on Dr. Kesselring's chemical expertise in arguing that labeling 5F-AKB48 as a controlled substance analogue of AM2201 is "incorrect" and a "material misstatement of a substance's status as an analogue."  (ECF No. 224 at 10).  However, the government explains that the affidavit should have referenced DEA control number 7048, which identifies AKB48 as a controlled substance analogue.  The defendants do not establish that 5F-AKB48 is not a controlled substance analogue of AKB48.  The record indicates that this statement is at most an innocent or negligent mistake, not the product of deliberate or reckless disregard for the truth.  It therefore cannot entitle the defendants to a *Franks* hearing.

### v.  Citations to Wikipedia

Finally, defendants argue that the affiant's reference to Wikipedia in paragraph 22 of the Orchard Drive affidavit "cannot be properly construed as anything short of reckless."  (ECF No. 224 at 11).  The affidavit states: "[a]ccording to Wikipedia, AB-FUBINACA is a drug that acts as a potent agonist for the cannabinoid receptors and was originally developed by Pfizer in 2009 as an analgesic medication but was never pursued for human use."  (ECF No. 227, Ex. 2-I, ¶ 22).  While the court is sensitive to the rights of individuals to be protected from warrants "based upon snippets of unverified information from the internet," (ECF No. 224 at 11), at bottom, this is a question of the integrity of the affidavit.  *Franks*, 438 U.S. at 171.

The undersigned does not find that the citation to Wikipedia, alone, renders the affiant's statements reckless with regard to the truth.  The defendants do not claim that this is a false statement (i.e. that AB-FUBINACA does *not* act as a potent agonist for the cannabinoid receptors or that the substance *was indeed* pursued for human use).  Defendants cannot claim that the affiant tried to hide his reliance on Wikipedia.  Defendants merely argue that a warrant's reliance on Wikipedia is a per se showing of reckless disregard for the truth.  While Wikipedia content may be edited by anyone with internet access, whatever their qualifications (ECF No. 227, Ex. 14), the web-based encyclopedia can still provide accurate information.  Indeed, the Eighth Circuit has cited Wikipedia as if it were a traditional encyclopedia.  *See United States v. Bazaldua*, 506 F.3d 671, 673 n. 2 (8th Cir. 2007).  In the instant case, moreover, the contested Wikipedia article cited Pfizer's own patent on the substance to support its conclusions about AB-FUBINACA's uses and effects.  (ECF No. 227, Ex. 14-A).

Accordingly, defendants have not met the substantial showing required for a *Franks* hearing in any respect.  Defendants fail to argue, yet alone demonstrate, that the affidavits were misleading as to the substance of what was stated.  Defendants' concern with the affiants' technical training is misplaced.  Defendants have failed to show that the law enforcement affiants had reason to believe or know that any of the statements or omissions they made were misleading.  Additionally, even if the court were to accept any or all of the statements as false and known to the affiants, there are a number of alternative bases upon which a judge could have found probable cause to issue the warrants.

## II.  Defendants' Motions to Suppress

In ruling on a motion to suppress, "the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed."  *Gates*, 462 U.S. at 238-39 (citations omitted).  The issuing judge is accorded great deference in her determination that the affidavits established probable cause.  *Id.*  The sufficiency of a search warrant affidavit is examined using a "common sense and not

a hypertechnical approach." *United States v. Grant*, 490 F.3d 627, 632 (8th Cir. 2007) (citations omitted).

Probable cause is determined based on "the information before the issuing judicial officer."  *United States v. Smith*, 581 F.3d 692, 694 (8th Cir. 2009) (citations omitted). That is, when the issuing judge has relied solely upon the supporting affidavit to issue the warrant, the existence of probable cause depends on whether in "the four corners of the affidavit" there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005).

Defendants' motion to suppress evidence in this case is entirely predicated on the court finding that defendants are entitled to *Franks* relief.  (ECF No. 225 at 2, 6-20). They only argue that there is a lack of probable cause when the contested language is removed and they do not challenge the investigative facts in the affidavits.  (*Id.*)  The undersigned concludes that defendants are not entitled to a *Franks* hearing and that the challenged statements should not be removed.  But even if the court makes a determination to the contrary, the affidavits nevertheless provide substantial bases for the findings of probable cause.

### a.  Search of Box #327 at UPS Store #869

The affidavit supporting the warrant to search UPS Store #869 and seize "all parcels, packages and mail addressed to [Tony or Mark Palmer] found in, for and/or around Box #327" (ECF No. 227, Ex. 1) contains sufficient information to support a finding of probable cause, even absent the contested statements.  It details the special agent affiant's experience and training in narcotic trafficking, including synthetic drug investigations.  (*Id.* at ¶ 1). Even if the court were to strike the affiants' scientific assertions in paragraphs 9-11, 21-23, 30a, and 30b, the affidavit still details the shipment of several suspicious international packages to Mark and Tony Palmer, some of which contained confirmed illegal substances.  For example, even if the court does not consider the package addressed to Mark Palmer containing AKB48 (because the DEA control number is inaccurate), the affidavit describes two other packages addressed from China

27

to defendant Troy Palmer that both contained XLR-11, a scheduled synthetic cannabinoid (according to an accurate DEA control number).  (*Id.* at ¶ 20).  Upon investigation, a chemical in another package shipped to Tony Palmer at the UPS store in question was identified as Pentaerythritol, a substance possibly used in the production of methamphetamine.  (*Id.* at ¶¶ 17-18).  The underlying affidavit also discusses "trash runs" at a business complex frequented by Mark and Tony Palmer, which resulted in the seizure of invoices, price lists, emails, and international shipping labels and packaging addressed to the Palmers and consistent with the manufacture of synthetic drugs.  (*Id.* at ¶ 28).  Finally, the affiant describes his personal experience in synthetic drug investigations regarding techniques used to ship and manufacture synthetic illicit drugs.  (*Id.* at ¶ 29-30).  The packages shipped to the Palmers at the UPS store in question exhibited many of these techniques.  According the issuing judge great deference, these facts are sufficient to establish by a fair probability that contraband or evidence of a crime would be found in the defendants' UPS box.

### b.  Searches of St. Peters and Bridgeton, Missouri Properties

The affidavits supporting the warrants to search Charles (Chuck) Wolfe's various properties in St. Peters, Missouri, and Bridgeton, Missouri, contain sufficient information to support a finding of probable cause, even if the contested statements in paragraphs 16-23, 30a, 30b, and 51 are stricken.  (ECF No. 227, Ex. 2-A to 2-H).  The affidavit still includes information about the suspicious packages and the trash runs discussed above.  (*Id.* at Ex. 2-I, ¶¶ 30-36).  It contains further details about the suspicious packages found as a result of the search of UPS Store #869, which contained confirmed synthetic drug JWH-018.  (*Id.* at ¶ 35).  Additionally, the affidavit discusses a traffic stop of John Galvin, who stated he had been working for Chuck Wolfe for approximately one and a half years; whose car had been observed at several of the Bridgeton, Missouri properties in question; who stated that he had delivered "aroma products" commonly known as "K2" on behalf of Wolfe; and who was carrying over 150 packets of substances identified elsewhere in the affidavit as XLR11, on the DEA's list of illegal analogues.  (*Id.* at ¶¶ 20,

39, 43).   The affidavit also details Wolfe's frequent communications with retail distributors of synthetic narcotics, as well as payments of large sums of money made to the Palmers.  (*Id.* at ¶ 41).  This is sufficient probable cause to search the Bridgeton commercial properties and St. Peters residential property, as each were owned or managed by Wolfe.  (*Id.* at ¶ 2).

### c.  Searches of Bridgeton, Missouri Storage Units

The affidavits supporting the warrants to search storage units controlled by Mark Palmer and Chuck Wolfe contain sufficient information to support a finding of probable cause, even if the contested statements in paragraphs 16-22 are stricken.  (ECF No. 227, Exs. 3-A to 4-C).  The affidavits discuss the suspicious packages, trash runs, and traffic stop of John Galvin as described above, and they also include details about a criminal informant's order to Cindy McRoberts.  (*Id.* at Ex. 4-A, ¶¶ 27-34).  The package received based on the order to McRoberts contained a number of illegal analogues, and it came in a FedEx envelope from Paggregate, Mark Palmer's drug distribution company.  (*Id.* at ¶¶ 28-29).  Additionally, the affidavits describe the search of a property with utility bills in Mark Palmer's or Paggregate's name, and which was found to contain a synthetic drug manufacturing facility.  (*Id.* at ¶ 35).  According the issuing judge great deference, these facts provide sufficient probable cause to search the storage units.

### d.  Search of Yahoo Email Addresses

The affidavits supporting the warrants to search two email addresses attributed to Chuck Wolfe contain sufficient information to support a finding of probable cause, even if the contested statements are stricken.  (ECF No. 227, Ex. 5-A to 5-B).  The affidavits still provide that certain compounds were "emergency scheduled" by the DEA in March 2011, and "temporarily scheduled" in May 2013.  (*Id.* at Exs. 5-A, ¶ 19-22; Ex. 5-B, ¶ 19-22).  The affidavits detail emails found during the execution of other search warrants. (*Id.* at Ex. 5-A, ¶¶ 37-39; Ex. 5-B, ¶¶ 37-39).  These emails discuss changes in legislation related to synthetic cannabinoids and how the changes applied to Wolfe's products.  (*Id.*

at Ex. 5-A, ¶¶ 37-39; Ex. 5-B, ¶¶ 37-39).  These emails were associated with Wolfe's bank accounts and were allegedly used to make orders of synthetic drug products and accept orders for synthetic drug distribution.  (*Id.* at Ex. 5-A, ¶¶ 39-41, 51; Ex. 5-B, ¶¶ 39-41, 51).  The affidavits attach emails to and from these addresses that appear to be orders of narcotics.  (*Id.* at Ex. 5-A, ¶ 51; Ex. 5-B, ¶ 51).  Finally, the affidavit relates the affiant's experience in narcotics-based economic crime.  (*Id.* at Ex. 5-A, ¶¶ 52-61; Ex. 5-B, ¶¶ 52-61).  According great deference to the issuing judge, these facts were sufficient to justify issuing a search warrant for the email addresses.

### e.  Searches of Packages at UPS Stores #2863 and #5369

The affidavits supporting the warrants to search packages at UPS Stores #2863 and #5369 contain sufficient information to support a finding of probable cause, even absent the contested statements.  The affidavits discuss the suspicious packages addressed to the Palmers at other UPS stores described in other affidavits, as described above, and they also detail supporting evidence found when executing earlier warrants the undersigned has concluded were based on probable cause.  (ECF No. 227, Ex. 6, ¶¶ 23-27; Ex. 7, ¶¶ 23-27).  Packages addressed to Tony Palmer at UPS Store #869 were found to contain JWH-018, which the affidavits describe as being scheduled since March 1, 2011.  (*Id.* at Ex. 6, ¶¶ 16, 23-27; Ex. 7, ¶¶ 16, 23-27).  The affidavits also describe the synthetic drug manufacturing facility discovered in a previous investigation, and based on evidence seized from the Palmer's offices, list the boxes that the Palmers leased at various UPS stores in the Midwest.  (*Id.* at Ex. 6, ¶¶ 28-30; Ex. 7, ¶¶ 28-30).

These facts provide sufficient probable cause to search the packages delivered to those boxes.

### f.  Searches of St. Charles, Missouri Storage Units

Even if the challenged statements were removed, the affidavits supporting the warrants to search the St. Charles, Missouri storage units provide sufficient independent facts upon which the issuing judge could find probable cause.  The affidavits detail the

evidence found upon the searches of the Bridgeton, Missouri properties and the Barnhart, Missouri property used as a drug manufacturing facility.  (ECF No. 227, Ex. 8-A, ¶ 19). The affidavit states that the synthetic drugs found on these locations contained scheduled substances JWH-018, 5F-PB-22, PB-2, XLR-11, and AB-Fubinaca.  (*Id.* at ¶¶ 8, 10, 11, 14, 15, 19).   The affidavit also details evidence supporting a search warrant for the residence of Joseph Gabrick, who was working with Chuck Wolfe in his manufacturing and distribution of synthetic marijuana.  (*Id.* at ¶ 22-40).  In Gabrick's residence, agents found storage rental agreements in a file drawer behind business records for a drug distribution LLC (*e.g.*, invoice books and un-deposited checks for products like "Head Trip," elsewhere identified as containing scheduled controlled substances).  (*Id.* at ¶¶ 26, 49).

The affidavit also describes an interview with the owner of the storage facility, who confirmed that Gabrick had rented unit I606 and who stated he also seemed to be associated with the individuals who rented unit G730.  (*Id.* at ¶¶ 50-51).  Unit G730 was in the name of James Wolfe, and the owner had noticed that James Wolfe was accompanied by another individual who had a bag on his side.  (*Id.*)  The affidavit states that based on the investigation, the agents know that Chuck Wolfe has a colostomy bag. (*Id.*).  The owner of the storage facility stated that James Wolfe had told him Joseph Gabrick would probably be moving his stuff from I606 to G730.  (*Id.*)  The owner stated that James Wolfe had wanted a climate controlled unit because "it would be cooler when they assembled things."  (*Id.*)  The agents then viewed video surveillance and confirmed that Joseph Gabrick and Chuck Wolfe were using the units at the dates and times the owner of the facility had said.  (*Id.* at ¶ 52).

These facts were sufficient for the issuing judge to conclude that there was a fair probability contraband would be found at the storage units in question.

### g.  Search of O'Fallon, Missouri Property

This affidavit contains sufficient facts independent of the challenged statements to support a finding of probable cause to search Joseph Gabrick's residence.  It details

Gabrick's communications with Chuck Wolfe and Mark Palmer: Gabrick and Wolfe shared office and storage space, Palmer invoiced Wolfe and Gabrick for a number of drugs containing scheduled substances, and agents found copies of checks written by Gabrick payable to Palmer's company.  (ECF No. 227, Ex. 9, ¶ 20-21).  The affidavit describes June 2013 emails between Gabrick and Wolfe containing lab reports for the products at issue.  For example, "Head Trip" and "Night Train" were reported to contain PB-22 and 5F PB-22.  (*Id.* at ¶ 24).  The affidavit states the DEA scheduled these substances in February 2014 but treated them as controlled substance analogues prior to that time if they were intended for human consumption.  (*Id.* at ¶ 24 n.1).  The affidavit describes the bank records of Blue Sky Solutions, LLC, Gabrick's business-front, which had over 2.3 million dollars-worth of deposits over a ten-month period.  (*Id.* at ¶¶ 25-27).  The affidavit also details the agents' interview with Mohammad Al Sharairei, who distributed synthetic drugs purchased from Wolfe.  (*Id.* at ¶¶ 29-41).  Al Sharairei stated that he had made orders of synthetic drugs through Gabrick and identified Gabrick in a photographic line-up.  (*Id.*)  The affidavit also details trash runs at Gabrick's residence in O'Fallon, Missouri.  (*Id.* at ¶ 42).  This evidence included several hundred feet of the paper sticker backing for product labels, direction-for-use labels, and size labels used in the manufacturing of synthetic drugs; invoices for several thousand packages of synthetic drugs; and a purchase order and envelope for several hundred packages of synthetic drugs.  (*Id.*)

Accordingly, the undersigned concludes that the subject affidavits provided each issuing judge with a substantial basis for finding probable cause.

## ORDER AND RECOMMENDATION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that the motion of the government for a pretrial determination of the admissibility of arguably suppressible evidence (ECF No. 60) is **DENIED AS MOOT**,

**IT IS HEREBY RECOMMENDED** that the separate general motions of defendants Charles Wolfe, Samuel Leinicke, Mark Palmer, and Robert Wolfe to suppress evidence (ECF Nos. 64, 67, 73, and 76 respectively) be **DENIED.**

**IT IS FURTHER RECOMMENDED** that the joint motion of defendants for a hearing under *Franks v. Delaware* (ECF No. 224) be **DENIED.**

**IT IS FURTHER RECOMMENDED** that the joint motion of defendants to suppress evidence (ECF No. 225) be **DENIED.**

The parties have until November 22, 2016, to file documentary objections to this Order and Recommendation.  Failure to file timely, documentary objections may waive the right to appeal issues of fact.


　　　　　　　　　　　　　　／s/ David D. Noce　　　　　　　　
**UNITED STATES MAGISTRATE JUDGE**

Signed on November 4, 2016.

33